IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

_____

No. 22-11273-A

_____

UNITED STATES OF AMERICA

Appellee,

vs.

JAVIER SANCHEZ MENDOZA, JR.

Appellant.

_____

DIRECT APPEAL FROM A CONVICTION
IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA

_____

# APPENDIX

_____

Scott G. Reddock
Scott G. Reddock Attorney at Law,
LLC
Georgia Bar No. 476162
111 West Court St. Suite B
Hinesville, GA 31313
912.332.7077
reddgeg@aol.com
Attorney for Appellant

## INDEX

District Court Docket Sheet . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .Dkt

Information . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .1

Judgment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

Sentencing Transcript . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .46

PSI and Addendum . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . SEALED

# DKT

District Court Docket Sheet

APPEAL,CLOSED,INTERPRETER

## U.S. District Court
## Southern District of Georgia (Brunswick)
## CRIMINAL DOCKET FOR CASE #: 2:21–cr–00034–LGW–BWC–1

Case title: USA v. Mendoza

Date Filed: 08/12/2021
Date Terminated: 04/08/2022

Assigned to: Judge Lisa G. Wood
Referred to: Magistrate Judge
Benjamin W. Cheesbro

Appeals court case number:
22–11273–A 11th Circuit

### Defendant (1)

**Javier Sanchez Mendoza, Jr.**
*TERMINATED: 04/08/2022*

represented by **Scott G. Reddock**
Attorney at Law, LLC
111 West Court Street
Suite B
Hinesville, GA 31313
912–332–7077
Fax: 912–332–7179
Email: reddgeg@aol.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: CJA Appointment*

**Steven G. Blackerby**
Brown, Readdick, Bumgartner, Carter, Strickland
& Watkins, LLP
P.O. Box 220
5 Glynn Avenue
Brunswick, GA 31521–0220
912–264–8544
Fax: 912–264–9667
Email: sblackerby@brbcsw.com
*TERMINATED: 04/25/2022*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: CJA Appointment*

| **Pending Counts** | **Disposition** |
| --- | --- |
| 18 U.S.C. § 1594(b) Conspiracy to Engage in Forced Labor (1) | BOP 360 months / 5 years supervised release / standard, special and mandatory conditions of release / no fine / $100 special assessment waived |

**Highest Offense Level (Opening)**

Felony

| **Terminated Counts** | **Disposition** |
| --- | --- |
| None | |

**Highest Offense Level (Terminated)**

None

| **Complaints** | **Disposition** |
|---|---|
| None | |

---

**Interpreter**

**Julia Davis**

---

**Interpreter**

**Michelle Gonzales**

---

**Plaintiff**

**USA**                                    represented by   **Tania D. Groover**
U.S. Attorney's Office – Savannah
P.O. Box 8970
22 Barnard Street, Suite 300
Savannah, GA 31401
912–201–2552
Fax: 912–652–4388
Email: tania.groover@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Retained*

**David H. Estes**
U.S. Attorney's Office–Savannah
22 Barnard St., Suite 300
P.O. Box 8970
Savannah, GA 31401
912–652–4422
Fax: 912–652–4326
Email: david.estes@usdoj.gov
*Designation: Retained*

**E. Gregory Gilluly , Jr.**
U.S. Attorney's Office – Savannah
P.O. Box 8970
22 Barnard Street, Suite 300
Savannah, GA 31401
912–652–4422
Fax: 912–652–4388
Email: greg.gilluly@usdoj.gov
*Designation: Retained*

**Karl Irving Knoche**
U.S. Attorney's Office – Savannah
P.O. Box 8970
22 Barnard Street, Suite 300
Savannah, GA 31401
912–652–4422
Fax: 912–652–4388
Email: karl.knoche@usdoj.gov
*Designation: Retained*

| Date Filed | # | Docket Text |
|---|---|---|
| 08/06/2021 | | NOTICE OF STANDING ORDER MC121–23 in re The National Emergency Declared on March 13, 2020: Fifth Renewal of the CARES Act Order. The authorizations contained in the Court's March 30, 2020 General Order (MC120–005), |

| | | |
|---|---|---|
| | | and renewed on June 20, 2020 (MC120–014), September 24, 2020 (MC120–021), December 21, 2020 (MC120–029), and March 18, 2021 (MC121–10) are hereby renewed. This authority is effective for ninety days unless otherwise ordered. (Click Here to View). Signed by Chief Judge J. Randal Hall on 08/06/2021. (WS) (Entered: 08/13/2021) |
| 08/12/2021 | 1 | INFORMATION as to Javier Sanchez Mendoza, Jr (1) count 1. (pts) (Entered: 08/12/2021) |
| 08/12/2021 | 2 | PENALTY CERTIFICATION by Government as to Javier Sanchez Mendoza, Jr. (pts) (Entered: 08/12/2021) |
| 08/13/2021 | 4 | TEXT ORDER for Appointment of Attorney as to Javier Sanchez Mendoza, Jr. Steven G. Blackerby is appointed to serve as attorney for Defendant Javier Sanchez Mendoza in this case. Signed by Magistrate Judge Benjamin W. Cheesbro on 8/12/2021. (km) (Entered: 08/13/2021) |
| 08/13/2021 | | NOTICE OF HEARING as to Javier Sanchez Mendoza, Jr.Initial Appearance and Arraignment set for 8/16/2021 11:30 AM in Brunswick – Courtroom 2 before Magistrate Judge Benjamin W. Cheesbro. Interpreter Julia Davis is appointed at a rate of $418/226 for one full day and approved to travel via POV pursuant to the contract. (KM) (Entered: 08/13/2021) |
| 08/13/2021 | 5 | Notice of Counsel's Post–Conviction Obligation Requirements as to Defendant Javier Sanchez Mendoza, Jr. (KM) (Entered: 08/13/2021) |
| 08/13/2021 | | NOTICE OF HEARING as to Javier Sanchez Mendoza, Jr. Change of Plea Hearing set for 8/16/2021 01:30 PM in Brunswick – Courtroom No. 1 – before Judge Lisa G. Wood. Interpreter Julia Davis is appointed at a rate of $418/226 for one full day and approved to travel via POV pursuant to the contract. (KM) (Entered: 08/13/2021) |
| 08/16/2021 | 6 | Minute Entry for proceedings held before Magistrate Judge Benjamin W. Cheesbro: Initial Appearance and Arraignment as to Javier Sanchez Mendoza, Jr. held on 8/16/2021. Defendant pled not guilty. Defendant has ICE detainer. Defendant remanded to custody of USMS. (Tape #FTR–BWK–CR2.) (KM) (Entered: 08/16/2021) |
| 08/16/2021 | 7 | WAIVER OF INDICTMENT by Javier Sanchez Mendoza, Jr. (jlh) (Entered: 08/16/2021) |
| 08/16/2021 | 8 | Minute Entry for proceedings held before Judge Lisa G. Wood: Change of Plea Hearing as to Javier Sanchez Mendoza, Jr. held on 8/16/2021. (Court Reporter Debbie Gilbert.) (WS) (Entered: 08/16/2021) |
| 08/16/2021 | 9 | PLEA AGREEMENT as to Javier Sanchez Mendoza, Jr. (Attachments: # 1 Order)(WS) (Entered: 08/16/2021) |
| 08/16/2021 | 10 | CHANGE OF PLEA entered by Javier Sanchez Mendoza Jr. (1) Guilty Count 1. (WS) (Entered: 08/16/2021) |
| 08/16/2021 | 11 | Order Designating Interpreter Julia Davis as to Javier Sanchez Mendoza, Jr. Signed by Magistrate Judge Benjamin W. Cheesbro on 8/16/2021. (ca) (Entered: 08/16/2021) |
| 08/17/2021 | 12 | AUTHORIZATION to Pay Julia Davis in the amount of $534.48, for 08/16/2021 as to Javier Sanchez Mendoza, Jr. Signed by Magistrate Judge Benjamin W. Cheesbro on 08/16/2021. (jlh) (Entered: 08/17/2021) |
| 10/18/2021 | 13 | Initial Presentence Investigation Report as to Javier Sanchez Mendoza, Jr (USPO) (Entered: 10/18/2021) |
| 10/27/2021 | 14 | Consent MOTION for Extension of Time to Respond to Presentence Report by Steven G. Blackerby as to Javier Sanchez Mendoza, Jr. Responses due by 11/10/2021. (Blackerby, Steven) (Entered: 10/27/2021) |
| 10/28/2021 | 15 | ORDER granting re 14 Consent Motion for Extension of Time to Respond to Presentence Report as to Javier Sanchez Mendoza Jr. (1). Signed by Judge Lisa G. Wood on 10/27/21. (loh) (Entered: 10/28/2021) |

| | | |
|---|---|---|
| 10/28/2021 | | Set/Reset Deadlines as to Javier Sanchez Mendoza, Jr: Objections to Presentence Report due by 11/15/2021. (loh) (Entered: 10/28/2021) |
| 11/12/2021 | 16 | Consent MOTION for Extension of Time to File Response to Presentence Report by Steven G. Blackerby as to Javier Sanchez Mendoza, Jr. Responses due by 11/26/2021. (Blackerby, Steven) (Entered: 11/12/2021) |
| 11/15/2021 | 17 | RESPONSE to Motion by USA as to Javier Sanchez Mendoza, Jr re 16 Consent MOTION for Extension of Time to File Response to Presentence Report (Groover, Tania) (Entered: 11/15/2021) |
| 11/15/2021 | 18 | ORDER granting 16 Motion for Extension of Time to Respond to Presentence Report. Defendant shall have through November 22, 2021 to file any objections to the presentence report, as to Javier Sanchez Mendoza Jr. (1). Signed by Judge Lisa G. Wood on 11/15/2021. (csr) (Entered: 11/15/2021) |
| 11/15/2021 | | Set/Reset Deadlines re Motion or Report and Recommendation in case as to Javier Sanchez Mendoza, Jr. Response to Presentence Report due by 11/22/2021 re: 18 Order. (csr) (Entered: 11/15/2021) |
| 11/16/2021 | | Terminate Compliance Deadline re 15 as to Javier Sanchez Mendoza, Jr. (JH) (Entered: 11/16/2021) |
| 12/07/2021 | 19 | MOTION for Leave of Absence as to Javier Sanchez Mendoza, Jr for dates of : 1/14/22 − 1/24/22. Responses due by 12/21/2021. (Blackerby, Steven) (Entered: 12/07/2021) |
| 12/08/2021 | | TEXT ORDER granting 19 Motion for Leave of Absence by Steven Blackerby for the dates of : January 14, 2022 through and including January 24, 2022. Signed by Judge Lisa G. Wood on 12/08/2021. (WS) (Entered: 12/08/2021) |
| 12/10/2021 | 20 | Final Presentence Investigation Report as to Javier Sanchez Mendoza, Jr (USPO) (Entered: 12/10/2021) |
| 12/22/2021 | | NOTICE OF STANDING ORDER MC121−27 in re The National Emergency Declared on March 13, 2020: Sixth Renewal of the CARES Act Order. The authorizations contained in the Court's March 30, 2020 General Order (MC120−005), and renewed on June 20, 2020 (MC120−014), September 24, 2020 (MC120−021), December 21, 2020 (MC120−029), March 18, 2021 (MC121−10), and June 17, 2021 (MC121−23) are hereby renewed. This authority is effective for ninety days unless otherwise ordered. (Click Here to View) Signed by Chief Judge J. Randal Hall on 9/14/2021. (gmh) (Entered: 12/22/2021) |
| 12/22/2021 | | NOTICE OF STANDING ORDER MC121−35 in re The National Emergency Declared on March 13, 2020: Seventh Renewal of the CARES Act Order. The authorizations contained in the Court's March 30, 2020 General Order (MC120−005), and renewed on June 20, 2020 (MC120−014), September 24, 2020 (MC120−021), December 21, 2020 (MC120−029), March 18, 2021 (MC121−10), June 17, 2021 (MC121−23), and September 14, 2021 (MC121−27) are hereby renewed. This authority is effective for ninety days unless otherwise ordered. (Click Here to View) Signed by Chief Judge J. Randal Hall on 12/9/2021. (gmh) (Entered: 12/22/2021) |
| 01/19/2022 | | NOTICE OF HEARING as to Javier Sanchez Mendoza, Jr. Sentencing set for 3/30/2022 02:00 PM in Brunswick – Courtroom No. 1 – before Judge Lisa G. Wood. Interpreter Julia Davis is appointed at a rate of $418/226 for one full day and approved to travel via POV pursuant to the contract.(WS) (Entered: 01/19/2022) |
| 03/16/2022 | | NOTICE OF STANDING ORDER MC122−8 in re The National Emergency Declared on March 13, 2020: Eighth Renewal of the CARES Act Order. The authorizations contained in the Court's March 30, 2020 General Order (MC120−005), and renewed on June 20, 2020 (MC120−014), September 24, 2020 (MC120−021), December 21, 2020 (MC120−029), March 18, 2021 (MC121−10), June 17, 2021 (MC121−23), September 14, 2021 (MC121−27), and December 9, 2021 (MC121−35) are hereby renewed. This authority is effective for ninety days unless otherwise ordered. (Click Here to View)Signed by Chief Judge J. Randal Hall on 3/9/22. (wwp) (Entered: 03/16/2022) |

| 03/30/2022 | | NOTICE OF HEARING as to Javier Sanchez Mendoza, Jr. Final Restitution Hearing set for 5/24/2022 01:00 PM in Brunswick – Courtroom No. 1 – before Judge Lisa G. Wood. (WS) (Entered: 03/30/2022) |
|---|---|---|
| 03/30/2022 | 21 | EXHIBIT LIST by USA as to Javier Sanchez Mendoza, Jr. (WS) (Additional attachment(s) added on 4/11/2022: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7, # 8 Exhibit 8, # 9 Exhibit 9, # 10 Exhibit 10, # 11 Exhibit 11, # 12 Exhibit 12, # 13 Exhibit 13, # 14 Exhibit 14, # 15 Exhibit 15, # 16 Exhibit 16, # 17 Exhibit 17, # 18 Exhibit 18, # 19 Exhibit 19, # 20 Exhibit 20, # 21 Exhibit 21, # 22 Exhibit 22) (kjm). (Entered: 03/30/2022) |
| 03/30/2022 | 22 | WITNESS LIST by USA as to Javier Sanchez Mendoza, Jr. (WS) (Entered: 03/30/2022) |
| 03/30/2022 | 23 | Minute Entry for proceedings held before Judge Lisa G. Wood: Sentencing held on 3/30/2022 for Javier Sanchez Mendoza, Jr. (1), Count(s) 1, BOP 360 months / 5 years supervised release / standard, special and mandatory conditions of release / no fine / $100 special assessment waived. (Court Reporter Debbie Gilbert.) (WS) (Entered: 03/31/2022) |
| 03/31/2022 | 24 | MOTION to Seal *Certain Exhibits* by Tania D. Groover as to Javier Sanchez Mendoza, Jr. Responses due by 4/14/2022. (Attachments: # 1 Text of Proposed Order Proposed Order)(Groover, Tania) (Entered: 03/31/2022) |
| 04/05/2022 | 25 | ORDER granting the United States' 24 Motion to Seal Certain Exhibits as to Javier Sanchez Mendoza Jr. (1). Signed by Judge Lisa G. Wood on 4/5/2022. (ca) (Entered: 04/05/2022) |
| 04/08/2022 | 26 | JUDGMENT as to Javier Sanchez Mendoza, Jr. (1), Count(s) 1, BOP 360 months / 5 years supervised release / standard, special and mandatory conditions of release / no fine / $100 special assessment / the determination of restitution is deferred until May 24, 2022. Signed by Judge Lisa G. Wood on 4/5/2022. (csr) (Entered: 04/08/2022) |
| 04/08/2022 | 27 | Statement of Reasons as to Javier Sanchez Mendoza, Jr (USPO) (Entered: 04/08/2022) |
| 04/13/2022 | 28 | ******* MOTION to Appoint Counsel , MOTION to Withdraw as Attorney by Steven G. Blackerby as to Javier Sanchez Mendoza, Jr. Responses due by 4/27/2022. (Blackerby, Steven) (Entered: 04/13/2022) |
| 04/13/2022 | 29 | Notice of Post–Conviction Consultation Certification (Blackerby, Steven) (Entered: 04/13/2022) |
| 04/13/2022 | 30 | NOTICE OF APPEAL by Javier Sanchez Mendoza, Jr re 26 Judgment, (Blackerby, Steven) (Entered: 04/13/2022) |
| 04/14/2022 | 31 | Transmission of Notice of Appeal and Docket Sheet as to Javier Sanchez Mendoza, Jr. to US Court of Appeals. Related Documents: 30 Notice of Appeal – Final Judgment. Other Appeals: No. Judge Appealed: Judge Lisa Godbey Wood. Court Reporter: Debbie Gilbert. Fee Paid: No. Pending COA/IFP: No. (slt) (Additional attachment(s) added on 4/14/2022: # 1 Record on Appeal) (slt). (Entered: 04/14/2022) |
| 04/14/2022 | | Set/Reset Deadlines as to Javier Sanchez Mendoza, Jr: Compliance due by 4/27/2022 re Eleventh Circuit Transcript Information Form. (thb) (Entered: 04/14/2022) |
| 04/18/2022 | | MOTIONS as to Javier Sanchez Mendoza, Jr REFERRED to Magistrate Judge: 28 MOTION to Appoint Counsel MOTION to Withdraw as Attorney . (cmr) (Entered: 04/18/2022) |
| 04/19/2022 | | NOTICE OF HEARING as to Javier Sanchez Mendoza, Jr. Attorney Appointment Hearing set for 4/25/2022 01:30 PM in Brunswick – Courtroom 2 before Magistrate Judge Benjamin W. Cheesbro. Interpreter Michelle Gonzales is appointed at a rate of $111/202 for one half day and approved to travel via POV pursuant to the contract. (KM) (Entered: 04/19/2022) |
| 04/19/2022 | 32 | Writ of Habeas Corpus ad Prosequendum Issued as to Javier Sanchez Mendoza, Jr. for April 25, 2022. Signed by Magistrate Judge Benjamin W. Cheesbro on April 19, 2022. (KM) (Entered: 04/19/2022) |

| 04/22/2022 | 33 | Order Designating Interpreter Michelle Gonzales as to Javier Sanchez Mendoza, Jr. Signed by Magistrate Judge Benjamin W. Cheesbro on 04/22/2022. (jlh) (Entered: 04/22/2022) |
|---|---|---|
| 04/22/2022 | 34 | USCA Case Number as to Javier Sanchez Mendoza, Jr 22–11273–A for 30 Notice of Appeal – Final Judgment filed by Javier Sanchez Mendoza, Jr. (wwp) (Entered: 04/22/2022) |
| 04/22/2022 | 35 | Appeal Remark re 30 Notice of Appeal–Final Judgment: Letter from USCA appointing Steven Blackerby as CJA appointed counsel for Defendnat. (gmh) (Entered: 04/22/2022) |
| 04/25/2022 | 36 | Minute Entry for proceedings held before Magistrate Judge Benjamin W. Cheesbro: Attorney Inquiry Hearing as to Javier Sanchez Mendoza, Jr. held on 4/25/2022. Court grants Defendant's Motion for Appointment of New Counsel. Scott Reddock appointed as new counsel. Written Order to follow. (Tape #FTR–BWK–CR2.) (KM) (Entered: 04/25/2022) |
| 04/25/2022 | 37 | ORDER granting re 28 Motion to Appoint Counsel; granting re 28 Motion to Withdraw as Attorney as to Javier Sanchez Mendoza Jr. Steven G. Blackerby withdrawn from case. The Court ORDERS Steven Blackerby to transfer all discovery in the case to Scott Reddock. CJA Counsel Steven Blackerby is ORDERED to file his CJA voucher within fourteen (14) days of the date of this Order. Signed by Magistrate Judge Benjamin W. Cheesbro on 4/25/22. (loh) (Entered: 04/25/2022) |
| 04/25/2022 | | Set/Reset Deadlines as to Javier Sanchez Mendoza, Jr: Compliance re 37 Order due by 5/9/2022. (loh) (Entered: 04/25/2022) |
| 04/26/2022 | 38 | NOTICE OF ATTORNEY APPEARANCE: Scott G. Reddock appearing for Javier Sanchez Mendoza, Jr (Reddock, Scott) (Entered: 04/26/2022) |
| 04/26/2022 | 39 | AUTHORIZATION to Pay Michele J. Gonzales in the amount of $193.88, for 4/25/2022 as to Javier Sanchez Mendoza, Jr. Signed by Magistrate Judge Benjamin W. Cheesbro on 4/26/2022. (pts) (Entered: 04/26/2022) |
| 04/27/2022 | 40 | TRANSCRIPT REQUEST by Javier Sanchez Mendoza, Jr for proceedings held on 3/30/22; 8/16/21 before Judge Wood, (Blackerby, Steven) (Entered: 04/27/2022) |
| 04/28/2022 | 41 | Court Reporter Acknowledgment re 30 Notice of Appeal – Final Judgment. (ca) (Entered: 04/28/2022) |
| 05/03/2022 | 42 | CJA 20 as to Javier Sanchez Mendoza, Jr.: Authorization to Pay Steven Blackerby. Amount: $9,049.80, Voucher #113J.1375121. Signed by Judge Lisa G. Wood on 05/03/2022. (WS) (Entered: 05/03/2022) |
| 05/03/2022 | 43 | Consent MOTION to Redact Sentencing Transcript by Tania D. Groover as to Javier Sanchez Mendoza, Jr. Responses due by 5/17/2022. (Attachments: # 1 Text of Proposed Order Proposed Order)(Groover, Tania) (Entered: 05/03/2022) |
| 05/09/2022 | 44 | ORDER granting re 43 Consent MOTION to Redact Sentencing Transcript as to Javier Sanchez Mendoza Jr. It is hereby ordered that all references to the name, address, and phone number of Jane Doe, the sexual assault victim in this case, be redacted from the transcript of the sentencing hearing held on March 30, 2022 until further Order of the Court. Signed by Judge Lisa G. Wood on 5/9/22. (loh) (Entered: 05/09/2022) |
| 05/10/2022 | | Terminate Deadlines as to Javier Sanchez Mendoza, Jr: Compliance Deadline set on 04/25/2022 for 05/09/2022. (thb) (Entered: 05/10/2022) |
| 05/18/2022 | | NOTICE – Interpreter Julia Davis is appointed at a rate of $418/226 for one full day and approved to travel via POV pursuant to the contract for the May 24, 2022 final restitution hearing.(WS) (Entered: 05/18/2022) |
| 05/18/2022 | 46 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings as to Javier Sanchez Mendoza, Jr held on 03/30/2022, before Judge Lisa Godbey Wood. Court Reporter/Transcriber Debbie Gilbert, Telephone number (912) 262–2608. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. (Transcript Redaction Policy Issued or Click here to view Transcript Redaction Policy) Redaction Request due 6/8/2022. |

| | | |
|---|---|---|
| | | Redacted Transcript Deadline set for 6/18/2022. Release of Transcript Restriction set for 8/16/2022. (Gilbert, Debra) (Entered: 05/18/2022) |
| 05/18/2022 | 47 | SEE CORRECTED TRANSCRIPT OF PROCEEDINGS 56 . NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings as to Javier Sanchez Mendoza, Jr held on 08/16/2022, before Judge Lisa Godbey Wood. Court Reporter/Transcriber Debbie Gilbert, Telephone number (912) 262–2608. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. (Transcript Redaction Policy Issued or Click here to view Transcript Redaction Policy) Redaction Request due 6/8/2022. Redacted Transcript Deadline set for 6/18/2022. (Gilbert, Debra) Modified on 7/21/2022 (slt). (Entered: 05/18/2022) |
| 05/20/2022 | 48 | NOTICE *Regarding Restitution* by USA (Groover, Tania) (Additional attachment(s) added on 5/23/2022: # 1 Exhibit A) (jrb). (Entered: 05/20/2022) |
| 05/20/2022 | 49 | MOTION to Seal Document *Exhibit A to Doc. 48* by Tania D. Groover as to Javier Sanchez Mendoza, Jr. Responses due by 6/3/2022. (Attachments: # 1 Text of Proposed Order Proposed Order)(Groover, Tania) (Entered: 05/20/2022) |
| 05/23/2022 | | Set/Reset Hearings as to Javier Sanchez Mendoza, Jr: ** Time Change only ** Final Restitution hearing set for 5/24/2022 01:30 PM in Brunswick – Courtroom No. 1 – before Judge Lisa G. Wood. (WS) (Entered: 05/23/2022) |
| 05/23/2022 | 50 | ORDER granting 49 Motion to Seal Document as to Javier Sanchez Mendoza Jr. (1). Signed by Judge Lisa G. Wood on May 23, 2022. (jrb) (Entered: 05/23/2022) |
| 05/24/2022 | 51 | Minute Entry for proceedings held before Judge Lisa G. Wood: Final Restitution Hearing as to Javier Sanchez Mendoza, Jr. held on 5/24/2022. (Court Reporter Debbie Gilbert.) (WS) (Entered: 05/25/2022) |
| 06/02/2022 | 52 | AMENDED JUDGMENT as to Javier Sanchez Mendoza, Jr. (1), Count(s) 1, BOP 360 months / 5 years supervised release / standard, special and mandatory conditions of release / no fine / $100 special assessment waived. Signed by Judge Lisa G. Wood on 6/1/2022. (ca) (Entered: 06/02/2022) |
| 06/09/2022 | 53 | Amended Statement of Reasons as to Javier Sanchez Mendoza, Jr (USPO) (Entered: 06/09/2022) |
| 07/11/2022 | 54 | ORDER of USCA granting the motion to withdraw Steven Blackerby as counsel as to Javier Sanchez Mendoza, Jr re 30 Notice of Appeal – Final Judgment. Scott Reddock is appointed to represent Sanchez Mendoza Jr on appeal. (wwp) (Entered: 07/11/2022) |
| 07/11/2022 | 55 | USCA CJA Appointment of Scott Reddock to represent Javier Mendoza, Jr re 30 Notice of Appeal – Final Judgment. (wwp) (Entered: 07/11/2022) |
| 07/21/2022 | 56 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings (CORRECTED – Replaces Transcript 47 ) as to Javier Sanchez Mendoza, Jr held on 08/16/2021, before Judge Lisa Godbey Wood. Court Reporter/Transcriber Debbie Gilbert, Telephone number (912) 262–2608. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. (Transcript Redaction Policy Issued or Click here to view Transcript Redaction Policy) Redaction Request due 8/11/2022. Redacted Transcript Deadline set for 8/21/2022. Release of Transcript Restriction set for 10/19/2022. (Gilbert, Debra) Modified on 7/21/2022 (slt). (Entered: 07/21/2022) |
| 07/21/2022 | | F.R.A.P. CERTIFICATE OF READINESS as to Javier Sanchez Mendoza, Jr re 30 Notice of Appeal – Final Judgment filed by Javier Sanchez Mendoza, Jr.. **The entire record on appeal is available electronically**. (thb) (Entered: 07/21/2022) |
| 07/27/2022 | 57 | Restitution/Victim Information as to Javier Sanchez Mendoza, Jr (USPO) (Entered: 07/27/2022) |

# 1

# INFORMATION

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA
BRUNSWICK DIVISION

FILED
U.S. DISTRICT COURT
AUGUSTA DIV.

2021 AUG 12  P 4: 55

CLER_____ _____
SO. DIST. OF GA.

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | INFORMATION NO. |
| | ) | |
| v. | ) | 18 U.S.C. § 1594(b) |
| | ) | Conspiracy to Engage in Forced |
| JAVIER SANCHEZ MENDOZA, JR. | ) | Labor |
| | ) | |
| | ) | Forfeiture Allegation |

CR 2 21 - 0 3 4

THE UNITED STATES ATTORNEY CHARGES THAT:

**COUNT ONE**
*Conspiracy to Engage in Forced Labor*
18 U.S.C. § 1594(b)

Beginning at a time unknown, but at least from on or about August 14, 2018,

and continuing through on or about November 4, 2019, the precise dates being

unknown, in Glynn County, Wayne County, and Pierce County, within the Southern

District of Georgia, and elsewhere, the defendant **JAVIER SANCHEZ MENDOZA,**

**JR.**, aided and abetted by others known and unknown, with some joining the

conspiracy earlier and others joining later, did knowingly and willfully combine,

conspire, confederate and agree with other persons known and unknown to the Grand

Jury, to commit an offense against the United States, that is, did knowingly benefit

financially from participation in a venture which has engaged in the providing and

obtaining of labor and services by unlawfully charging foreign workers to obtain an

H-2A visa and by unlawfully withholding their identification documents, by means of

the abuse and threatened abuse of law and legal process and by means of a scheme,

plan, and pattern intended to cause foreign workers to believe that, if such foreign

workers did not perform such labor and services, that the foreign workers would suffer serious harm or physical restraint in violation of Title 18, United States Code, Sections 2, 1589(b).

All done in violation of Title 18, United States Code, Sections 2 and 1594(b).

## FORFEITURE ALLEGATION

The allegations contained in Count One of this Information are hereby re-alleged and incorporated by reference for the purpose of alleging forfeiture to the United States of America pursuant to Title 18, United States Code, Section 1594(d).

Upon conviction of Count One of this Information, the defendant **JAVIER SANCHEZ MENDOZA, JR**, shall forfeit to the United States of America, pursuant to Title 18, 1594(d), any property, real or personal, that was involved in, used, or intended to be used to commit or to facilitate the commission of such violation, and any property traceable to such property; and any property, real or personal, constituting or derived from, any proceeds that such person obtained, directly or indirectly, as a result of such violation, or any property traceable to such property.

If any property subject to forfeiture as a result of any act or omission of the Defendant:

     a.    cannot be located upon the exercise of due diligence;

     b.    has been transferred or sold to, or deposited with, a third party;

     c.    has been placed beyond the jurisdiction of the court;

     d.    has been substantially diminished in value; or

     e.    has been commingled with other property that cannot be divided without difficulty;

the United States of America shall be entitled to forfeiture of substitute property pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461.

3

All pursuant to Title 18, United States Code, Section 1594(d)(2) and 2428, as

incorporated by Title 28, United States Code, Section 2461.

 

_____  
David H. Estes  
Acting United States Attorney

Tania D. Groover  
Assistant United States Attorney  
*Lead Counsel

_____  
Karl I. Knoche  
Assistant United States Attorney  
Chief, Criminal Division

_____  
E. Greg Gilluly  
Assistant United States Attorney  
Deputy Chief, Criminal Division

4

# 26

# JUDGMENT

GAS 245B          (Rev. 06/21) Judgment in a Criminal Case
DC Custody TSR

# UNITED STATES DISTRICT COURT
### SOUTHERN DISTRICT OF GEORGIA
BRUNSWICK DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | **JUDGMENT IN A CRIMINAL CASE** |
| **v.** | ) | |
| <u>Javier Sanchez Mendoza, Jr.</u> | ) | |
| | ) | Case Number:      2:21CR00034-1 |
| | ) | USM Number:      18118-509 |
| | ) | <u>Steven G. Blackerby</u> |
| | | Defendant's Attorney |

## THE DEFENDANT:

☒ pleaded guilty to Count       1

☐ pleaded nolo contendere to Count(s) _____ which was accepted by the court.

☐ was found guilty on Count(s) _____ after a plea of not guilty.

The defendant is adjudicated guilty of these offenses:

| Title & Section | Nature of Offense | Offense Ended | Count |
|---|---|---|---|
| 18 U.S.C. § 1594(b), 18 U.S.C. § 1589(b), 18 U.S.C. 18 § 1589(d), and 18 U.S.C. § 2 | Conspiracy to engage in forced labor | November 4, 2019 | 1 |

The defendant is sentenced as provided in pages 2 through     7     of this judgment.  The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

☐ The defendant has been found not guilty on Count(s) _____

☒ Count _____1_____ of Indictment 2:20CR00049 is dismissed as to this defendant on the motion of the United States.

It is ordered that the defendant must notify the United States Attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid.  If ordered to pay restitution, the defendant must notify the Court and United States Attorney of material changes in economic circumstances.

<u>March 30, 2022</u>
Date of Imposition of Judgment

<u>Signature of Judge</u>

LISA GODBEY WOOD
UNITED STATES DISTRICT JUDGE
Name and Title of Judge

April 5, 2022
Date

GAS 245B          (Rev. 06/21) Judgment in a Criminal Case                                                    Judgment — Page 2 of 7
DC Custody TSR

---

DEFENDANT:          Javier Sanchez Mendoza Jr.
CASE NUMBER:        2:21CR00034-1

# IMPRISONMENT

The defendant is hereby committed to the custody of the Federal Bureau of Prisons to be imprisoned for a total term of: <u>360 months. This sentence shall be served concurrently with any sentence which may be imposed on the pending related state case in Pierce County (Georgia) Superior Court, Docket Number 19-4902-CF. Upon release from confinement, the defendant shall be delivered to a duly authorized Immigration and Customs Enforcement officer for deportation proceedings.</u>

☒     The Court makes the following recommendations to the Bureau of Prisons:
       It is recommended that the defendant be evaluated by Bureau of Prisons officials to establish his participation in an appropriate program of substance abuse treatment and counseling, including the Residential Drug Abuse Program (RDAP). It is further recommended that the defendant receive treatment for his ongoing medical conditions. To the extent that space and security will allow, designation to the federal facility in Jesup, Georgia, is recommended.

☒     The defendant is remanded to the custody of the United States Marshal.

☐     The defendant shall surrender to the United States Marshal for this district:

       ☐     at _____     ☐ a.m.   ☐ p.m.     on _____ .

       ☐     as notified by the United States Marshal.

☐     The defendant shall surrender for service of sentence at the institution designated by the Bureau of Prisons:

       ☐     before 2 p.m. on _____ .

       ☐     as notified by the United States Marshal.

       ☐     as notified by the Probation or Pretrial Services Office.

# RETURN

I have executed this judgment as follows:

Defendant delivered on _____     to _____

at _____ , with a certified copy of this judgment.

_____
UNITED STATES MARSHAL

By _____
DEPUTY UNITED STATES MARSHAL

GAS 245B          (Rev. 06/21) Judgment in a Criminal Case                                                    Judgment — Page 3 of 7
DC Custody TSR

DEFENDANT:          Javier Sanchez Mendoza Jr.
CASE NUMBER:        2:21CR00034-1

## SUPERVISED RELEASE

Upon release from imprisonment, you will be on supervised release for a term of: <u>5 years</u>.

## MANDATORY CONDITIONS

1.    You must not commit another federal, state, or local crime.

2.    You must not unlawfully possess a controlled substance.

3.    You must refrain from any unlawful use of a controlled substance.  You must submit to one drug test within 15 days of release
      from imprisonment and at least two periodic drug tests thereafter, as determined by the court.

      ☐ The above drug testing condition is suspended, based on the court's determination that you pose a low risk of future
      substance abuse.  *(Check, if applicable.)*

4.    ☒ You must make restitution in accordance with 18 U.S.C. §§ 3663 and 3663A or any other statute authorizing a sentence of
      restitution.  *(Check, if applicable.)*

5.    ☒ You must cooperate in the collection of DNA as directed by the probation officer. *(Check, if applicable.)*

6.    ☐ You must comply with the requirements of the Sex Offender Registration and Notification Act (34 U.S.C. § 20901, et seq.) as
      directed by the probation officer, the Bureau of Prisons, or any state sex offender registration agency in the location where you
      reside, work, are a student, or were convicted of a qualifying offense.  *(Check, if applicable.)*

7.    ☐ You must participate in an approved program for domestic violence.  *(Check, if applicable.)*


You must comply with the standard conditions that have been adopted by this court as well as with any other conditions
on the attached page.

GAS 245B         (Rev. 06/21) Judgment in a Criminal Case
DC Custody TSR                                                                            Judgment — Page 4 of 7

DEFENDANT:          Javier Sanchez Mendoza Jr.
CASE NUMBER:        2:21CR00034-1

# STANDARD CONDITIONS OF SUPERVISION

As part of your supervised release, you must comply with the following standard conditions of supervision. These conditions are imposed because they establish the basic expectations for your behavior while on supervision and identify the minimum tools needed by probation officers to keep informed, report to the court about, and bring about improvements in your conduct and condition.

1.  You must report to the probation office in the federal judicial district where you are authorized to reside within 72 hours of your release from imprisonment, unless the probation officer instructs you to report to a different probation office or within a different time frame.

2.  After initially reporting to the probation office, you will receive instructions from the court or the probation officer about how and when you must report to the probation officer, and you must report to the probation officer as instructed.

3.  You must not knowingly leave the federal judicial district where you are authorized to reside without first getting permission from the court or the probation officer.

4.  You must answer truthfully the questions asked by your probation officer.

5.  You must live at a place approved by the probation officer. If you plan to change where you live or anything about your living arrangements (such as the people you live with), you must notify the probation officer at least 10 days before the change. If notifying the probation officer in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.

6.  You must allow the probation officer to visit you at any time at your home or elsewhere, and you must permit the probation officer to take any items prohibited by the conditions of your supervision that he or she observes in plain view.

7.  You must work full time (at least 30 hours per week) at a lawful type of employment, unless the probation officer excuses you from doing so. If you do not have full-time employment you must try to find full-time employment, unless the probation officer excuses you from doing so. If you plan to change where you work or anything about your work (such as your position or your job responsibilities), you must notify the probation officer at least 10 days before the change. If notifying the probation officer at least 10 days in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.

8.  You must not communicate or interact with someone you know is engaged in criminal activity. If you know someone has been convicted of a felony, you must not knowingly communicate or interact with that person without first getting the permission of the probation officer.

9.  If you are arrested or questioned by a law enforcement officer, you must notify the probation officer within 72 hours.

10. You must not own, possess, or have access to a firearm, ammunition, destructive device, or dangerous weapon (i.e. anything that was designed, or was modified for, the specific purpose of causing bodily injury or death to another person such as a nunchakus or tasers).

11. You must not act or make any agreement with a law enforcement agency to act as a confidential human source or informant without first getting permission from the court.

12. If the probation officer determines that you pose a risk to another person (including an organization), the probation officer may require you to notify the person about the risk and you must comply with that instruction. The probation officer may contact the person and confirm that you have notified that person about the risk.

13. You must follow the instructions of the probation officer related to the conditions of supervision.

## U.S. Probation Office Use Only

A U.S. probation officer has instructed me on the conditions specified by the court and has provide me with a written copy of this judgment containing these conditions. For further information regarding these conditions, see *Overview of Probation and Supervised Release Conditions*, available at: www.uscourts.gov.

Defendant's Signature _____     Date _____

GAS 245B          (Rev. 06/21) Judgment in a Criminal Case                                                    Judgment — Page 5 of 7
DC Custody TSR

DEFENDANT:          Javier Sanchez Mendoza Jr.
CASE NUMBER:        2:21CR00034-1

# SPECIAL CONDITIONS OF SUPERVISION

1.      If you are ordered deported from the United States, you must remain outside the United States, unless legally authorized to re-enter. If you re-enter the United States, you must report to the nearest probation office within 72 hours of re-entry. If not deported, you must report to the nearest probation office within 72 hours of release from custody.

2.      If not deported, you must submit your person, property, house, residence, office, vehicle, papers, computers (as defined in 18 U.S.C. § 1030(e)(1)), other electronic communications or data storage devices or media, to a search conducted by a United States probation officer. Failure to submit to a search may be grounds for revocation of release. You must warn any other occupants that the premises may be subject to searches pursuant to this condition. The probation officer may conduct a search under this condition only when reasonable suspicion exists that you have violated a condition of supervision and that the areas to be searched contain evidence of this violation. Any search must be conducted at a reasonable time and in a reasonable manner.

3.      You must not communicate, or otherwise interact, with victims, either directly or through someone else, without first obtaining the permission of the probation officer.

GAS 245B      (Rev. 06/21) Judgment in a Criminal Case                                    Judgment — Page 6 of 7
DC Custody TSR
_____

DEFENDANT:        Javier Sanchez Mendoza Jr.
CASE NUMBER:      2:21CR00034-1

# CRIMINAL MONETARY PENALTIES

The defendant must pay the total criminal monetary penalties under the schedule of payments.

|  | **Assessment** | **Restitution** | **Fine** | **AVAA Assessment\*** | **JVTA Assessment \*\*** |
|---|---|---|---|---|---|
| **TOTALS** | $100 | To be determined | None | N/A | N/A |

☒  The determination of restitution is deferred until <u>May 24, 2022</u>. An *Amended Judgment in a Criminal Case (AO 245C)* will be entered after such determination.

☐  The defendant must make restitution (including community restitution) to the following payees in the amount listed below.

If the defendant makes a partial payment, each payee shall receive an approximately proportioned payment, unless specified otherwise in the priority order or percentage payment column below. However, pursuant to 18 U.S.C. § 3664(i), all nonfederal victims must be paid before the United States is paid.

| **Name of Payee** | **Total Loss\*\*\*** | **Restitution Ordered** | **Priority or Percentage** |
|---|---|---|---|
|  |  |  |  |
| **TOTALS** | $ | $ | |

☐  Restitution amount ordered pursuant to plea agreement  $_____

☐  The defendant must pay interest on restitution and a fine of more than $2,500, unless the restitution or fine is paid in full before the fifteenth day after the date of the judgment, pursuant to 18 U.S.C. § 3612(f). All of the payment options on Sheet 6 may be subject to penalties for delinquency and default, pursuant to 18 U.S.C. § 3612(g).

☐  The court determined that the defendant does not have the ability to pay interest and it is ordered that:

☐  the interest requirement is waived for the   ☐  fine   ☐  restitution.

☐  the interest requirement for the   ☐  fine   ☐  restitution is modified as follows:

\* Amy, Vicky, and Andy Child Pornography Victim Assistance Act of 2018, Pub. L. No. 115-299.
\*\* Justice for Victims of Trafficking Act of 2015, Pub. L. No. 114-22.
\*\*\* Findings for the total amount of losses are required under Chapters 109A, 110, 110A, and 113A of Title 18 for offenses committed on or after September 13, 1994, but before April 23, 1996.

GAS 245B   (Rev. 06/21) Judgment in a Criminal Case                                    Judgment — Page 7 of 7
DC Custody TSR

| DEFENDANT: | Javier Sanchez Mendoza Jr. |
|---|---|
| CASE NUMBER: | 2:21CR00034-1 |

# SCHEDULE OF PAYMENTS

Having assessed the defendant's ability to pay, payment of the total criminal monetary penalties is due as follows:

**A** ☒ Lump sum payment of _____$ 100_____ due immediately.

  ☐ not later than _____ , or
  ☐ in accordance ☐ C, ☐ D, ☐ E, or ☐ F below; or

**B** ☐ Payment to begin immediately (may be combined with ☐ C, ☐ D, or ☐ F below); or

**C** ☐ Payment in equal _____ (e.g., weekly, monthly, quarterly) installments of $ _____ over a period of
  _____ (e.g., months or years), to commence _____ (e.g., 30 or 60 days) after the date of this judgment; or

**D** ☐ Payment in equal _____ (e.g., weekly, monthly, quarterly) installments of $ _____ over a period of
  _____ (e.g., months or years), to commence _____ (e.g., 30 or 60 days) after release from imprisonment to a
  term of supervision; or

**E** ☐ Payment during the term of supervised release will commence within _____ (e.g., 30 or 60 days) after release from
  imprisonment. The court will set the payment plan based on an assessment of the defendant's ability to pay at that time; or

**F** ☐ Special instructions regarding the payment of criminal monetary penalties:

Unless the court has expressly ordered otherwise, if this judgment imposes imprisonment, payment of criminal monetary penalties is due during imprisonment. All criminal monetary penalties, except those payments made through the Federal Bureau of Prisons' Inmate Financial Responsibility Program, are made to the clerk of the court.

The defendant shall receive credit for all payments previously made toward any criminal monetary penalties imposed.

☐  Joint and Several
  Defendant and Co-Defendant Names and Case Numbers (including defendant number), Total Amount, Joint and Several Amount,
  and corresponding payee, if appropriate.

☐  The defendant shall pay the cost of prosecution.

☐  The defendant shall pay the following court cost(s):

☐  The defendant shall forfeit the defendant's interest in the following property to the United States:

Payments shall be applied in the following order: (1) assessment, (2) restitution principal, (3) restitution interest, (4) fine principal, (5) fine interest, (6) community restitution, (7) JVTA Assessment, (8) penalties, and (9) costs, including cost of prosecution and court costs.

# 46

# SENTENCING TRANSCRIPT

1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
BRUNSWICK DIVISION


UNITED STATES OF AMERICA )
)
vs. )
) CASE NO.
JAVIER SANCHEZ MENDOZA, JR., ) 2:21-CR-00034-LGW-BWC
)
_____Defendant. )



SENTENCING HEARING
BEFORE THE HONORABLE LISA GODBEY WOOD
March 30, 2022 at 2:21 p.m.
Brunswick, Georgia

APPEARANCES:

For the Government:      TANIA D. GROOVER, Esq.
                        E. GREG GILLULY, JR., Esq.
                        U. S. Attorney's Office
                        P. O. Box 8970
                        Savannah, Georgia  31412
                        (912) 201-2552
                        tania.groover@usdoj.gov
                        greg.gilluly@usdoj.gov

For the Defendant:      STEVEN G. BLACKERBY, Esq.
                        Brown, Readdick, Bumgartner,
                          Carter, Strickland & Watkins
                        P. O. Box 220 (31521)
                        5 Glynn Avenue
                        Brunswick, Georgia  31520
                        (912)264-8544
                        sblackerby@brbcsw.com


Reported by:            Debbie Gilbert, RPR, CCR
                        Official Court Reporter
                        801 Gloucester Street
                        Post Office Box 1894
                        Brunswick, GA 31521-1894
                        (912) 262-2608 or (912) 266-6006
                        debra_gilbert@gas.uscourts.gov
                          - - -

2

I N D E X

                                                     PAGE




OPENING STATEMENTS

GOVERNMENT WITNESSES

    SPECIAL AGENT JULIO LOPEZ
        Direct Examination By Ms. Groover          10
        Cross-Examination By Mr. Blackerby         56
        Redirect Examination By Ms. Groover        66

    ████████████████████████████
        Direct Examination By Ms. Groover          67
        Cross-Examination By Mr. Blackerby         98

    OFFICER MICHAEL CALLAHAN
        Direct Examination By Mr. Gilluly         100

    DETECTIVE JEREMY STAGNER
        Direct Examination By Mr. Gilluly         104

    ROSALINO HERNANDEZ DIAZ
        Direct Examination By Mr. Gilluly         119
        Cross-Examination By Mr. Blackerby        133

3

E X H I B I T S

| GOVERNMENT'S EXHIBITS | DESCRIPTION | I.D.'d | ADMITTED |
|---|---|---|---|
| No. 1 | Record of Sworn Statement | 28 | 56 |
| No. 2 | Photograph | 54 | 56 |
| No. 3-7 | Photographs | 88 | 90 |
| No. 8-14 | Photographs | 90 | 93 |
| No. 15-17 | Photographs | 94 | 96 |
| No. 18 | Wayne Memorial Hospital Record | 55 | 56 |
| No. 19 | Screen Shot of Google Translate | 114 | 116 |
| No. 20 | Photograph | 132 | 132 |
| No. 21 | Photograph | 132 | 132 |
| No. 22 | Knife | 117 | 118 |

4

```
 1              P R O C E E D I N G S

 2              (Call to order at 2:21 p.m.)

 3         THE COURT:  Good afternoon.  Ms. Sharp, call the next

 4    case.

 5         THE CLERK:  United States of America versus Javier

 6    Sanchez Mendoza, Jr., Greg Gilluly, Tania Groover for the

 7    Government, Steven Blackerby for the Defense.

 8         MS. GROOVER:  United States is ready to proceed.

 9         MR. BLACKERBY:  Ready for the Defense.

10         THE COURT:  Mr. Blackerby, approach with your client,

11    Mr. Javier Sanchez Mendoza, Jr.  And it's my understanding that

12    Mr. Mendoza needs hearing devices but not an interpreter; is

13    that correct, Mr. Mendoza?

14         THE DEFENDANT:  Yes, ma'am.

15         THE COURT:  And we've provided you with the earbuds sort

16    of like what I use.  Are you able to hear adequately?

17         THE DEFENDANT:  Yes, ma'am.

18         THE COURT:  That being said, Mr. Mendoza, you appeared

19    before me on August 16th, 2021 accompanied by your attorney, Mr.

20    Blackerby, for your Rule 11 proceeding.

21         THE DEFENDANT:  Yes, ma'am.

22         THE COURT:  Pursuant to a plea agreement, you pled

23    guilty and were adjudged guilty of Count 1 of the indictment --

24    I'm sorry -- it was an information, charging you with conspiracy

25    to engage in forced labor in violation of 18 USC Section
```

5

1   1594(b).

2        Now, at the end of that Rule 11 proceeding and my

3   acceptance of your plea of guilty, I directed the probation

4   office to prepare a presentence report and to disclose that

5   report to the Defense and to the Government.

6        Now, Mr. Mendoza, have you had the opportunity to read

7   and review that report and its addendum and discuss them with

8   Mr. Blackerby?

9        THE DEFENDANT:  Yes, ma'am.

10        THE COURT:  And are there any objections that remain as

11   to either the probation officer's factual statements contained

12   in that report or to her application of the advisory sentencing

13   guidelines.

14        MR. BLACKERBY:  There are objections, Your Honor.

15        THE COURT:  And Mr. Blackerby, let's go through those in

16   summary fashion so we can make sure we have what each of them

17   are and then we will hear in detail from each side with regard

18   to their respective positions.

19        It's my understanding that you object to Paragraph 11

20   and that it is your contention that it contains several factual

21   statements that are not true.  You object likewise to Paragraph

22   16 and contend that it contains several factual inaccuracies.

23        You object to Paragraph 19, and that paragraph states

24   that there were a number of workers who worked at Hilltop

25   Packing and you dispute that.

6

1          Paragraphs 22 and 23 you also take issue with and you

2    dispute some of the facts contained in those paragraphs as well

3    as Paragraph 24.  You deny that Mr. Mendoza ever made the threat

4    that is set forth in Paragraph 24.

5          Likewise, Paragraph 25 you deny any of the threats set

6    forth in Paragraph 25.  You also object with regard to the

7    offense level computation to the cross-reference utilized by the

8    probation officer in calculating the advisory guidelines.

9          As a result you object to Paragraph 34 and contest any

10   kind of criminal sexual abuse and you contend that the

11   cross-reference is misapplied in this case.

12         And it's my understanding that you object to Paragraph

13   35 as far as the victim-related adjustment under 3A1.1(b)(1) of

14   the guidelines.  You contest both the accuracy of allegations of

15   Jane Doe and that that would qualify for any vulnerable victim

16   adjustment.

17         And in addition to those objections, you wish to put

18   forth a point of clarification with regard to Paragraphs 12 and

19   15.  Those paragraphs generally describe an incident regarding

20   Jane Doe Number 1 and you wish to point out that that incident

21   was preceded by a domestic dispute between the defendant and

22   Jane Doe, and you contend that Jane Doe had stolen money and a

23   phone and documents from the defendant.

24         Is that the totality of objections that you're making?

25         MR. BLACKERBY:  It is, Your Honor.

7

1          THE COURT:  On behalf of the United States, any

2     objections?

3          MS. GROOVER:  No objections, Your Honor.

4          THE COURT:  Let me say that, with regard to the factual

5     statements contained in that report that were not objected to,

6     I'll adopt those as my findings of fact, and with regard to the

7     conclusions that were reached with regard to application of the

8     advisory guidelines that are contained in the report that were

9     not objected to, I adopt those as my conclusions and therefore

10    turn to the paragraphs that are objected to.

11          Mr. Blackerby, before I turn to the Government for any

12    evidence that they would like to put forth with regard to those

13    objections, do you want to set the table in any way or would you

14    prefer that I turn straight to them?

15          MR. BLACKERBY:  Your Honor, if you could turn straight

16    to them and if I could have an opportunity to offer argument in

17    rebuttal.

18          THE COURT:  Certainly.  Then, Mr. Blackerby and Mr.

19    Mendoza, if you will have a seat and let me turn to Ms. Groover

20    for any proof or argument you'd like to put forth on those

21    objections.

22          MS. GROOVER:  Thank you, Your Honor.  We do have a

23    number of witnesses we would like to call and then argument at

24    the appropriate time.

25          THE COURT:  All right.  Proceed.

8

1          MR. BLACKERBY:  Your Honor, if I may, I would like to

2     invoke the rule and have the witnesses sequestered.

3          THE COURT:  Any objection to that?

4          MS. GROOVER:  No objection, Your Honor.

5          THE COURT:  If you will have your witnesses come forth.

6          MS. GROOVER:  Your Honor, for purposes of the record, we

7     do have two Spanish-speaking witnesses and an interpreter to

8     assist.

9          THE COURT:  In that case, I do need to swear the

10    interpreter.  So if you will have your interpreter come forward

11    and, Ms. Sharp, if you will administer the oath.

12          (Interpreter Rachel Ramcheran was sworn.)

13          THE CLERK:  If you will please state your full name.

14          INTERPRETER RAMCHERAN:  Rachel Ramcheran.

15          THE COURT:  And potential witnesses if you will come

16    forward.  If you will have them come into the well.

17          Ladies and gentlemen, The Court has invoked a rule that

18    requires your absence from the courtroom at all times except

19    when you're called to the witness stand.  Indeed, until you're

20    called to the witness stand, you're to remain outside of the

21    courtroom.  Once you're called, you will testify.  You're not to

22    discuss your testimony with anyone.  You may, however, discuss

23    it with attorneys from either side but not in presence or

24    earshot of other witnesses.

25          Failure to follow that rule can result in you being

9

1  excluded as a witness and found in contempt; understand?  Any

2  questions?  Ms. Sharp, if you will swear them in.

3          THE CLERK:  Starting with you, if you'll state your

4  name.

5          DEPUTY JOE SIMMONS:  Deputy Joe Simmons.

6          OFFICER MICHAEL CALLAHAN:  Officer Michael Callahan.

7          OFFICER RONALD COOPER:  Officer Ronald Cooper.

8          ██████████████████████: ████████████████████████

9          ROSALINO HERNANDEZ DIAZ:  Rosalino Hernandez Diaz.

10          INVESTIGATOR JEREMY STAGNER:  Investigator Jeremy

11  Stagner.

12          SPECIAL AGENT JULIO LOPEZ:  And Special Agent Julio

13  Lopez.

14          (Witnesses sworn.)

15          THE COURT:  You may withdraw from the courtroom at this

16  time, and, Ms. Groover, call your first witness.

17          MS. GROOVER:  Thank you, Your Honor.  The United States

18  calls Special Agent J. C. Lopez.

19          THE CLERK:  Sir, you were just sworn.  Do you still

20  uphold that deposition.

21          THE WITNESS:  Yes.

22                  SPECIAL AGENT JULIO LOPEZ,

23  having been first duly sworn, was examined and testified as

24  follows:

25          THE CLERK:  State your full name, spell your last, state

10

1    your occupation and your business address.

2         THE WITNESS:  My name is Julio Lopez, L-o-p-e-z.  I'm a

3    special agent for the Department of Homeland Security in

4    Savannah, Georgia.

5                        DIRECT EXAMINATION

6    BY MS. GROOVER:

7    Q.    Good afternoon.

8    A.    Good afternoon.

9    Q.    How long have you been a special agent with HSI, sir?

10   A.    I've been a special agent since September of 2002.

11   Q.    And what are your duties as a special agent?

12   A.    We investigate criminal allegations and special sections

13   of the US Code.

14   Q.    Are you one of the lead case agents in this investigation?

15   A.    Yes, ma'am, I am.

16   Q.    And is this case connected to a larger investigation known

17   as Operation Blooming Onion?

18   A.    Yes, ma'am, it is.

19   Q.    And is this an investigation into a transnational criminal

20   organization that was committing human smuggling, human

21   trafficking and visa fraud as primarily operating here in

22   Southern District of Georgia as well as throughout the United

23   States, Mexico, Guatemala and Honduras?

24   A.    That is correct.

25   Q.    And is this a joint investigation not only with HSI but

11

1   also with the department of labor, the department of state, the

2   United States Postal Service as well as the FBI?

3   A.    That is correct, yes, ma'am.

4   Q.    And have these federal agencies been investigating this

5   organization since as early as 2016?

6   A.    Correct, yes, ma'am.

7   Q.    And the investigation confirmed that they were

8   fraudulently using the H-2A visa program to smuggle Mexican,

9   Guatemalan and Honduran nationals into the United States, under

10  the pretext of being an agricultural worker?

11  A.    That is exactly right.

12  Q.    Are you generally familiar with the H-2A process, sir?

13  A.    Yes, ma'am, I am.

14  Q.    And is that in general, foreign nationals are not allowed

15  to work in the United States unless they have prior

16  authorization from the United States Government; is that

17  correct?

18  A.    Yes, ma'am.

19  Q.    And they can obtain authorization by getting an employer

20  here in the United States to sponsor them; is that correct?

21  A.    Correct.

22  Q.    And that US-based employer would then file a petition

23  seeking them to come to the United States; is that correct?

24  A.    Yes, ma'am.

25  Q.    And they would seek a petition requiring the United

12

1   States, asking the United States Government to issue them an

2   H-2A visa?

3   A.    Correct.

4   Q.    And that H-2A visa, is that solely for agriculture

5   purposes?

6   A.    Correct.  The H-2A is specifically for agriculture work.

7   Q.    So if an individual came on an H-2A visa, they couldn't

8   then go drive a school bus or work in a restaurant, for example?

9   A.    No, ma'am.  They could not.

10   Q.    And as part of the petition requesting workers, does the

11   petition document state where the workers will live and where

12   exactly they will be performing their agricultural work?

13   A.    Correct.

14   Q.    And individuals who are granted an H-2A visa, must they

15   stay at the approved housing and work at the approved locations?

16   A.    That is correct, yes, ma'am.

17   Q.    Under the H-2A system, are foreign nationals supposed to

18   pay for the visa?

19   A.    Initially, the visa is the only thing they pay for;

20   however, they are reimbursed for that cost.

21   Q.    And that visa, they are not paying like for a right for a

22   visa.  It's a processing fee; is that correct?

23   A.    That is correct, yes, ma'am.

24   Q.    Minimal amount?

25   A.    Exactly.

13

1   Q.   And under the H-2A visit lawful program, workers can have

2   to pay for their travel expenses into the United States as long

3   as they are reimbursed within a week; is that correct?

4   A.   That is correct, yes, ma'am.

5   Q.   And so their sponsoring employer must provide for their

6   transportation?

7   A.   Correct.

8   Q.   And must provide for their housing?

9   A.   Correct.

10  Q.   And the housing, is that supposed to be approved by the

11  State that they are living in, their department of labor, in

12  this case the Georgia Department of Labor?

13  A.   Georgia Department of Labor verifies the housing locations

14  and does inspections at said location.

15  Q.   To ensure appropriate plumbing, appropriate windows,

16  heating, things like that?

17  A.   That is correct.

18  Q.   After the expiration of their visa, are the foreign

19  workers required then to return to their home countries?

20  A.   Yes, ma'am.  It's a temporary work authorization visa, so

21  they go back to their home country.

22  Q.   Now in this particular investigation, did your

23  investigation reveal that this organization was unlawfully

24  charging foreign nationals fees or smuggling debt to obtain an

25  H-2A visa?

14

1    A.    Yes, ma'am, we did.

2    Q.    Were they also bribing state work employees of the Georgia

3    state department of labor to approve housing for H-2A workers?

4    A.    Yes, ma'am.

5    Q.    And once inside the United States, did your investigation

6    reveal that members of the organization did not pay the workers

7    as required under the terms of the contract?

8    A.    Yes, ma'am.

9    Q.    And that they would move them to unapproved locations?

10   A.    Yes, ma'am.

11   Q.    And that they would require them to work until they paid

12   the smuggling debt that they had to pay initially to get into

13   the United States?

14   A.    That is correct.

15   Q.    Did your organization, excuse me, did the investigation

16   also reveal that members of this organization were threatening

17   the workers with deportation and violence if they did not pay or

18   stay and work?

19   A.    Yes, ma'am.

20   Q.    Did your investigation also reveal, though, other people

21   were charged even more fees and simply allowed to abscond once

22   they entered the United States and never ever worked at all?

23   A.    Right.  Some, some individuals had an agreement in place

24   already to be charged excessive fees for the right to be

25   smuggled into the country and basically exploiting the H-2A visa

15

1   worker program.

2   Q.   But then never to --

3   A.   Correct.  They never worked because they paid such large

4   amounts of money.

5   Q.   Did your investigation specifically reveal that to cheat

6   foreign workers and to cheat the system for financial gain, from

7   at least 2015 and continuing to approximately November of 2021,

8   did members of this organization mail dozens if not hundreds of

9   false petitions to the United States Government?

10  A.   Yes, ma'am, they did.

11  Q.   In the total of all those dozens if not hundreds of

12  petitions they sought over 71,000 foreign workers?

13  A.   Correct.

14  Q.   And those 71,000 workers were to enter the United States

15  for agricultural visas -- excuse me -- agricultural purposes of

16  a H-2A visa?

17  A.   Yes, ma'am.

18  Q.   And based on that paperwork, did, in fact, the United

19  States issue thousands of H-2A visas to foreign nationals who

20  were supposed to be coming and working under this organization?

21  A.   Yes, ma'am.

22  Q.   And did your investigation -- did you have an opportunity

23  to speak with many workers who paid the fees to come over into

24  the United States?

25  A.   Yes, ma'am.

16

1   Q.    And did you also have an opportunity to speak with

2   cooperating defendants who have been charged in this particular

3   organization?

4   A.    Yes, ma'am, we did.

5   Q.    As well as cooperating sources who were working at hotels,

6   for example, where workers would stay and had inside information

7   into the organization?

8   A.    Correct.  Some workers were working in restaurants and

9   construction and different types of work.

10  Q.    And through your entire investigation, were you able to

11  determine approximately how much money this organization was

12  making based off the illegal fees they were charging the

13  workers?

14  A.    Yes, ma'am, that's correct.

15  Q.    And from, you know, at least 2015 through November of

16  2021, does a conservative estimate indicate that the

17  organization illegally profited over 200 million dollars from

18  this scheme?

19  A.    Yes, ma'am, that's correct.

20  Q.    Did your investigation reveal that Mr. Sanchez Mendoza,

21  the defendant, was a part of this organization?

22  A.    Yes, ma'am.

23  Q.    And that he benefited financially from bringing workers

24  into the United States?

25  A.    That is correct.

17

```
 1   Q.    And he benefited financially by charging them unlawful

 2   fees; is that correct?

 3   A.    That is correct.  Yes, ma'am.

 4   Q.    Did he also hold their documentation until the fees were

 5   paid?

 6   A.    Correct, he would hold on to their passports.

 7   Q.    Did he primarily operate here in Glynn County, Wayne

 8   County and Pierce County?

 9   A.    Yes, ma'am.

10   Q.    And specifically his role in this organization, did he

11   meet with workers once they got -- entered into the United

12   States and was similar to a crew leader, and so he assured where

13   the workers stayed and where they were supposed to be working

14   for him?

15   A.    Yes, ma'am, that's correct.

16   Q.    And did he receive money for his role in this

17   organization?

18   A.    Yes, ma'am, he did.

19   Q.    This is a joint investigation with four or five federal

20   agencies; correct?

21   A.    That is right.

22   Q.    And each agency had a different role in the investigation;

23   is that correct?

24   A.    Yes, ma'am.

25   Q.    And the state department, was their -- the state
```

Case 2:21-cr-00034-LGW-BWC   Document 46   Filed 05/18/22   Page 18 of 179
USCA11 Case: 22-11273   Document: 17   Date Filed: 09/28/2022   Page: 42 of 205

18

1   department was able to determine the exact number of visas and

2   petitions that were entered with respect to different defendants

3   and members of this organization; is that correct?

4   A.   That is correct, yes, ma'am.

5   Q.   And did you receive information from the state department,

6   lead state agent, with respect to the number of petitions and

7   workers that Mr. Mendoza, this defendant, personally brought

8   into the United States?

9   A.   Yes, ma'am.

10   Q.   And did the investigation reveal that there were a total

11   of five petitions that this defendant submitted or caused to be

12   submitted for himself?

13   A.   Yes, ma'am.

14   Q.   And of those five petitions, did the United States then

15   issue 565 visas, H-2A visas, for workers?

16   A.   That's correct, 565.

17   Q.   So those were actually 565 that came into the United

18   States to work for the man, this defendant?

19   A.   Correct.

20   Q.   We will talk about it more in detail, but did you also

21   personally determine that there were approximately 300

22   additional people in Mexico that were attempting to enter the

23   United States at the time that Mr. Mendoza was arrested?

24   A.   Correct.  While we were conducting the investigation, I

25   was still receiving phone calls of people that had been

19

1    defrauded that were basically stuck in Mexico.

2    Q.    Do you speak Spanish?

3    A.    I do.

4    Q.    And how did you learn Spanish, sir?

5    A.    That was my first language.  I'm a first-generation US

6    citizen.

7    Q.    And as part of your duties in this investigation, were you

8    personally interviewing workers and witnesses and victims who

9    speak Spanish?

10   A.    That is correct, yes, ma'am.

11   Q.    And as part of being special agent with HSI, do you have

12   training and experience in investigating cases, human-

13   trafficking cases?

14   A.    Yes, ma'am, I do.

15   Q.    Specifically labor-trafficking cases?

16   A.    Correct, yes, ma'am.

17   Q.    And in general, are international laboring traffic,

18   trafficking cases, does that include witnesses and victims who

19   are from other countries who are coming to America to look for

20   work?

21   A.    That is correct, yes.

22   Q.    And in your training and experience -- well, how long have

23   you been investigating cases involving labor trafficking, sir?

24   A.    Since I believe it was 2005, about three years after I

25   graduated.  My first three years were primarily in the narcotics

20

1   field.  Then I transferred out to human smuggling, the human-

2   trafficking unit.

3   Q.   And where was that at, sir?

4   A.   That was in south Texas, in McAllen, Texas to be specific.

5   Q.   So since 2005 you've been investigating cases involving

6   foreign nationals and that touch on human trafficking and labor

7   trafficking?

8   A.   That's correct, yes, ma'am.

9   Q.   And in your training and experience, are victims of

10  international human trafficking, are they familiar with the laws

11  of the United States of America?

12  A.   No, ma'am, they are not.

13  Q.   Are they familiar with the culture here in the United

14  States of America?

15  A.   No, ma'am.

16  Q.   Do they speak English?

17  A.   No, ma'am.

18  Q.   Some of them may speak a little English?

19  A.   Right.  Most of the times, they do not.

20  Q.   And do they generally come from a low economic background?

21  A.   Yes, ma'am.

22  Q.   And in general looking for a better life here in America?

23  A.   That's correct.

24  Q.   Are you familiar with the term "climate of fear"?

25  A.   Correct, yes, ma'am.

21

1    Q.    Can you describe that for The Court, please.

2    A.    Basically, it's where individuals are so scared that

3    they -- they are basically kept as prisoners because there's so

4    much fear instilled by the aggressor, by the person who is

5    defrauding them.

6    Q.    And in this investigation, approximately how many Spanish-

7    speaking witnesses or workers or victims, all of those

8    categories, have you spoken to in this case, sir?

9    A.    I think our latest numbers are over 200, ma'am.  I don't

10   have the exact number but it's over 200 victims.

11   Q.    You've personally spoken with hundreds of people?

12   A.    Yes, ma'am.

13   Q.    All who speak Spanish?

14   A.    Correct.

15   Q.    All coming from a low economic background?

16   A.    That's true.

17   Q.    Not familiar with the laws of the United States?

18   A.    Correct.

19   Q.    Or our culture?

20   A.    Correct.

21   Q.    And did they in general express some sort of limitation in

22   coming forward and reporting to you and law enforcement what had

23   happened to them?

24   A.    Yes, ma'am, because they have been threatened with being

25   turned over to law enforcement and being deported, so many of

22

1    them decide not to make an outcry initially until later that

2    they learn that they are not going to be deported and that they

3    are actually victims of human trafficking.

4    Q.    And in this case, when the investigation has determined

5    that someone is a potential witness or, excuse me, a potential

6    victim of labor trafficking, did law enforcement then provide

7    them with benefits?

8    A.    Yes, ma'am.

9    Q.    And do those benefits include, for example, the right to

10   remain in the United States such as continued presence?

11   A.    Yes, ma'am.

12   Q.    Or an application for a visa, more of a permanent

13   presence?

14   A.    Correct.  Initially it's called a continued presence, and

15   the whole reason behind a continued presence is so the

16   individual does not become a burden on the US Government, and

17   they are given an opportunity to find employment and be able to

18   provide for their basic needs.

19   Q.    And they are not deported during the investigation and

20   prosecution of the case; is that correct?

21   A.    That is correct.

22   Q.    So one benefit the witnesses in this case were given is

23   the right to remain in the United States with a continued

24   presence to work during the investigation and prosecution of

25   this case?

23

1   A.     Yes, ma'am, correct.

2   Q.     And some of them are also applying for a T visa or a U

3   visa as a being a documented victim; is that correct?

4   A.     That is correct, yes, ma'am.

5   Q.     And in addition to giving the benefit of status, were the

6   victims and workers in this particular case given other

7   benefits?

8   A.     I'm not sure what you're referring to, ma'am.

9   Q.     Did law enforcement align each victim with a

10  non-government organization?

11  A.     Yes, ma'am, we've got -- we work closely with the NGO's.

12  We've got a victims' assistance coordinator, and the NGO's will

13  make contact with our victims and make sure that they have got

14  food, they've got shelter, and, again, their basic needs are met

15  especially in the initial contact with the victims.

16  Q.     In your experience investigating this case, when you first

17  made, would make contact with a potential witness or worker, did

18  they have their basic needs met at that time?

19  A.     Not at the initial time, but we would contact, again, our

20  victims coordinator and get ahold of an NGO to be able to come

21  and assist us with the situation or maybe put them in a hotel

22  and give them some food.

23  Q.     And so benefits were provided to help provide them shelter

24  and food initially, on an initial matter, and then long term

25  through a non-governmental organization?

24

1   A.    Yes, ma'am, correct.

2   Q.    And would the non-government organization, such as the

3   YMCA, Salvation Army or Tapestry, would they then assist them in

4   trying to find employment as well?

5   A.    Yes, ma'am.

6   Q.    And transportation for those jobs as well; correct?

7   A.    Yes.

8   Q.    Are you familiar with the Santa Muerte?

9   A.    Yes, ma'am, I am.

10  Q.    Can you tell The Court what is that?

11  A.    Santa Muerte is basically the -- the holy death, if you

12  will, or the saint of death and is something that has come

13  about, especially we first saw it in the narco culture.  It's a

14  type of black magic, if you will, which many of the individuals

15  involved in organized crime partake.

16  Q.    How is it -- is it portrayed as a skeletal figure wearing

17  a robe?

18  A.    It is.  It's a skeletal figure, like you mentioned.  They

19  come in different colors.  Sometimes you will see one with a

20  sickle and they will be holding like scales on one side or the

21  world on other the hand.

22  Q.    And is there any symbolic meaning to the scales or the

23  world or the sickle?

24  A.    According to them, the Santa Muerte does not judge them,

25  so it doesn't care whether you do right or do wrong but

Case 2:21-cr-00034-LGW-BWC   Document 46   Filed 05/18/22   Page 25 of 179
USCA11 Case: 22-11273   Document: 17   Date Filed: 09/28/2022   Page: 49 of 205

25

1    typically the Santa Muerte, when we ran across it, especially

2    along the south Texas border, it was because they would look to

3    this saint of death to protect them from their enemies and also

4    they would do offerings to this figure in return for favors.

5    Q.    When you say offerings to the figure, what exactly do you

6    mean by that?

7    A.    Many times in homes that we would conduct search warrants

8    in, there would be altars made to this -- this Santa Muerte, and

9    in the bottom of the altar you would find money, you would find

10   liquor, that type of offering.

11   Q.    And have you -- and through your, since 2005, when you've

12   been investigating these types of cases, have you had an

13   opportunity to come across the Santa Muerte in many of the

14   investigations?

15   A.    Yes, ma'am, we have.

16   Q.    And have you also spoken not only with individuals charged

17   in these types of cases as well as victims and interviewed them

18   about the Santa Muerte?

19   A.    Yes, ma'am, we have.

20   Q.    And so does your information that you're telling us today

21   come from that training and experience and that knowledge?

22   A.    That's correct, yes, ma'am.

23   Q.    And does this climate of fear that you've talked about,

24   does it involve the Santa Muerte of trying to keep witnesses in

25   line for what they should be doing?

26

1    A.    Yes, ma'am, that's correct.

2    Q.    Almost as if death will come to them if they don't do what

3    they are ordered to do?

4    A.    Right, and again, many of these people are very low

5    income.  Many of them they really don't know how to read or

6    write, but they really believe in this evil underworld and evil

7    spirits wholeheartedly.  So when they're being threatened by

8    that, they genuinely feel fear.

9    Q.    When you've had the chance to speak with these hundreds of

10   witnesses in this particular case or the larger investigation,

11   did they explain to you about their journey on how they came to

12   the United States on the H-2A visa?

13   A.    Yes, ma'am, they did.

14   Q.    In general, what did they tell you had happened?

15   A.    Many of them were recruited in their small hometowns back

16   in Mexico, and they were offered employment in the US as a

17   temporary visa, you know, a farm worker, so many of them didn't

18   have the money or they would end up having to put their homes up

19   for sale or get loans from family members in order to pay the

20   moneys that were being asked upfront by these individuals that

21   were again exploiting the H-2A visa worker program.

22   Q.    And did they tell you what happened once they actually got

23   into the United States with the visa?

24   A.    Yes, ma'am.  After making -- after entering the US with

25   their visas, most of the workers were stripped of their

27

1   passports and told that they could not leave of their own free

2   will, that they had to listen to whatever the boss said.

3   Q.   Did they then explain how they were taken advantage of

4   where -- once they were in the United States?

5   A.   Yes, ma'am.  The agreed-upon, the contract, you know, all

6   of them had a contract before coming into the US on how much

7   they were going to get per hour, and it seems most -- almost

8   nobody was getting paid what they were originally contracted to

9   get paid.  Many of them were not working where they said that

10  they were going to be working, where they told them they were

11  going to be working, and, yes, ma'am, there was different types

12  of violations that we found.

13  Q.   As part of your larger investigation, did you have an

14  opportunity to investigate not only the defendant, but also an

15  individual by the name of Charles King and Stanley Neal

16  McGauley?

17  A.   Yes, ma'am.

18  Q.   And can you describe for The Court who are Charles King

19  and Stanley Neal McGauley?

20  A.   They were coconspirators with the defendant.

21  Q.   Have they since been charged in a separate case?

22  A.   Yes, they both have.

23       MS. GROOVER:  And, Your Honor, may I approach the

24  witness?

25       THE COURT:  You may.

28

1    (By Ms. Groover)   Sir, I'm handing you what's been marked as

2    Government Exhibit 1.  Can you take a look at that exhibit and

3    tell me if you recognize that, please?

4    A.    It is a record of a sworn statement, ma'am.

5    Q.    As part of this investigation, did the department of labor

6    wage and hour divisions conduct site visits at different

7    locations?

8    A.    Yes, ma'am, they did.

9    Q.    And the purpose of conducting those site visits is that

10   the United States was trying to follow up on visas that were

11   entered to ensure that people were staying where they were

12   supposed to be and working where they were supposed to be; is

13   that correct?

14   A.    That is correct, yes, ma'am.

15   Q.    And is Government's Exhibit 1, is that a sworn statement

16   that the department of labor received in this case with respect

17   to Charles King?

18   A.    Charles King, yes, ma'am.

19   Q.    And in general, what is Mr. King explaining to the

20   department of labor about the defendant, Mr. Mendoza?

21   A.    In his own statement, Mr. King said that he met Javier

22   Sanchez Mendoza in -- on or about May of 2018 and that he was

23   looking for work.

24        He acquired Mr. Mendoza's services in order to get workers

25   to work his fields, Sanchez Harvesting, and to oversee the H-2A

29

1    workers that were brought in.

2         He, meaning Mr. Sanchez Mendoza, is responsible for

3    housing and paying the workers and that the farmer, Mr. King,

4    Charles King, paid Javier Sanchez Mendoza directly.

5    Q.   Now, with respect to the workers that came in with respect

6    to Charles King, Neal McGauley and the defendant, did you have

7    an opportunity to interview a number of workers that were

8    supposedly working for them?

9    A.   Yes, ma'am, we did.

10   Q.   In particular did you interview an individual known as

11   ████████████████?

12   A.   Yes, ma'am.

13   Q.   And what did she tell you?

14   A.   ██████████████ --

15        MR. BLACKERBY:  Your Honor, I haven't made any

16   objections to what other people said, but I do want to make a

17   hearsay objection at this point.  I know that this particular

18   witness is here today and can testify herself as to what she

19   says or experienced, but I want to object to any further

20   questions of the agent regarding what anyone told him if it's

21   being offered for the truth of the matter asserted.

22        THE COURT:  Ms. Groover?

23        MS. GROOVER:  The Government does believe that certain

24   hearsay that is reliable can be admitted at sentencing, given

25   the indicia of reliability, and in this particular case, through

30

1    the agent, we will establish her reliability based on his

2    interview not only with her and other witnesses who had similar

3    stories, statements that they gave to law enforcement about what

4    had happened to them.

5         It's the Government's position that hearsay statements

6    that the witness will testify as to what witnesses told him is

7    reliable based on the cross-corroboration through the other

8    witnesses that he interviewed as well as the corroboration

9    through the larger investigation that he's just been outlining

10   for Your Honor.

11        THE COURT:  I will overrule your objection at this time

12   and note that, of course, the Federal Rules of Evidence don't

13   apply strictly at this proceeding.

14        I nevertheless have to find that there is a sufficient

15   indicia of reliability to hear the hearsay, and I will at this

16   point let it go forward and keep my ears open for that.

17   Continue.

18        MS. GROOVER:  Thank you, Your Honor.

19   Q.   (By Ms. Groover)  Can you tell us what she told you about

20   her journey here to the United States?

21   A.   My partner and myself were dispatched, if you will, to

22   Brunswick, Georgia because ████████████ had made a what we

23   call an outcry of labor trafficking, human trafficking.

24   Q.   And did she tell you what happened?

25   A.   Yes, ma'am.  ██████████ stated that he had been -- she

31

 1   had come into the US under the H-2A work visa program, and that

 2   Mr. Javier Sanchez Mendoza was the one that originally had

 3   offered her the job to come to the US to work.

 4   Q.   Did she explain how she started communicating with him

 5   when she was in Mexico?

 6   A.   Initially it was via text messages.

 7   Q.   Did she explain anything about those text messages in

 8   particular?

 9   A.   Initially she noticed that they were very flirtatious in

10   nature.  I guess it was sexual innuendo type.

11        THE COURT:  Is this the person that's identified as Jane

12   Doe in the presentence report?

13        MS. GROOVER:  That is correct, Your Honor.

14        THE COURT:  And the name that you're using with her.

15        THE WITNESS:  I apologize.  That's correct.

16        THE COURT:  Okay, continue.

17   Q.   (By Ms. Groover)  Jane Doe Number 1 or ███████?

18        THE COURT:  There's Jane Doe and Jane Doe Number 1.  Are

19   those the same person?

20        MS. GROOVER:  That is correct in the PSI, Your Honor.

21        THE COURT:  All right.

22        MS. GROOVER:  I will state, though, for the record the

23   victim impact statements they are different numbering and that

24   is because this initial victim was charged in the initial case

25   and then when we merged all the cases to keep all the witnesses

32

1   straight, we had a master numbering system.

2        THE COURT:  And the Jane Doe that you're asking about

3   presently, is this the Jane Doe that there's an issue about

4   whether they were or were not married and the consensual nature

5   of the relationship?

6        MS. GROOVER:  That is correct, and as Mr. Blackerby

7   stated, she is present and the Government anticipates calling

8   her next.

9        THE COURT:  I understand.  Proceed.

10  Q.   (By Ms. Groover)  Thank you?

11       And did she explain how she responded to those text

12  messages?

13  A.   How she responded?

14  Q.   That were flirtatious or sexual?

15  A.   No, ma'am.

16  Q.   Did she explain if she had to pay money in order to come

17  over to the United States?

18  A.   Yes, ma'am.  She did explain that, that she was being

19  charged money to come into the United States.  However, because

20  Mr. Sanchez Mendoza had an interest in her, he charged her a

21  much less amount.  I believe it was something like $250.00 if

22  I'm not mistaken.

23  Q.   Much less than he was charging everybody else?

24  A.   Compared to the thousands he was charging other people;

25  correct?

33

1   Q.   And did she explain what happened to her when she got her

2   visa and entered the United States?

3   A.   As far as what she went through, the suffering?

4   Q.   Yes.

5   A.   Yes, ma'am.  Basically she was being forced against her

6   will to endure different types of instances of abuse.

7   Q.   Did she explain that she was separated from the group that

8   she came over with?

9   A.   Yes, ma'am, that's correct.

10  Q.   And that she was forced to live with the defendant in his

11  residence?

12  A.   Correct.

13  Q.   While other individuals lived at a barracks?

14  A.   Yes, ma'am.  He took an interest specifically in her.

15  Q.   And did she explain that at one point she believed she was

16  tricked into marrying him?

17  A.   Yes, ma'am, she did.

18  Q.   Can you describe that for The Court, please.

19  A.   She mentioned an occasion where Mr. Sanchez Mendoza had

20  driven to a building that she later found out was a courthouse

21  and that she did not know how to read or write the English

22  language so she didn't comprehend.  However, she said that Mr.

23  Sanchez Mendoza asked her to sign some documents inside that

24  building, and upon signing those documents, he told her, "Now

25  you just married me."

34

1    Q.    And did she express her -- that she was tricked into that,

2    that she didn't want to do that?

3    A.    Yes, ma'am.  She said she never accepted that.

4    Q.    Did she explain that at some point he began having sex

5    with her against her will?

6    A.    Yes, ma'am.

7    Q.    And that he would beat her?

8    A.    Correct.

9    Q.    And would she explain that because she lived with him she

10   was familiar with his operation of his criminal organization?

11   A.    Yes, ma'am.

12   Q.    And how the organization was charging workers and moving

13   workers around and working with coconspirators in Mexico?

14   A.    That is correct, yes, ma'am.

15   Q.    Did she provide you detailed information about what she

16   learned from the defendant and the organization, their scheme?

17   A.    Yes, ma'am, correct.

18   Q.    And the information she provided, did you find it

19   credible?

20   A.    Yes, ma'am.

21   Q.    And why is that?

22   A.    ████████ also provided us with other victims of crime, of

23   labor trafficking, specifically, other individuals that were

24   afraid to make outcries, so other individuals started calling

25   me, and then myself and my partner would interview them and kind

Case 2:21-cr-00034-LGW-BWC   Document 46   Filed 05/18/22   Page 35 of 179
USCA11 Case: 22-11273   Document: 17   Date Filed: 09/28/2022   Page: 59 of 205

35

1   of started putting the puzzle together in order to get to Mr.

2   Sanchez Mendoza's whereabouts.

3   Q.    And did your investigation of interviewing not only ███

4   ███ but the other people who started calling, was that

5   corroborated by the department of state's investigation as well

6   as the department of labor's investigation?

7   A.    Correct.

8   Q.    And FBI's investigation?

9   A.    Yes, ma'am.

10  Q.    And United States Postal Service's investigation?

11  A.    Correct.

12  Q.    And so the larger investigation, the documents, the fees,

13  the visas, the petitions, the coconspirator statements of

14  interviews of cooperating defendants were all corroborated by

15  what ███████ was telling you?

16  A.    That is correct, yes, ma'am.

17  Q.    How did Ms. -- on November 4th of 2019, law enforcement

18  was dispatched in Brunswick, Georgia to a kidnapping.  Are you

19  familiar with that incident?

20  A.    I've read the reports.  I -- unfortunately, I arrived to

21  Brunswick, I believe it was April of 2020.

22  Q.    Is it your understanding that in broad daylight ███████

23  was outside a home in a front yard playing with children when

24  the defendant drove up in a truck, exited with a knife and

25  abducted her?

36

```
 1    A.    Yes, ma'am.

 2    Q.    And according to ███████ she explained that he was going

 3    to kill her?

 4    A.    Correct.

 5    Q.    And, in fact, that's what he intended to do?

 6    A.    Yes, ma'am.

 7          MR. BLACKERBY:  Objection.  That calls for speculation,

 8    Your Honor.

 9          THE COURT:  Sustained.

10    Q.    (By Ms. Groover)  Did the investigation reveal that law

11    enforcement was called from 911 after she was abducted in that

12    truck; is that correct?

13    A.    Yes, ma'am.

14    Q.    And did law enforcement then get an emergency ping to

15    locate her, her cell phone?

16    A.    Yes, ma'am.

17    Q.    And did law enforcement eventually locate her cell phone

18    at the residence of Mr. Mendoza?

19    A.    Yes, ma'am.

20    Q.    Did law enforcement then locate Mr. Mendoza when they went

21    inside the home?

22    A.    Yes, ma'am.

23    Q.    And it was after that incident that you were then able to

24    interview her and connect her statements to the larger

25    investigation; is that correct?
```

37

1    A.    Correct, months later, yes, ma'am.

2    Q.    Is it your understanding that when ████████ was located in

3    Mr. Mendoza's house that he was also arrested at that time?

4    A.    Correct.

5    Q.    And did law enforcement, they searched his home; is that

6    correct?

7    A.    Yes, ma'am.

8    Q.    And did they find a Santa Muerte shrine?

9    A.    They did.

10   Q.    And did they also find her hair on that shrine?

11   A.    Yes, ma'am.

12   Q.    As well as a drop of her blood on the figure?

13   A.    Correct.

14   Q.    Did they also find a photograph of her that was placed

15   upside down underneath one of the candles?

16   A.    Yes, ma'am.

17   Q.    And what, if anything, based on your training and

18   experience, is significant about those items found in Mr.

19   Sanchez's home?

20   A.    Again, this is a type of a ritualistic sacrifice,

21   offerings to the Santa Muerte and wanting to cause harm to an

22   individual or harm to come to an individual specifically.  And

23   by harm I mean death, I'm sorry.

24   Q.    And did, based on your training and experience and what

25   was actually found at Mr. Mendoza's house, did that corroborate

1   ██████████  statement that she believed he was going to kill her?

2   A.    Yes, ma'am.

3   Q.    Did you have an opportunity to speak with other

4   individuals who told a similar story to ████████?

5   A.    Yes, ma'am.

6   Q.    In particular, did you speak with an individual by the

7   name of Olga?

8   A.    Yes, ma'am.

9   Q.    And what did Olga tell you?

10  A.    Olga was one of the individuals that was kidnapped while

11  Mr. Mendoza was out after being arrested for the kidnapping --

12  on the kidnapping charges.  He had, I believe, at the time still

13  had an ankle monitor on him.

14  Q.    Let's back up again, a moment then.  When you spoke with

15  ████████ did she explain that she tried to escape once before,

16  before the FBI came on November the 4th of 2019?

17  A.    Yes, ma'am.

18  Q.    And what exactly did she tell you about that event?

19  A.    That this was the second time it happened.  It wasn't the

20  first time so she was very scared when she talked to us because

21  she believed he was incarcerated and then later we discovered

22  that he was actually out and still defrauding people of monies

23  and still exploiting the H-2A visa worker program.

24  Q.    And did she explain that he was initially arrested back in

25  August of 2019 and was in jail for a period of time and then was

39

1  released on bond?

2  A.   Yes, ma'am.

3  Q.   And then found her when he was released on bond?

4  A.   Correct.

5  Q.   And so the second time when law enforce -- when 911 was

6  called because she was in the front yard playing with children,

7  that was the second time he had come after her?

8  A.   I believe that was in November of 2019; correct.

9  Q.   And did she explain that he was angry and she believed he

10 wanted to kill her because she had tried to escape again?

11 A.   Correct.

12 Q.   And did she further explain to you that she believed he

13 was angry and wanted to kill her because she knew so much about

14 his organization?

15 A.   Yes, ma'am.

16 Q.   Going fast-forward back to Olga, an individual named Olga

17 that you interviewed, tell The Court what she said.

18 A.   Olga was again another individual that came across under

19 the H-2A visa worker program.  She was one of the ladies that

20 was kidnapped.  I believe it was a total of four, a total of

21 four individuals that were kidnapped at that time by Mr. Sanchez

22 Mendoza.

23      Olga expressed concerns because she feared that Mr.

24 Sanchez Mendoza was going to rape her because he took a special

25 interest in her.  So she -- she was very scared of being left

40

1   alone with Mr. Sanchez Mendoza, and again he separated her from

2   the other group of people that had come into the country.

3   Q.   Did her story about fear of being separated and the

4   special interest that the defendant took in her, was that

5   similar to what ████████ explained to you?

6   A.   That's correct, yes, ma'am.

7   Q.   And you mentioned that there was four people that were

8   kidnapped.  Have you personally spoken with all four of those

9   individuals?

10  A.   Yes, ma'am, I have.

11  Q.   And did you speak with them on different occasions?

12  A.   We did.

13  Q.   And in general, were their stories similar?

14  A.   Yes, ma'am.

15  Q.   And can you tell The Court about the kidnapping incident

16  involving these four individuals.

17  A.   Okay, they --

18       MR. BLACKERBY:  Your Honor, I will again make the

19  objection to hearsay testimony since it's based entirely on what

20  other individuals told the agent.

21       THE COURT:  And I will overrule it.  Proceed.

22  Q.   (By Ms. Groover)  Tell The Court what happened in that

23  kidnapping incident involving these four individuals?

24  A.   Initially it was not Ms. Olga who we spoke to.  I believe

25  it was Rosalino, one of the other individuals who was also part

41

1   of the kidnapped group before.

2        MS. GROOVER:  And let me just stop you.  Your Honor,

3   Rosalino is present and will be testifying as well.

4        THE WITNESS:  Correct.  So we received the phone call

5   from Rosalino and he explained his story about how he was

6   charged excessive fees.  There was no work when he came over to

7   the United States.  He told a story of how they were brought to

8   a barracks location, and there were armed men outside of the

9   barracks location guarding anybody, make sure that they didn't

10  leave, and when Rosalino asked Sanchez Mendoza who those people

11  were, he said, "Those are my men making sure you're not leaving,

12  that nobody is going to leave."

13       There are many details, and I don't have the report here

14  in front of me.  However, I will tell you that there was four

15  individuals that were taken in a pickup truck up towards North

16  Carolina area and during the -- every one of the different

17  interviews, everybody expressed fear because he was heading to

18  go meet with a person that they called sicario.  Sicario is

19  basically an assassin in Spanish.

20  Q.   (By Ms. Groover)  The word sicario translate to assassin?

21  A.   Correct, and this was one of his friends up in the North

22  Carolina area who he was meeting with and the people had been

23  here for, I guess, a couple of days.  Again they were

24  complaining of no food or anything like that.

25  Q.   Let me stop you for just a moment.  So this information is

42

1   coming initially from an individual by the name of Rosalino;

2   correct?

3   A.    Correct, yes, ma'am.

4   Q.    And he's telling you this information that this defendant

5   was doing to them; is that correct?

6   A.    That is correct.

7   Q.    That the defendant had them at barracks; is that correct?

8   A.    Yes, ma'am.

9   Q.    Surrounded by armed guards that he said were his men?

10  A.    That he said that they were his men, correct.

11  Q.    And at one point in time the defendant had individuals

12  removed from the barracks; is that correct?

13  A.    Correct.

14  Q.    And is this the situation where the word "sicario" came

15  up?

16  A.    Yes, ma'am.

17  Q.    And what exactly did Rosalino tell you about the sicario

18  event?

19  A.    That this was an individual that they were meeting with in

20  North Carolina, that Sanchez Mendoza was meeting with in North

21  Carolina.  Again, all four of the witnesses, victims, stated

22  that, during the trip up there, Sanchez Mendoza was receiving a

23  lot of threats, a lot of phone calls and he was very angry

24  because there was some type of fallout with some people that he

25  had contracts with.  A lot of people were stranded in Mexico.

43

1   There was a lot of money that was owed and basically they were

2   selling workers or employees, so he was -- he was very irate,

3   according to all four of the witnesses, and just very angry and

4   didn't know what to do with the -- with the individuals.

5   Q.   And did Rosalino explain why the four individuals were in

6   the car initially with the defendant?

7   A.   The -- the reason that all four of them is -- I'm trying

8   to remember what exactly he said, but I don't recall at this

9   moment.

10  Q.   In general, do you recall from what the four of them said

11  the reason was?

12  A.   He had taken the females -- Olga was one of the females he

13  was interested with.  He was mad because they had let -- now I

14  remember.  Rosalino had let a lot of the individuals go because

15  he had separated the women from Michoacan and told Rosalino,

16  "You just leave those women from Michoacan at the barracks

17  because I've got special plans for them" is basically what he

18  had told them.

19  Q.   So Rosalino explained to you that the defendant wanted the

20  women to be separated because he had special plans?

21  A.   Correct, yes, ma'am.

22  Q.   Did Rosalino take that to mean anything in particular?

23  A.   He believed that the women were going to be murdered.

24  Q.   So this was an incident where he was trying to help get

25  the women away, escape?

44

1    A.    Right, but, again, Mr. Sanchez Mendoza ended up taking

2    them far away, and he was -- he threatened that he was going to

3    kill them on the trip.  Supposedly they had -- Mr. Sanchez

4    Mendoza was doing drugs and drinking, and then they picked up

5    the individual named sicario.

6    Q.    The four witnesses explained that the defendant became

7    angry because they were going to help people escape and so he

8    took them on the trip to North Carolina?

9    A.    Right, yes, ma'am.

10   Q.    And in the course of this trip to North Carolina, the four

11   witnesses explained that the defendant was -- they believed him

12   to be under the influence?

13   A.    Correct.

14   Q.    And acting bizarre; correct?

15   A.    Yes, ma'am.

16   Q.    And that he was communicating with other individuals on

17   the phone; is that correct?

18   A.    That is correct.

19   Q.    And that the defendant was upset because contracts, worker

20   contracts, were falling through and he owed people a lot of

21   money?

22   A.    Right, yes, ma'am.

23   Q.    And that at one point, these four witnesses explained that

24   at one point during this journey to North Carolina they met up

25   with an individual that the defendant identified as a sicario;

45

1   is that correct?

2   A.   Correct.

3   Q.   And did these four individuals explain what they thought

4   was happening, was going to happen to them?

5   A.   They all thought they were going to die.

6   Q.   Did they explain a situation where at one point they go

7   down a dirt road?

8   A.   Yes.

9   Q.   Can you tell The Court about that.

10  A.   They said they turned into a dirt road and that there was

11  no cars.  There was no cars driving by, and I believe that they

12  said that the only reason that they were able to leave is

13  because they -- Javier Sanchez Mendoza had to go to the restroom

14  and so he left.  Him and sicario left for a second; however,

15  they had locked Olga inside.  She couldn't -- the doors were

16  locked so they couldn't get her out so they didn't leave her,

17  and then a police cruiser, they happened to be in the area, and

18  they ended up getting Olga out and ran to a restaurant that was

19  in the area.

20  Q.   And did they explain what happened at the restaurant?

21  A.   The individual, the owner of the restaurant, hid them in

22  the restroom and told them not to worry, that they would get

23  help, and according to them, that Sanchez Mendoza was just kind

24  of cruising around the outside of the restaurant at that point.

25  Q.   Apparently trying to look for them?

46

 1   A.    Correct.

 2   Q.    But that is eventually how they were able to escape from

 3   this kidnapping trip?

 4   A.    Yes, ma'am, correct.

 5   Q.    And you interviewed --

 6         THE COURT:  Exactly what happened?  Then did the

 7   restaurant call the police?

 8         THE WITNESS:  There was -- the restaurant owner actually

 9   called a taxi and ended up getting -- getting them out of the

10   situation.  I believe that they ended up staying in a hotel that

11   was actually paid by the restaurant owner if I'm not mistaken.

12   Q.    (By Ms. Groover)  But law enforcement, to your knowledge,

13   was not called at that particular time?

14   A.    No, ma'am, not at that time.

15         THE COURT:  Do you know why?

16         THE WITNESS:  Again, they were scared.  They are not

17   from this country.  They don't know what to do.

18         THE COURT:  The restaurant owner, too?

19         THE WITNESS:  No, not the restaurant owner, but the

20   people that were running away, the four victims.

21   Q.    (By Ms. Groover)  Do you know if they explained to the

22   restaurant owner exactly what was going on?

23   A.    I'm assuming that they did, ma'am, but I don't have that

24   information.

25   Q.    So these four individuals, they were interviewed at

47

1   separate times; correct?

2   A.   Correct.

3   Q.   And they gave very similar accounts of this incident of

4   the kidnapping trip to North Carolina; is that correct?

5   A.   That is correct.  Yes, ma'am.

6   Q.   And do you believe their statements to be credible?

7   A.   Yes, ma'am.

8   Q.   And why is that?

9   A.   They all had the same story, ma'am, the same dates.

10   The -- they mentioned the same individual, Sanchez Mendoza.

11   They mentioned sicario.  They mentioned the fees that they were

12   charged in order to be smuggled into the US.

13   Q.   Have you recently been in contact with at least two of

14   these individuals in an attempt to bring them today to court?

15   A.   Yes, ma'am.

16   Q.   In particular, Olga, did you reach out to Olga?

17   A.   I did, yes, ma'am.

18   Q.   And is Olga currently pregnant?

19   A.   Yes.

20   Q.   Is she under doctor's orders to not travel?

21   A.   Correct.  She's almost nine months' pregnant now.

22   Q.   What state is she in?

23   A.   I believe she's in Ohio.

24   Q.   Too far of a journey at this moment to travel according to

25   her doctor?

48

1   A.   Correct.

2   Q.   Is one of the other individuals of these four a lady by

3   the name of Gregoria?

4   A.   Gregoria, right.

5   Q.   Have you recently been in contact with her?

6   A.   Yes, ma'am.

7   Q.   Can you describe her emotional state to The Court?

8   A.   Gregoria is a little bit older lady, and she is kind of --

9   kind of almost like a mother to Olga, so wherever Olga goes

10  Gregoria is there with her, and at this time, because Olga is

11  pregnant, Gregoria is there by her side.

12  Q.   Did Gregoria express fear of going anywhere without Olga?

13  A.   Yes, ma'am.

14  Q.   Based on the situation that happened to them, did she feel

15  terrorized?

16  A.   Yes, ma'am, she did.

17  Q.   And based on your entire investigation and your

18  interactions with Gregoria, do you believe that she was very

19  emotionally fragile?

20  A.   Yes, ma'am.

21  Q.   And do you believe based on what you know of her that she

22  could travel without Olga?

23  A.   No, ma'am.

24  Q.   And did you feel it was -- thank you.

25       Did Olga and Gregoria both at separate times explain to

49

1   you that, after the incident at the restaurant, the defendant

2   reached back out to them?

3   A.   Yes, ma'am, they did.

4   Q.   Did they both give similar accounts about what happened

5   when the defendant reached back out to them?

6   A.   Yes, he was -- he was -- according to both of them, he was

7   very upset that they had left and started hounding them by cell

8   phone and telling them that they had to return; they had to

9   return and work because there was a lot of people that were --

10  that everybody had absconded and left, so eventually both of

11  them did return.

12  Q.   So he had their cell phone and they didn't change their

13  cell phone numbers?

14  A.   Right, correct.

15  Q.   Did they have a lot of economic means?

16  A.   No, ma'am.

17  Q.   Didn't have the financial ability to change a phone

18  number?

19  A.   Correct.

20  Q.   Were they afraid?

21  A.   Yes, ma'am, they were very afraid.

22  Q.   So what did they do?

23  A.   They ended up returning, and I believe they met with not

24  only Javier but his coconspirator Mr. McGauley, Neal McGauley.

25  Q.   So they explained that after they escaped from the

50

1    incident involving the restaurant, the defendant kept contacting

2    them and they were afraid and so they listened to him and came

3    back?

4    A.    Yes, ma'am.

5    Q.    Afraid that he would find them and harm them if they did

6    not return?

7    A.    Correct.

8          THE COURT:  At that point, what is their immigration

9    status?

10         THE WITNESS:  They are -- technically they had come in

11   under that H-2A visa.  I believe it was still within the

12   timeframe where it was still valid; however, they weren't

13   working where they were supposed to be working and so the threat

14   was "I will report you to immigration," and there was also other

15   threats that were allegedly made.

16   Q.    (By Ms. Groover)  Did they have their visas and passports?

17   A.    I do not recall at this time.

18   Q.    Did they explain what happened to them and if they were

19   ever able to leave again?

20   A.    They -- they eventually did leave.  I don't think they

21   were with him very long and they escaped once again.

22   Q.    After your investigation of interviewing several witnesses

23   about the defendant, was he eventually -- a federal arrest

24   warrant was eventually issued for his arrest; is that correct?

25   A.    That is correct.  We started receiving phone calls that

51

1  there was approximately 300 individuals that had been defrauded

2  in Monterey, Mexico and Mr. Javier Sanchez Mendoza was the one

3  who had defrauded them, said that he was going to get them a

4  H-2A work visa to come and work in the United States, and so I

5  started receiving phone calls from, again, different people and

6  this is all word of mouth because of victims who I had

7  previously spoken to, so we ended up getting a ping order in

8  order to -- a cell site search warrant.

9  Q.   To try to locate the defendant?

10 A.   Correct.

11 Q.   Did you personally speak with many individuals who were

12 located in Mexico about this situation who explained that they

13 were stranded there?

14 A.   Correct, I did.

15 Q.   And did you learn from -- approximately how many did you

16 speak with personally, if you recall?

17 A.   I would say easily at least 20 people have contacted me.

18 Q.   20 different people?

19 A.   20 different people, correct, all of them telling me the

20 same story, that there were hundreds that were stuck in

21 Monterey, Mexico and had been defrauded of a lot of money, at

22 least $500.00 apiece is what they were telling me.

23 Q.   In general, the H-2A visa process, do they have to go

24 through a consulate office to receive their visa once it's been

25 approved on a petition?

52

```
 1    A.    Yes, ma'am.

 2    Q.    And this organization, do they typically use the location

 3    in Monterey?

 4    A.    Yes, ma'am.

 5    Q.    And based on your investigation, did you learn that most

 6    of the witnesses would come to Monterey at the direction of

 7    whoever was petitioning them over?

 8    A.    Right.

 9    Q.    In this case, it would have been with defendant; is that

10    correct?

11    A.    Yes, ma'am.

12    Q.    And then they waited in Monterey until their visa was

13    ready; is that correct?

14    A.    That is correct.

15    Q.    And the defendant would have them stay at a hotel in

16    Monterey to collect their visas?

17    A.    Yes, ma'am.

18    Q.    And would the defendant require them to pay for their

19    hotel fees?

20    A.    Everybody paid their own way, yes, ma'am.

21    Q.    Again, under the lawful program, that has to be reimbursed

22    within a week; is that correct?

23    A.    Correct.

24    Q.    And were these individuals that you spoke to who were

25    located in Mexico, were they explaining that they were promised
```

53

1   a visa with Mr. Mendoza but then he didn't have the visa that

2   they had paid for?

3   A.   Correct.  They had been stranded, basically left, and

4   no -- no further information, no more answering his cell phone.

5   Q.   Did you find their statements to be credible?

6   A.   Yes, ma'am.

7   Q.   Did you -- was that based in part on the investigation

8   from the state department that were able to corroborate that

9   petitions had been --

10  A.   Submitted.

11  Q.   -- submitted?

12  A.   Correct.

13  Q.   And in general how that process works, once a petition is

14  received and if it meets the right -- checks the right boxes,

15  that's when individuals can show up to receive their visas at

16  the Monterey consulate office; is that correct?

17  A.   Yes, ma'am, that's correct.

18  Q.   And so the state department would be able to match up a

19  petition with names from a visa?

20  A.   Yes, ma'am.

21  Q.   So based on that entire investigation, you found that

22  those 20 people were credible?

23  A.   Yes, ma'am.  There's -- if I can say one more thing.  I

24  believe I also had received screen shots of I believe it was on

25  Facebook where he was advertising H-2A work in the United

54

```
 1   States, so he was actually advertising and some of these victims

 2   were forwarding me the information.

 3   Q.    Recruiting the workers in Mexico?

 4   A.    Correct, recruiting in Mexico.

 5   Q.    And eventually, after that, the defendant was eventually

 6   arrested; correct?

 7   A.    Yes, ma'am.

 8   Q.    As part of his arrest, does law enforcement through

 9   Probation also document any tattoos --

10   A.    Yes, ma'am.

11   Q.    -- an inmate will have or defendant?

12   A.    Correct.

13        MS. GROOVER:  Your Honor, may I approach the witness.

14        THE COURT:  You may.

15   Q.    (By Ms. Groover)  I'm handing you what's been marked as

16   Government Exhibit 2.  Do you recognize that, sir?

17   A.    Yes, ma'am.

18   Q.    What is this a photograph of?

19   A.    That's Santa Muerte tattoos on Sanchez Mendoza's chest.

20   Q.    That's on the defendant?

21   A.    Correct.

22   Q.    And is there anything in particular that you notice about

23   that tattoo?

24   A.    I apologize, the resolution is not very good.  It's a

25   small picture.
```

55

1   Q.   Does it have the Santa Muerte death saying itself?

2   A.   Correct.  It looks like it's holding a world and a sickle

3   type.

4   Q.   Is there also scales on there?

5   A.   On the bottom, it does have the scales as well; correct.

6   Q.   And, again, the significance of the scales and the world

7   together with the Santa Muerte?

8   A.   Right.  The Santa Muerte won't judge you whether you do

9   right or you do wrong.

10        MS. GROOVER:  Your Honor, may I have just a moment,

11   please?

12        THE COURT:  Yes.

13        MS. GROOVER:  Your Honor, may I approach the witness?

14        THE COURT:  You may.

15   Q.   (By Ms. Groover) Sir, I'm handing you a document that will

16   be marked as Government Exhibit 18.  Can you take a look at that

17   and tell me, tell us do you recognize that to be a medical

18   report of ██████████████?

19   A.   Yes, ma'am, I see it.  It's Wayne Memorial medical report.

20   Q.   Is this a report indicating her injuries after the

21   kidnapping incident on November the 4th of 2019?

22        MR. BLACKERBY:  Your Honor, I will object to this

23   document.  I think it's multiple layers of hearsay.  It's what

24   ██████████ apparently told a medical provider who put it into the

25   record.  We don't have the medical provider to authenticate it.

56

 1   We don't have a records custodian to authenticate it, and it's

 2   again hearsay within hearsay, so I would object.

 3           THE COURT:  Ms. Groover, your purpose?

 4           MS. GROOVER:  It is further corroboration of ███████.

 5   It's a document from a medical examiner who examined her after

 6   November the 4th of 2019.  Further shows indicia of reliability

 7   of her testimony and to document her injuries.

 8           THE COURT:  All right, I will overrule the objection,

 9   and allow it to be admitted.

10   Q.   (By Ms. Groover)  And does this report indicate that she

11   has a concussion from that evening?

12   A.   Yes, ma'am, along with raccoon eyes, pain in the neck,

13   other issues.

14           MS. GROOVER:  Thank you.  I would move for the admission

15   of Exhibits 1, 2 and 18 into evidence, Your Honor.

16           THE COURT:  And Mr. Blackerby, you reassert your

17   objections?

18           MR. BLACKERBY:  Same objections, Your Honor.

19           THE COURT:  And I will overrule those objections and

20   permit those exhibits to be introduced.

21           MS. GROOVER:  Thank you.  With that no further questions

22   of this witness, Your Honor.

23           THE COURT:  Mr. Blackerby, cross-examination.

24                         CROSS-EXAMINATION

25   BY MR. BLACKERBY:

57

```
 1   Q.    Thank you, Your Honor.

 2         Good afternoon, Special Agent Lopez.

 3   A.    Good afternoon.

 4   Q.    I just have a few questions for you.  I think we met

 5   before at the Coffee County jail if I'm not mistaken; is that

 6   right?

 7   A.    Most likely, yes, sir.

 8   Q.    That was at the interview of my client; is that correct?

 9   A.    Are you talking about in November?

10   Q.    Were you present for the interview of --

11   A.    Oh, yes, sir, correct, for the debrief.

12   Q.    At the Coffee County jail some months back?

13   A.    Yes, sir.

14   Q.    The purpose of that was to allow you-all to ask him

15   questions about this particular offense; is that correct?

16   A.    That's correct, yes, sir.

17   Q.    He, of course, volunteered to meet with you-all; is that

18   correct?

19   A.    Yes, sir.

20   Q.    He met with you as well as I believe one other Homeland

21   Security agent; is that right?

22   A.    That's correct, yes.

23   Q.    Also I think somebody from the department of labor was

24   there if I'm not mistaken?

25   A.    I believe you're right.
```

58

```
 1   Q.   I think Ms. Groover from the US Attorney's Office was
 2   there?
 3   A.   She was there.
 4   Q.   And we all sat down with Mr. Mendoza and we let you and
 5   other agents ask him questions; correct?
 6   A.   That is correct, yes, sir.
 7   Q.   And he cooperated, didn't he?
 8   A.   He spoke with us, yes, sir.
 9   Q.   For more than an hour if I'm not mistaken; correct?
10   A.   That is correct.
11   Q.   And he freely admitted that he was involved in the H-2A
12   visa conspiracy; correct?
13   A.   Yes, sir.
14   Q.   He identified other individuals who were involved in the
15   conspiracy as well, didn't he?
16   A.   Correct.
17   Q.   I think he specifically mentioned Neal McGauley; is that
18   correct?
19   A.   Yes.
20   Q.   And Charles King; is that correct?
21   A.   Correct.
22   Q.   Both those individuals are now under indictment, are they
23   not?
24   A.   They are.
25   Q.   For their participation in that scheme?
```

59

1   A.    Correct.

2   Q.    And the information that Mr. Mendoza provide you, did it,

3   in your opinion, did it appear to be correct as far as it

4   concerns the activities of these other coconspirators?

5   A.    It corroborated information, correct.

6   Q.    Charles King is the owner of one of the farms; is that

7   correct?

8   A.    Yes, sir.

9   Q.    This conspiracy, it had one group of individuals in Mexico

10  where the recruitment was actually occurring; correct?

11  A.    Uh-huh, correct.

12  Q.    And then the other end of the conspiracy was at the farms

13  here in Georgia where the workers were eventually supposed to

14  wind up; is that correct?

15  A.    That's correct.  Yes, sir.

16  Q.    And Mr. Mendoza was essentially in that pipeline --

17  correct -- between the individuals in Mexico and the farms where

18  they would eventually end up?  Mr. Mendoza was in the middle of

19  that scheme; is that right?

20  A.    We -- we would call him a farm labor contractor.

21  Q.    He was essentially a middleman in that pipeline from

22  Mexico to the farms; correct?

23  A.    Yes, sir.

24  Q.    He was not at the top of the conspiracy?

25  A.    Depends on what exactly you mean, not at the top of the

60

1   conspiracy.

2   Q.   Well, there was an actual attorney in Mexico I believe in

3   Monterey --

4   A.   Correct.

5   Q.   -- who was working on the paperwork there in Mexico for

6   these visas; correct?

7   A.   Yes, sir.

8   Q.   And then you had the farmers who were actually stating

9   falsely in these applications that they needed these laborers;

10  correct?

11  A.   Some of the individuals were and some their names were

12  just used.

13  Q.   Right.  They would overestimate or inflate how many

14  workers they needed to get more visas?

15  A.   Correct.

16  Q.   And those individuals would never come work?

17  A.   Correct.

18  Q.   Mr. Mendoza's role in that was essentially in the

19  transport and the housing and the logistical end here in

20  Georgia; is that more or less accurate?

21  A.   No, sir.

22  Q.   Well, how would you describe it?

23  A.   I would describe him as an actual recruiter of people

24  trying to come into the US to work.

25  Q.   But he was not in Mexico; correct?

61

1   A.   No.  His family is in Mexico.

2   Q.   You testified earlier about ████████ quite a bit.

3   Do you know when she first entered the United States?

4   A.   I believe it was 2018 if I'm not mistaken.

5   Q.   September 2018?

6   A.   That sounds correct.

7   Q.   Was that the first time she had come into the US?

8   A.   I don't recall, sir.

9   Q.   That was the first time she came in on one of these visas?

10  A.   Under one of those visas, correct, yes, sir.

11  Q.   Once she came in 2018, September 2018, do you know if she

12  ever returned to Mexico?

13  A.   No, sir.

14  Q.   You don't know, or no, she --

15  A.   No, she did not return to Mexico.

16  Q.   How do you know for a fact that she didn't return?

17  A.   There is no record of her leaving and going to Mexico

18  again, sir.  She was -- from my conversations with ████████

19  she came in and was a victim and stayed even past that -- that

20  time because of the threats.  She came over to work to make

21  money and send to her child in Mexico.

22  Q.   But you can't say with any certainty whether she may have

23  at some point gone back to Mexico and then come back again?

24  A.   She's never -- not to my knowledge, sir.

25  Q.   She didn't tell you that?

62

 1   A.   Correct.

 2   Q.   But it's possible; correct?

 3   A.   Sure.

 4   Q.   You mentioned that she had been text messaging with Mr.

 5   Mendoza while she was still in Mexico; is that correct?

 6   A.   Yes, sir.

 7   Q.   Have you seen those text messages?

 8   A.   No, sir.

 9   Q.   So when you testified earlier that she -- I think you

10   testified she didn't really respond to the more romantic

11   messages.  That's based on what she told you; correct?

12   A.   That's correct.

13   Q.   That's not based on an independent analysis of the text

14   messages?

15   A.   Correct.

16   Q.   You're taking her at her word on that?

17   A.   I am, yes, sir.

18   Q.   I want to drill down a little bit on the story about the

19   sicario in North Carolina.  What was the name of the alleged

20   sicario?

21   A.   They knew him or they called him sicario, and that was it,

22   sir.  There was no -- no name given to my knowledge.

23   Q.   Have you ever heard the name Enrique Waldondo; does that

24   sound familiar?

25   A.   No, sir.

63

1   Q.    Do you know if this sicario may have been someone who had

2   previously come over on a H-2A visa?

3   A.    No, sir.

4   Q.    You don't know either way?

5   A.    I don't know.

6   Q.    Do you know if this sicario had any previous interactions

7   or relationship with Mr. Mendoza?

8   A.    No, sir, I do not know.

9   Q.    Do you know if he may have had any previous relationship

10  with ██████████?

11  A.    No, sir.

12  Q.    You just don't know either way?

13  A.    Correct.

14  Q.    The story about the sicario, I think you're saying that

15  Mr. Mendoza took -- it was four of the workers to North Carolina

16  where he had the meeting with the sicario?

17  A.    Right.

18  Q.    And tell me again what was the reason that he, to your

19  understanding, the reason that he took four workers with him to

20  meet the sicario?

21  A.    To my -- it's my understanding that he was looking to get

22  rid of them, and I'm not sure if he was asking this gentleman

23  called assassin to be able to get rid of them for him or what

24  the purpose behind it was.  All I can tell you is what the

25  victims said as far as being terrified and believing they were

64

1   doing to die.

2   Q.   Certainly this alleged sicario did not, in fact, kill

3   them?

4   A.   No, sir.

5   Q.   And you said they escaped at a restaurant; right?

6   A.   That's correct.  Yes, sir.

7   Q.   No one called the police?

8   A.   To my knowledge, no, sir.

9   Q.   None of the four of them?

10  A.   No, sir.

11  Q.   No one at the restaurant?

12  A.   No, sir.

13  Q.   Do you know where they eventually wound up after they

14  escaped?

15  A.   I believe -- I'm not sure where each one of them ended up,

16  but a few of them came back to this -- this area.

17  Q.   Do you know if some of them went to Michigan?

18  A.   I'm not sure.  I'm not sure.

19  Q.   Do you know if some of them went to New Jersey?

20  A.   Yes, yes.

21  Q.   Is that where --

22  A.   One, I believe at least one of the individuals had gone up

23  to New Jersey.

24  Q.   Is that one of the ones who came back?

25  A.   I believe it was one of the ladies that had come back.

65

1   They were trying to find employment, and I think there was some

2   farm work to be done in New Jersey.

3   Q.   So one of these individuals --

4   A.   It may have been both females.  I'm sorry.

5   Q.   Both females you believe went to New Jersey?

6   A.   For employment purposes, correct.  I believe that's

7   correct.

8   Q.   So they were taken from south Georgia by Mr. Mendoza to

9   North Carolina.  They escaped at a restaurant, then traveled to

10  New Jersey, and it's your understanding that Mr. Mendoza tracked

11  them down in New Jersey?

12  A.   No, they were -- they were coaxed back into this area.

13  Q.   Right.  That's what I'm trying to get at.  How did they

14  get coaxed and who --

15  A.   They were -- by telephone.

16  Q.   Who?  Who?

17  A.   Mr. Sanchez Mendoza and actually there was supposedly Mr.

18  Neal McGauley also had gotten on the phone and tried to get them

19  to get back over here because he was going to get in trouble for

20  them leaving as well.

21  Q.   So it's your understanding that they escaped to New

22  Jersey; they got phone calls, and despite having previously been

23  threatened and in fear for their lives, they traveled back from

24  New Jersey back to south Georgia back to Mr. Mendoza?

25  A.   Right, because they were scared again.  I believe even

66

1   Olga had family back in Mexico.  So they were scared -- that's

2   what it was.  Olga has a sister and Mr. Sanchez Mendoza had

3   threatened her and told her "I know who your sister is and I

4   know where she is."

5   Q.    But they still even at that point never contacted law

6   enforcement?

7   A.    Not until I -- I believe I spoke with them.  They did not

8   fill out any type of police report; correct.

9         MR. BLACKERBY:  Nothing further.  Thank you, Mr. Lopez.

10        THE COURT:  Any brief redirect?

11        MS. GROOVER:  Very brief, Your Honor.

12        THE COURT:  All right.

13                        REDIRECT EXAMINATION

14  BY MS. GROOVER:

15  Q.    Out of the 25 to 30 individuals who have been charged so

16  far in the organization, would you believe -- do you believe

17  that the defendant is the most brutal in his treatment of

18  workers?

19  A.    Absolutely.

20  Q.    And in your interviews of hundreds of workers who came

21  from foreign countries into the United States, based on those

22  personal interviews of hundreds of people, is it uncommon for

23  people not to report to the police when they have been

24  threatened and terrorized?

25  A.    It's very common.

67

1    Q.    And why is that, common not to report?

2    A.    It's common not to report.

3    Q.    Why is that?

4    A.    Fear of retaliation.

5              MS. GROOVER:  Thank you.  No further questions.

6              THE COURT:  You may step down.  Call your next witness.

7              MS. GROOVER:  The Government calls ███████████.  Your

8    Honor, she does require the assistance of a Spanish translator.

9              THE COURT:  All right.

10             THE CLERK:  You were previously sworn.  Do you still

11   uphold that oath?

12             INTERPRETER RAMCHERAN:  Yes.

13             THE CLERK:  For both of you, and for you?

14             THE WITNESS:  Yes.

15                    ███████████████████████,

16   having been first duly sworn, was examined and testified

17   through the interpreter as follows:

18             THE CLERK:  Thank you.  You may be seated, and if you

19   will please state your full name.

20             THE WITNESS:  My name is ██████████████████.

21                        DIRECT EXAMINATION

22   BY MS. GROOVER:

23   Q.    Good afternoon.  Are you a citizen of Mexico?

24   A.    Yes.

25   Q.    And when did you come to the United States?

68

```
 1    A.    September of 2018.

 2    Q.    And was that the first time you came to the United States?

 3    A.    Correct.

 4    Q.    And where in Mexico are you from, ma'am?

 5    A.    San Luis Potosi.

 6    Q.    Why did you want to come to the United States in September

 7    of 2018?

 8    A.    I was coming to work.

 9    Q.    How did you find out about the work opportunity in the

10    United States?

11    A.    Through a meeting that Mr. Javier Mendoza had.

12    Q.    And where was that meeting?  Where did that meeting take

13    place at?

14    A.    In the town where I lived.  With a lady by the name Maria

15    Morgal.

16    Q.    How do you know this lady by the name of Maria?

17    A.    She is an acquaintance from my town.

18    Q.    And did she introduce you to Javier Sanchez Mendoza to

19    learn about the opportunity to work in the United States?

20    A.    Correct.

21    Q.    And what was your understanding of Javier Sanchez

22    Mendoza's job?

23    A.    I was coming to work on blueberries and tomatoes, onions,

24    strawberries.

25    Q.    Did you understand him to be a contractor, that he would
```

69

1    find people to work in the United States on ranches?

2    A.   He was a manager at King's Berry Farms.

3    Q.   And was he located in the United States?

4    A.   Correct.

5    Q.   How did you begin communicating with Javier Sanchez

6    Mendoza when you were in Mexico?

7    A.   Ms. Maria shared Javier's phone number so I could ask for

8    a pass for myself to open up a slot, a spot for me to come and

9    work here in the United States.

10   Q.   You contacted Javier through a telephone number to come to

11   the United States; is that correct?

12   A.   Correct.

13   Q.   And did you have to pay any money to get on this open slot

14   to come to the United States?

15   A.   Yes.

16   Q.   What did you pay?

17   A.   I paid for a visa, $195.00.

18   Q.   United States dollars?

19   A.   Correct.

20   Q.   Who did you pay that fee to?

21   A.   I sent it to Mr. Javier through Western Union.

22   Q.   How did you know to send it to him through Western Union?

23   A.   Because he would send us his name, his address and where

24   we had to send it to.

25   Q.   And how would he send you that information?

70

```
 1   A.    Through texts.

 2   Q.    On your cell phone?

 3   A.    Correct.

 4   Q.    Were you told how much you would be paid when you got to

 5   the United States to work on the ranches?

 6   A.    Yes, they were going to pay $10.95 an hour.

 7   Q.    Who told you you would be paid that?

 8   A.    His associate, Salvador Salcedo.

 9   Q.    Where was Salvador Salcedo located, if you know?  Was he

10   in Mexico or United States?

11   A.    In Mexico in the city of Monterey.

12   Q.    And did you have to travel to Monterey to fill out any

13   paperwork for this visa process?

14   A.    Correct.  I had to go to the consulate in Monterey.

15   Q.    And what did you do at the consulate office?

16   A.    They took our fingerprints and pictures of our eyes, and

17   the following day, we had an interview with a US citizen so she

18   could facilitate the visa for us to cross over.

19   Q.    And what happened when you got your visa and crossed over?

20   A.    We were told that we had to cross over with money on us.

21   Q.    Who told you that?

22   A.    The lawyer, Salvador Salcedo, and Mr. Mendoza.

23   Q.    How much money did you have to bring?

24   A.    Me, on my person, I had $4,000.00.  Other people had on

25   them 8,000, 9,000, 10,000 dollars.
```

71

1   Q.   How did you know the other people had that much money on

2   them?

3   A.   Because Mr. Mendoza left a person in charge on the bus on

4   which we were travelling, in charge of this.  And the lawyer,

5   Mr. Salcedo, would tell them how much money they had to carry on

6   them to bring over.

7   Q.   Approximately how many people were in your group when you

8   crossed over?

9   A.   38 people.

10  Q.   Did each person have money on them, to your knowledge?

11  A.   Yes.

12  Q.   And what happened then when you entered the United States?

13       THE COURT:  How did you get $8,000.00?

14       THE WITNESS:  The lawyer would hand it over to us.

15       THE COURT:  So the lawyer gave you the money?  It wasn't

16  your money?

17       THE WITNESS:  It was not mine.  It belonged to Mr.

18  Javier.

19       THE COURT:  Okay.

20  Q.   (By Ms. Groover)  Do you know why you were asked to carry

21  cash belonging to Javier across the United States border?

22  A.   Because large transactions cannot be completed through

23  Western Union because once it crosses over that it is questioned

24  here in the United States.

25  Q.   So your understanding was people were carrying cash across

72

```
 1    the border to avoid reporting requirements?
 2    A.    So the Government wouldn't question it.
 3    Q.    Were you told how to answer questions if you were
 4    questioned by a US Government official?
 5    A.    That if we were surprised with the money to say that the
 6    money was ours.
 7    Q.    When was the first time you saw Javier Sanchez Mendoza?
 8    A.    It was when I arrived here in Douglas, Georgia.
 9    Q.    And tell us what happened when you got here to Douglas,
10    Georgia.
11    A.    He separated me from the group and told his guards to
12    place me in his truck while -- to wait while he made sure that
13    he settled all the people that had arrived with her.
14    Q.    Did you sit then in the truck?
15          INTERPRETER RAMCHERAN:  I'm sorry?
16    Q.    (By Ms. Groover) Did you sit then in his truck?
17    A.    Yes.
18    Q.    What happened next?
19    A.    I got off the truck and I saw how Mr. Javier had them
20    handing over the money.  He would receive the money from them
21    and then he would set them aside, to send them to Alabama and
22    North Carolina and other places that I cannot recall that well.
23    Q.    So the people were separated to go to different locations?
24    A.    Yes.
25    Q.    And it was your understanding that people were separated
```

73

1  after they gave the money to Javier Sanchez that they brought

2  over?

3  A.    Yes.  Some would leave or head out, rather, to the places

4  where they were designated to leave, according to Javier,

5  because he already had sold the visas to those who were

6  crossing.

7  Q.    What do you mean by that?

8  A.    Mr. Javier would sell the visas so we could enter legally

9  into the United States.

10  Q.    Where did he take you?

11  A.    He took me to his house.

12  Q.    Did anyone else go to his house with you?

13  A.    Only me.

14  Q.    Out of the group that originally came over to the United

15  States that you were with, the 38 people or so, did any of them

16  stay in Georgia?

17  A.    Five people that were traveling with me from my town.  And

18  the rest left to the places where Javier had sold the visas to.

19  Q.    The four other people that you were with, where did they

20  stay?

21  A.    They stayed with me at his house and then he sent them to

22  North Carolina to work.

23  Q.    How long were they with you at his house?

24         THE COURT:  Wait, wait, let me, I thought she went to

25  his house alone, only her.

74

1          THE WITNESS:  Yes.

2          THE COURT:  But then you say these others went to his

3     house also, so which is it?

4          THE WITNESS:  15 days later he picked them up to his

5     house.

6          THE COURT:  I understand.

7     Q.    (By Ms. Groover)  Did you ever work on any blueberry farms

8     or strawberry fields?

9     A.    Only in blueberry.

10    Q.    And tell The Court about the actual work that you

11    performed when you were with Javier?

12    A.    Packing pine straw.  I would write out the checks to the

13    people.  Okay, I would write out the checks to -- for the rest

14    of the people that were working in the blueberry fields and I

15    would help out with the packing, the packaging area.

16    Q.    Did you get paid for your work?

17    A.    No.

18    Q.    Were you ever paid for any of their time or work when you

19    were with Javier?

20    A.    No.

21    Q.    Describe the working conditions in the fields and the

22    blueberry or packing area for The Court.

23    A.    He sometimes treated me with violence in the pine-straw

24    packing area.  In the blueberry, I did not work with any of the

25    ones I came with from Mexico.  I worked with people from

75

1    Guatemala and there were children among them.

2    Q.    The people from Guatemala in the blueberry fields, were

3    they there before you arrived with Javier?

4    A.    They were already here in the United States.  But I had

5    not worked with them until then.

6    Q.    Tell The Court about the threat that occurred at the

7    pine-straw packing area.

8    A.    He beat me with a piece of wood and asked me -- I'm

9    sorry -- told me to pack the pine straw, get going with the

10   packing of the pine straw and his father was also insulting me

11   verbally.

12   Q.    Any other threat at this pine-straw packing area?

13   A.    There he only beat me.

14   Q.    Let's talk about the blueberry fields.  What were the

15   working conditions like in the blueberry fields?

16   A.    There you had children working without any food or water.

17   And there was one occasion where he beat me for taking these

18   children to the store because he did not want to spend his money

19   on people who were his employees.  People would ask Javier at

20   what time was it time to eat because their children were there

21   and he just wouldn't answer.  He would do other things.

22   Q.    The children that were there, did you come to find out

23   that they were children of the other workers from Guatemala?

24   A.    Yes.

25   Q.    And you explained that you tried to take them to the store

76

1    and he beat you for that.  Tell The Court about that whole

2    incident, how it happened.

3    A.    Okay.  I gathered the children and I told them that I was

4    taking them to eat.  I took some of Javier's money and his car

5    to take them.  He caught up to me in his other car.  He took the

6    money and the key away from me.  I'm sorry, took the money and

7    the car away from me and beat me in front of the children, and

8    he told me that I could not buy that.

9    Q.    What were you trying to buy?

10   A.    Food for the children.

11   Q.    And where did you -- where did this happen at?

12   A.    That was between -- somewhere between the road, Alma and

13   Waycross.

14   Q.    Was it actually at a store where he caught up to you at?

15   A.    Yes, it was a Friendly.

16   Q.    And did you -- that encounter happened at the parking lot

17   or inside the car or inside the store?

18   A.    At the parking lot.  It happened in the parking lot.

19   Q.    When Javier first began texting with you, communicating

20   with you in Mexico, did some of his text messages turn more

21   sexual in nature?

22   A.    He had a certain interest in me.

23   Q.    And did you respond back as if you were also interested in

24   him?

25   A.    I told him that I wanted to work.  He told me that if I

77

1    did not pay attention to him that I was not coming to the United

2    States to work.  I wouldn't give him a yes.  I was not

3    interested in him.  I wanted to come and work in the United

4    States.

5    Q.    At some point did he express physical interest in you once

6    you got to the United States?

7    A.    The first time he saw me he abused me.

8    Q.    What happened the first time he saw you?

9    A.    He brought me to his house and he began touching me.

10   Q.    What exactly did he do to you?

11   A.    He made me have relations with him.

12   Q.    When you say relations, you mean sex, sexual intercourse?

13   A.    Yeah, sexual.

14   Q.    Did you tell him no, that you didn't want to do that?

15   A.    I told him no.

16   Q.    Did you try to fight back at all?

17   A.    No, because he would say that -- anything that I did he

18   would call immigration on me.

19   Q.    How many times did he rape you?

20   A.    Many.

21   Q.    How long were you with him, do you remember?

22   A.    One year.

23   Q.    And during that year, did he rape you on a weekly, monthly

24   or daily basis?

25   A.    Whenever he wanted to.

78

```
 1   Q.   And could you ever push him off of you?

 2   A.   No, sometimes -- no.

 3   Q.   But did you want to have sex with him?

 4   A.   No.

 5   Q.   Did he ever hit you beside the incident at the pine-straw

 6   packing place?

 7   A.   He spent his time hitting me.

 8   Q.   How often would he hit you?

 9   A.   He would hit me almost always because I did not want to

10   receive his money because he would get angry for many reasons.

11   Q.   And how would he hit you?

12   A.   He would use his hands.

13   Q.   And where -- what places would he hit you on your body?

14   A.   On the head.

15   Q.   At any point in time do you remember him telling you that

16   you were married to him?

17   A.   Yes.

18   Q.   Tell The Court about that incident.

19   A.   He took me to the court in Baxley.  He asked me for my

20   passport.  They were asking for witnesses so supposedly I would

21   marry him.  From there, and according -- so the process occurred

22   where supposedly I was married to him.

23   Q.   Did he give you paperwork to sign?

24   A.   Yes, but ...  until I realized that he only signed a

25   license, a marriage license.
```

79

1   Q.   Do you speak English at all, ma'am?

2   A.   When I first arrived, no.

3   Q.   And when you first arrived did you read English?

4   A.   No.

5   Q.   Was the paperwork that he asked you to sign, was that in

6   English or in Spanish?

7   A.   In English.

8   Q.   And did he ask you to sign it before or after he told you

9   what it was?

10   A.   After -- oh, sorry, before.

11   Q.   Why did you sign it?

12   A.   I did not know what I was signing.

13   Q.   So to be clear, did he tell you what you were signing

14   before or after you signed it?

15   A.   I did not know I was signing beforehand.

16   Q.   Did you think after that moment, though, that you were

17   married to him?

18   A.   Yes, I lived under the assumption that I was for one year.

19   Q.   And why did you think you were married to him for one

20   year?

21   A.   Because he told me so.

22   Q.   And did you understand how marriage works in the United

23   States?

24   A.   No.

25   Q.   Did you ever hear him talking on the phone with other

80

1   people involving this bringing workers over to the United

2   States?

3   A.   Yes.

4   Q.   And did you understand that he was talking with other

5   people who were helping him recruit and bring workers over?

6   A.   Yes.

7   Q.   Did he often speak on, use a telephone on speaker phone in

8   your presence?

9   A.   Yes.

10  Q.   And did he speak in Spanish so you could understand him?

11  A.   Yes, he spoke Spanish to the people in Mexico.

12  Q.   And were you able to hear how this organization worked?

13  A.   Yes.

14  Q.   Is this where Javier and people in Mexico would ask

15  workers to give them money to come over to the United States?

16          INTERPRETER RAMCHERAN:   Can you repeat that question,

17  I'm sorry?

18  Q.   (By Ms. Groover)   That Javier and the people in Mexico

19  would give them money to come to the United States?

20  A.   He would ask for a fee for them to have a spot on that

21  visa.

22  Q.   Similar to what you had to pay?

23  A.   Yes.

24  Q.   And would you overhear him talking about the contracts and

25  petitions to get people over to the United States?

81

```
 1   A.    Yes.
 2   Q.    And would he ask you to help with collecting money through
 3   Western Union?
 4   A.    Yes, so it wouldn't show, it wouldn't reflect that he was
 5   receiving this money, in case a case came up where they would
 6   be --
 7   Q.    I'm sorry.
 8   A.    -- there wouldn't be a proof that he was receiving all
 9   this money from Mexico.
10   Q.    So you knew how he was hiding the money?
11   A.    Yes.
12   Q.    Did you ever try to leave or escape from Javier?
13   A.    No, because I don't have any family members here.  And
14   another thing was that if I ever escaped he would talk to
15   immigration.
16   Q.    Were you afraid to leave?
17   A.    Yes.
18   Q.    In August of 2019, or excuse me, back in 2019 was there an
19   incident involving a knife and Javier?
20   A.    That was the first time that I reported him to the police.
21   Q.    Tell The Court about the first time you reported him to
22   the police.
23   A.    I got tired of him abusing of me.  He ripped my clothes
24   off.  And he wanted to rape me.  He got on top of me and he was
25   asphyxiating me.  How I managed, I set myself from him.  And
```

82

1  then I asked for help to -- from two other gentlemen that lived

2  there with us so I could talk to the police.

3  Q.   So at the time before you reported him to the police there

4  were two other individuals living with you at the house?

5  A.   Yes, from another group that he had brought over.

6  Q.   And he was trying to rape you and you got away and asked

7  one of them to help you call the police?

8  A.   He wanted to rape me.  The only thing is I did not allow

9  him to.

10  Q.   On that occasion?

11       INTERPRETER RAMCHERAN:  I'm sorry?

12  Q.   (By Ms. Groover)  On that occasion?

13  A.   I just did not want him to abuse me anymore.

14  Q.   So what happened when you asked for help?

15  A.   He chased us with a knife.

16  Q.   Who did he chase?

17  A.   Myself and the two others that were there with me.

18  Q.   And where did he chase you?

19  A.   On the street.

20  Q.   And did someone call the cops?

21  A.   I called.

22  Q.   Did you use one of the other gentlemen's phone that he was

23  chasing?

24  A.   Yes.

25  Q.   And did law enforcement respond?

83

1   A.   Yes.

2   Q.   And did you speak with the officer about what happened?

3   A.   Yes.

4   Q.   And was he arrested that day?

5   A.   Yes, but he denied knowing us.  Said that we were the ones

6   trying to attack him with the knife and that day he threw it on

7   the floor.  We couldn't find it and that's why we didn't have

8   proof of the knife that night until the next day when we found

9   it.  But we didn't know how to get it in the hands of who it had

10  to be.

11  Q.   The police officer?

12  A.   Yes.

13  Q.   Did Javier stay in jail for long?

14  A.   Two months.

15  Q.   What happened when he got out?

16  A.   I came here to Brunswick.

17  Q.   Why did you come here to Brunswick?

18  A.   Because they helped me escape.

19  Q.   So you knew -- after Javier got arrested after you called

20  the cops and he chased you with the knife, you called someone in

21  Brunswick to help you?

22  A.   Yes.

23  Q.   Did you ever see Javier again after you moved to Brunswick

24  and had escaped?

25  A.   I saw him again on November 4th.

84

```
 1    Q.    2019?

 2    A.    Correct.

 3    Q.    What were you doing right before you saw Javier?

 4    A.    I was looking after one of my friend's daughters.

 5    Q.    And did your friend have your cell phone number at the

 6    time?

 7    A.    Yes.

 8    Q.    And were you inside a house or outside the house?

 9    A.    Outside of their house.

10    Q.    And tell us what happened when you saw Javier.

11    A.    He arrived in a gray pickup truck.  He followed me.  His

12    face was covered.  He had a knife in his hand.  And he placed me

13    in the truck by force.  But if I didn't comply, that he would

14    stab me with the knife.

15    Q.    Was this in front of the children?

16    A.    Yes.

17          THE COURT:  Where exactly was this?

18          THE WITNESS:  It was here in Brunswick.

19          THE COURT:  Do you recall what street it happened on?

20          THE WITNESS:  I do not recall the name, but I do know --

21    but it's on the outer skirts of Brunswick.

22          THE COURT:  This was someone's front yard?

23          THE WITNESS:  It was in the yard of my friend's house.

24          THE COURT:  Was it a house or apartment or a -- what

25    kind of --
```

85

1              THE WITNESS:  Trailer.

2              INTERPRETER RAMCHERAN:  Do you want me to ...

3              THE COURT:  A trailer?

4              THE WITNESS:  A trailer.

5              THE COURT:  Was this a trailer that had a lot of other

6   trailers around it or just off by itself?

7              THE WITNESS:  It was a place that was habitated.

8              THE COURT:  Understood.  Ms. Groover, continue.

9   Q.   (By Ms. Groover)  What happened when he forced you in the

10  truck at knifepoint?

11  A.   He started telling me why did I leave him.  And I told him

12  that I just did not want him.  I never wanted to be with him.

13  And he told me that because I had left him he was going to kill

14  me.  And then he spoke to Salvador to ask him what they were

15  going to do with me.  Salvador told him to -- to kill me.

16  Q.   Was this on speaker phone?

17  A.   Yes.

18  Q.   Was there anyone else in the truck?

19  A.   His mother.

20  Q.   What was she doing?

21  A.   She was laughing.

22  Q.   What happened next?

23  A.   He continued talking with the lawyer.  And then he went to

24  a field of pines and a cemetery.  And that's where he began

25  beating me.

86

```
1    Q.    Did he take you out of the car?

2    A.    Inside.

3    Q.    Inside the truck parked at a cemetery?

4    A.    Yes.

5    Q.    Were you scared?

6    A.    A lot.

7    Q.    Did you think he was going to kill you?

8    A.    Yes.

9    Q.    Where did he hit you at?

10         INTERPRETER RAMCHERAN:  I'm sorry?

11   Q.    (By Ms. Groover)  Where did he hit you at?

12   A.    On my head, on the back, on my face, in my stomach.  He

13   told me that if I did not stay with him he was going to kill my

14   son in Mexico.

15   Q.    Did you leave your son in Mexico when you came over to the

16   United States on the visa?

17   A.    Yes, with my parents.

18         THE COURT:  How old is he?

19         THE WITNESS:  Six.

20   Q.    (By Ms. Groover)  Is he six years old now or was he six

21   years old at the time?

22   A.    Now.  But when the threat took place he was four years

23   old.  It's been almost two years since that happened.

24   Q.    When he was hitting you in the truck, where was he sitting

25   and where were you sitting and where was his mother sitting?
```

87

1  A.    His mother was in the copilot seat.  He was driving.  But

2  since he stopped at that place, he moved to the back seat where

3  he beat me.

4  Q.    Do you know what he did with the knife?

5  A.    It fell between the seats and couldn't find it, thank God.

6  Q.    Do you remember what the knife looked like?

7  A.    It was a knife.

8  Q.    What happened after he finished beating you in the car at

9  the cemetery?

10  A.    He wanted to head to -- if it was in Florida or North

11  Carolina, but his mom forgot her medications in Jesup, and

12  that's where he took me.

13  Q.    What happened, did he take you back to his home in Jesup?

14  A.    He continued threatening me.  He beat me.  He cut my hair.

15  He wanted to cut me to get some blood from me and place it on an

16  altar that he had.

17  Q.    Did he?

18  A.    No.  He only took blood from my face because I beg him

19  just do not harm me anymore.

20  Q.    What happened after he took your blood?

21  A.    He continued threatening me and talking until finally the

22  police arrived.

23  Q.    What happened when the police arrived?

24  A.    They saved me.  If the police probably had not arrived, I

25  probably would be dead right now.

88

1  Q.    Why do you think that?

2  A.    Because he wanted to kill me.

3        MS. GROOVER:  Your Honor, may I approach the witness?

4        THE COURT:  You may.

5  Q.    (By Ms. Groover)  Let the record reflect that I'm handing

6  the exhibits that are marked Government's Exhibit 3 through 7.

7  Can you please take a look at Exhibits 3 through 7 and tell us

8  if you recognize those.

9  A.    This was a pickup truck in which he came for me.

10 Q.    Okay, and so let's start then with Exhibit 3.  That's the

11 pickup truck that he came for you?

12 A.    Yes.

13 Q.    And let's look at Exhibit 4.

14       THE COURT:  Before you go on to 4, is the home depicted

15 in 3 his home?

16       THE WITNESS:  Yes.

17       THE COURT:  All right, continue.

18 Q.    (By Ms. Groover)  Exhibit 4, tell us what are we looking

19 at in Exhibit 4.

20 A.    The handkerchief, which was covering his face --

21       INTERPRETER:  I'm sorry.

22       THE WITNESS:  -- the bandanna that was covering his

23 face.

24 Q.    (By Ms. Groover)  Is this the inside of his car?

25 A.    Yes.

89

1    Q.    And then the purple bandanna that he had on his face when

2    he kidnapped you?

3    A.    Yes.

4    Q.    Exhibit 5, do you recognize this photograph?

5    A.    Yes, it's my phone protector, phone case.

6    Q.    Is this a photograph of the inside of the defendant's car?

7    A.    Yes, the part where he was in.

8    Q.    The front seat?

9    A.    Yes.

10   Q.    Do you know how your phone got on the floor in the front

11   seat?

12   A.    Because he took it away.

13   Q.    Do you know what he did with your phone?

14   A.    He kept it.

15           THE COURT:  The Newport cigarette box in the corner of

16   Exhibit 5, who smokes those?

17           THE WITNESS:  Him.

18   Q.    (By Ms. Groover)  In Exhibit 6, do you recognize what's

19   depicted in Exhibit 6?

20   A.    My phone case.

21   Q.    Is this a close-up picture of your phone case?

22   A.    Yes.

23   Q.    And Exhibit 7, do you recognize what's depicted in Exhibit

24   7?

25   A.    The front part, front side of his house.

90

1    Q.    Is this the house that he took you back after he kidnapped

2    you?

3    A.    Yes.

4    Q.    Do these photographs accurately represent his truck and

5    his home?

6    A.    Yes.

7          MS. GROOVER:  The Government would move for admission of

8    Exhibits 4 through 7.

9          THE COURT:  Any objection?

10         MR. BLACKERBY:  No objection, Your Honor.

11         THE COURT:  Admitted without objection.

12         MS. GROOVER:  Your Honor, may I approach the witness?

13         THE COURT:  You may.

14   Q.    (By Ms. Groover)  For purposes of the record, I'm handing

15   you Exhibits 8 through 14.  Can you please take a look at

16   Exhibit 8 and tell us if you have ever seen that before?

17         INTERPRETER RAMCHERAN:  Can you repeat that?

18   Q.    (By Ms. Groover)  Please take a look at Exhibit 8 and tell

19   us if you've ever seen that before.

20   A.    That's where he placed my hair and my blood on.

21   Q.    Is this a photograph of inside his home?

22   A.    Yes.

23   Q.    And do you know what room this is?

24   A.    Where other people slept, not his.

25   Q.    Is this a mattress on the right side of the photograph?

91

1    A.    Yes.

2    Q.    And let's look at Exhibit 9.  Do you recognize Exhibit 9?

3    A.    Yes.

4    Q.    What is depicted in Exhibit 9?

5    A.    My hair and my blood.

6    Q.    Have you ever heard of the term "Santa Muerte"?

7    A.    Yes.

8    Q.    What does that mean to you?

9    A.    Something bad.  It's a belief that we have.

10   Q.    What kind of belief is it?

11   A.    She protects those people who do bad things, that dedicate

12   themselves to narcotic trafficking or use drugs or do bad

13   things.

14   Q.    And do you know why there are fruit and cigarettes and

15   alcohol that are placed around the images of Santa Muerte?

16   A.    It's an offering.

17   Q.    To the Santa Muerte?

18   A.    Yes.

19   Q.    An offering to help her protect, protect people who do bad

20   things?

21   A.    Yes.

22   Q.    When you said your hair and your blood is on here, where

23   is your blood at?

24   A.    Where is the blood?

25   Q.    Correct.

92

1   A.    On what she is holding in her hand.

2   Q.    Let's look at Exhibit 10.  Do you recognize Exhibit 10?

3   A.    It's a candle.  Candles.

4   Q.    A closeup photograph of one of the candles there by Santa

5   Muerte?

6   A.    Yes.

7   Q.    And let's look at Exhibit 11.  Is this a closeup

8   photograph of the bottom of the Santa Muerte statue with your

9   hair?

10  A.    Yes.

11  Q.    Is your hair between the cigarettes, the white cigarettes,

12  not the cigarettes in the boxes but the cigarettes that are

13  laying down?

14  A.    Yes.

15  Q.    What did he use to cut your hair?

16  A.    A knife.

17  Q.    And what part of your hair did he cut?

18  A.    The frontal part of my -- am I supposed to say forehead

19  but ...

20  Q.    Exhibit 12, what is depicted in Exhibit 12?

21  A.    My blood.

22  Q.    Is that the blood that he took from you after he beat you

23  and you were bleeding?

24  A.    Yes, he took it from my face.

25  Q.    Let's look at Exhibit 13.  Is that -- do you recognize

93

1   that?

2   A.   It says my name and my date of birth.

3   Q.   Is that the white card with some writing in blue that says

4   your name and date of birth on that?

5   A.   ███████████████, ███████████.

6   Q.   And Exhibit 14.  Do you recognize this?

7   A.   That's me.

8   Q.   Is that a photograph of you?

9   A.   Yes.

10  Q.   Is that the front side of what was written with your name

11  and date of birth that was placed on the Santa Muerte shrine?

12  A.   Yes.

13  Q.   And do the photographs in Exhibits 8 through 13, are they

14  true and accurate depiction of what you saw on November the 4th?

15       INTERPRETER RAMCHERAN:  Can you repeat the question?

16  Q.   (By Ms. Groover)  The photographs depicted in 8 through

17  13, are they a true and accurate depiction of the Santa Muerte

18  shrine that you saw on November 4th?

19  A.   Yes.

20       MS. GROOVER:  Government would move for admission of

21  Exhibits 8 through 13.

22       THE COURT:  Any objection?

23       MR. BLACKERBY:  No objection.

24       THE COURT:  Admitted without objection.

25       MS. GROOVER:  Your Honor, may I approach the witness?

94

1          THE COURT:  You may.

2     Q.    (By Ms. Groover)  I'm handing you what's been marked as

3     Government's Exhibit 15 through 17.  Can you take a look at

4     Exhibit 15 and tell me if you recognize that?

5     A.    That's me beat up.

6     Q.    Is that a photograph of the injuries to your lip and your

7     face?

8     A.    Yes.

9     Q.    Is that a true and accurate depiction of the injuries to

10    your lips?

11    A.    Yes.

12          MS. GROOVER:  Government would move for the admission of

13    Exhibit 15.

14          THE COURT:  Any objection?

15          MR. BLACKERBY:  No objection, Your Honor.

16          THE COURT:  For clarification, this photograph, Exhibit

17    15, when is it --

18          MS. GROOVER:  Thank you, Your Honor.

19    Q.    (By Ms. Groover)  You testified this is a photograph of

20    your injury.  Was this the injury on November the 4th of 2019

21    when the defendant beat you in the cemetery?

22          INTERPRETER RAMCHERAN:  Can you repeat that date again.

23    Q.    (By Ms. Groover)  November the 4th of 2019?

24          INTERPRETER RAMCHERAN:  She does not understand.

25    Q.    (By Ms. Groover)  After the police rescued you, did they

95

1    take you to the hospital?

2    A.    Yes.

3    Q.    And do you remember your -- law enforcement taking

4    pictures of your injury at the hospital?

5    A.    At the hospital and then when they took me to do my

6    declaration, then when I left -- when I was leaving the

7    hospital.

8            THE COURT:  When was this picture taken?

9            THE WITNESS:  That was that day when he beat me.

10           THE COURT:  All right.  Ms. Groover, the date on it, the

11   Thursday, October 15th, 2020, that's just when it was run?

12           MS. GROOVER:  That is correct, Your Honor.

13           THE COURT:  I understand.

14   Q.    (By Ms. Groover)  In Exhibits 16 and 17 that are in front

15   of you, do you know when those photographs were taken, ma'am?

16   A.    That was in the hospital.

17   Q.    The same day that he beat you and kidnapped you?

18   A.    Yes.

19   Q.    Let's look at Exhibit 16.  What is that a photograph of?

20   A.    I am here on a bed in the hospital.

21   Q.    And does that show injuries to your eye?

22   A.    Yes.

23   Q.    And who caused those injuries?

24   A.    Javier.

25   Q.    In Exhibit 17, what are we looking at in Exhibit 17?

96

1   A.   They were taking more pictures of my injuries.

2   Q.   In Exhibit 17, does it show where your hair was cut?

3   A.   Yes.

4   Q.   And can you describe in the photo where your hair was cut

5   at?

6   A.   In the frontal part of my face.

7   Q.   Right where you're pointing to on the photograph?

8   A.   Here.

9   Q.   At the top near the part of your hair?

10  A.   Top part of my head.

11       MS. GROOVER:  Government would move for the admission of

12  Exhibit 15, 16 and 17.

13       THE COURT:  Any objection?

14       MR. BLACKERBY:  No objection, Your Honor.

15       THE COURT:  Admitted without objection.

16       MS. GROOVER:  Your Honor, may I have just a moment,

17  please.

18       THE COURT:  You may.

19       MS. GROOVER:  Your Honor, those are all the questions.

20  I would, in case I missed it, I would move for the formal

21  admission of Exhibits 1 through 18 if I missed any of those.

22       THE COURT:  And other than any objection previously

23  stated, Mr. Blackerby, any objection to those?

24       MR. BLACKERBY:  No, Your Honor.

25       THE COURT:  Let me ask before I call on Mr. Blackerby

97

1   for cross-examination, Exhibit 14, if you will turn to that,

2   what are -- you're holding flowers.

3           THE WITNESS:  Yes.

4           THE COURT:  And food.

5           THE WITNESS:  It was a supposed to be a gift asking for

6   forgiveness from Javier towards me.

7           THE COURT:  When was that given?

8           THE WITNESS:  He did not give it to me.  He sent a

9   person, a friend of his.

10          THE COURT:  This was after he beat you?

11          THE WITNESS:  That was the first time that he went to

12  jail.  But that was after he beat me.  He managed to ensure that

13  I received this.

14          THE COURT:  Who took the picture?

15          THE WITNESS:  A friend of his.  His name is Neal.

16          THE COURT:  And all of these pictures bear 11/4/2019 in

17  the bottom.

18          INTERPRETER RAMCHERAN:  I'm just trying to translate for

19  her.

20          THE COURT:  What am I missing?  So the Exhibit 15, Ms.

21  Groover, that was taken 11/4.

22          MS. GROOVER:  Your Honor, yes, and we can clarify that

23  with another witness.  These were photographs that were taken of

24  items on that shrine and on the shrine was a photograph.  I'm

25  happy -- this witness may not know the answer to that, but

98

1    another witness will that we have available.

2         THE COURT:  Let me call on Mr. Blackerby for

3    cross-examination.

4                        CROSS-EXAMINATION

5    BY MR. BLACKERBY:

6    Q.   Good afternoon, Ms. ███.

7    A.   Good afternoon.

8    Q.   I just have a few quick questions for you.  You first came

9    into the United States in September of 2018; is that correct?

10   A.   Yes.

11   Q.   After you came into the US in 2018, didn't you return to

12   Mexico twice?

13   A.   No.

14   Q.   Is it your testimony that you never returned to Mexico?

15   A.   I only went once.

16   Q.   When was that, do you recall?

17   A.   In February.

18   Q.   Of which year?

19   A.   2019.

20   Q.   Did you take a bus from North Carolina on that trip?

21   A.   Yes.

22   Q.   And did you take cash with you back to Mexico for your

23   family?

24   A.   No, only what Javier had given me.

25   Q.   He gave you $25,000.00; correct?

99

```
 1   A.    No.

 2   Q.    How much?

 3   A.    He gave me my fare.  I'm sorry, he gave me enough for my

 4   fare, because I did not need any more money because I was good

 5   as ... because that's where I lived and I had my parents there.

 6   Q.    How long did you stay in Mexico when you returned?

 7   A.    One week.

 8   Q.    And then you returned to Mr. Mendoza?

 9   A.    Yes.

10   Q.    Did you ever at some point take a van from Waycross

11   operated by Vasquez Transport back to Mexico?

12         INTERPRETER RAMCHERAN:  Transport?

13         THE WITNESS:  No.

14   Q.    (By Mr. Blackerby)  Just to be clear, you never returned

15   to Mexico with cash from Mr. Mendoza other than what you needed

16   in order to pay for your travel?

17   A.    Yes, only my fare.

18   Q.    I think you said this earlier but you would go to pick up

19   cash for Mr. Mendoza; correct?

20   A.    Because he would ask us to.

21         MR. BLACKERBY:  Nothing further.  Thank you.

22         THE COURT:  Any brief redirect?

23         MS. GROOVER:  No, nothing further, Your Honor.

24         THE COURT:  You may step down.  Thank you.  We will take

25   a brief ten-minute break and return to hear the balance of the
```

100

```
 1   witnesses.
 2            MS. GROOVER:  Thank you, Your Honor.
 3            (Recess from 5:02 p.m. to 5:15 p.m.)
 4            THE COURT:  Call your next witness.
 5            MR. GILLULY:  I'd like to call Deputy Callahan to the
 6   stand.
 7            THE CLERK:  Sir, you were previously sworn.  Do you
 8   still uphold that oath?
 9            THE WITNESS:  I do.
10                     OFFICER MICHAEL CALLAHAN,
11   having been first duly sworn, was examined and testified as
12   follows:
13            THE CLERK:  You may be seated.  And if you will please
14   state your full name, spell your last, state your occupation and
15   your business address.
16            THE WITNESS:  Michael Callahan.  I'm a police officer in
17   Blackshear Police Department.  I'm sorry, what was the --
18            THE COURT:  Business address.
19            THE WITNESS:  Business address is 219 Nicholls Street,
20   Blackshear, Georgia 31516.
21                       DIRECT EXAMINATION
22   BY MR. GILLULY:
23   Q.   Thank you, sir.  And prior to you working with the
24   Blackshear Police Department, you were with the Pierce County
25   Sheriff's Office; is that right?
```

101

1  A.   Yes, sir.

2  Q.   How long have you been in law enforcement?

3  A.   Four years.

4  Q.   And I want to date your attention back to August 1 of

5  2019.  Did you respond to a call regarding a man chasing a

6  female and two males down the road with a knife?

7  A.   Yes, sir.

8  Q.   Can you tell The Court a little bit about what you

9  observed when you arrived on the scene?

10 A.   I met the female and two males down the road from the

11 house.  As I got out with them, I could tell she was visibly

12 upset.  She was crying.

13      I couldn't get much out of her because of the English/

14 Spanish barrier.  She just kept pointing in the house, so we

15 went down there and talked to him, detained him for the time

16 being, didn't find any weapons on him when we patted him down.

17      As soon as she came walking back up to the house with

18 somebody on the phone that could speak English/Spanish, he

19 interpreted for us.

20      He said that he got home, that he -- they didn't say how

21 it started.  Just said that he got a knife and he tried to cut

22 or stab them and then chased them out of the house down the

23 road.

24 Q.   This happened I guess August 1st, 2019 and you were

25 dispatched to 5279 Eden Road; right?

102

```
 1    A.     Yes.
 2    Q.     And when you got there you came in contact with ▆▆▆▆▆
 3    ▆▆▆▆▆ is how it's indicated in the report?
 4    A.     Uh-huh.
 5    Q.     And she was upset and crying?
 6    A.     Uh-huh.
 7    Q.     And there were also two other males; is that correct?
 8    A.     That's correct.
 9    Q.     Were there two males with her?
10    A.     There was.
11    Q.     Apart from this defendant?
12    A.     Yes.
13    Q.     And during your investigation, did you learn through a
14    friend of Ms. Gonzalez trying to assist interpreting that
15    essentially this defendant chased Ms. ▆▆▆▆▆ and the two
16    males down the road with a knife?
17    A.     Yes.
18    Q.     And ultimately did you, in fact, arrest him for aggravated
19    assault/family violence?
20    A.     I did.
21    Q.     And while talking to this defendant, did he make any
22    statements on whether he knew ▆▆▆▆▆?
23    A.     He said he didn't know them and they did not live there.
24    Q.     So denied even knowing her?
25    A.     Yes.
```

1   Q.    And do you remember if when he was placed in your patrol

2   car whether he was cooperative or attempting to resist or --

3   A.    When we placed him in cuffs and told him he was being

4   detained, he was pretty cooperative, but then when we made our

5   way to the truck after we told him he was being arrested, he

6   tried to like tense up and resist.

7         We put him in the vehicle and shut the door.  He then

8   began to hit his head on our window.

9   Q.    In that case, was a felony charge that was pending and

10  that's pretty much your involvement; correct?

11  A.    Yes.

12  Q.    Never found the knife?

13  A.    No, sir.

14        MR. GILLULY:  That's all the questions I have, Your

15  Honor.

16        THE COURT:  Any cross-examination, Mr. Blackerby?

17        MR. BLACKERBY:  No questions, Your Honor.

18        THE COURT:  You may step down.  Thank you.  Any

19  objection to this witness being excused?

20        MR. GILLULY:  No, Your Honor.

21        THE COURT:  Mr. Blackerby, any objection to him being

22  excused?

23        MR. BLACKERBY:  No objection, Your Honor.

24        THE COURT:  You may be excused, thank you.  Call your

25  next witness.

104

1          MR. GILLULY:  Call Jeremy Stagner.

2          THE CLERK:  And, sir, you were previously sworn.  Do you

3    still uphold that oath?

4          THE WITNESS:  Yes, I do, ma'am.

5                       DETECTIVE JEREMY STAGNER,

6    having been first duly sworn, was examined and testified as

7    follows:

8          THE CLERK:  Please be seated.

9          THE WITNESS:  Thank you.

10         THE CLERK:  And if you will please state your full name,

11   spell your last, state your occupation and your business

12   address.

13         THE WITNESS:  It is Jeremy Lynn Stagner, S-t-a-g-n-e-r.

14   I am currently with the Glynn County Police Department as an

15   investigator with the special investigations unit at 157 Carl

16   Alexander Way, Brunswick, Georgia, Glynn County.

17         MR. GILLULY:  Thank you.  May I proceed?

18         THE COURT:  You may.

19                       DIRECT EXAMINATION

20   BY MR. GILLULY:

21   Q.   Detective Stagner, were you at one point assigned to the

22   violent crimes task force with the FBI?

23   A.   Yes, I was.

24   Q.   What was your duty there?

25   A.   To be a full-time task force officer with the FBI, Title

105

1    18 and Title 21, and we investigated violent criminals and

2    violent gangs within ten counties of southeast Georgia.

3    Q.   And I want to date your attention back to November 4th,

4    2019.  Do you remember getting a call of some kind or receiving

5    information regarding a kidnapping that just happened not far

6    from this courtroom?

7    A.   Yes.

8    Q.   And tell The Court what happened, like what you were doing

9    and how you responded.

10   A.   Okay.  Honestly, I just got off duty from a long day of

11   work.  Just went home to my wife and kids when I received an

12   emergency text message from Glynn County Police Department

13   saying that there has been a kidnapping off Old Cate Road, 134,

14   and a couple minutes later, FBI Task Force Officer Ronnie Cooper

15   called me and said Lieutenant Keith Stalvey with Glynn County

16   Police Department is requesting our assistance with this

17   kidnapping.

18   Q.   And did the information you received indicate that -- was

19   it still daylight?

20   A.   It was in the evening time, maybe getting a little darker.

21   Q.   And did the information you received, literally there was

22   a female outside with kids and a man drove up in a truck armed

23   with a knife and a bandanna and literally kidnapped a female

24   with a knife?

25   A.   Yes, sir.  TFO Cooper and I linked up, and we had a

Case 2:21-cr-00034-LGW-BWC   Document 46   Filed 05/18/22   Page 106 of 179
USCA11 Case: 22-11273   Document: 17   Date Filed: 09/28/2022   Page: 130 of 205

106

1    conversation with Lieutenant Stalvey and he described that very

2    scenario to us, and then we were -- furthermore, we were told

3    that there was an emergency exigent circumstance ping on ██████

4    ████████ cell phone and it was heading out to Jesup, Jesup,

5    Georgia.

6    Q.   And the supervisor procured the ping, the emergency ping

7    on the phone?

8    A.   Yes, sir, Sergeant Brandon Gregory with the Glynn County

9    Police Department.

10   Q.   And the purpose of that was to try to just get on and just

11   rescue this victim as soon as possible?

12   A.   Yes, sir.  At the time -- I believe at the time we didn't

13   really know who the suspect was, but we definitely knew who the

14   victim was so -- and we knew her cell phone number, and we went

15   ahead -- that's why we chose her cell phone number.

16   Q.   And then tell us what happened.  What were you wearing?

17   A.   I was wearing full loadout gear with a vest, bold letters,

18   "police" on the front and back, casually dressed short sleeves,

19   pair of jeans, shoes and we went into Jesup, Georgia.  Ronnie

20   Cooper spoke with a DEA task force officer, a TFO Royal, and we

21   also met with a Sergeant Stallings with Jesup, Georgia Police

22   Department, and we all met at the same -- about the same

23   location and we started collaborating from there.  We started

24   letting the Jesup, Georgia sheriff's deputies and also police

25   officers know what's going on.

107

1   Q.   Okay.

2   A.   Go ahead.

3   Q.   No, you go.

4   A.   And at that time, TFO Royal also brought up some previous

5   domestic he knew about 124 Mill Road in Jesup, Georgia, Lot

6   Number 3, so we told him to go ahead and get eyes on the

7   location and start conducting physical surveillance.

8   Q.   This is a matter of how long do you think from that phone

9   call from your supervisor to you getting eyes on the residence,

10   I mean, how long did that take?

11   A.   It was probably about 30 to 40 minutes' drive time and

12   going a little faster than normal speeds.  But about 30 or 40

13   minutes from Brunswick to Jesup, yeah.

14   Q.   Had you ever in your career responded to a kidnapping in

15   progress of this nature?

16   A.   Of this nature, no, sir, not at all.

17   Q.   So you get there.  You guys put eyes on the property.

18   What do you observe?

19   A.   Yes.  We observed -- well, during that meeting with Jesup

20   and Wayne County deputies and police officers, Brandon Gregory,

21   Sergeant Brandon Gregory kept sending us images of the ping and

22   it was exactly over Lot Number 3 of the mobile home, and we

23   drove by the mobile home.  We observed a newer F150 silver-in-

24   color pickup truck parked in the rear of the residence, and that

25   was the same description that Lieutenant Stalvey gave us that

Case 2:21-cr-00034-LGW-BWC   Document 46   Filed 05/18/22   Page 108 of 179
USCA11 Case: 22-11273   Document: 17   Date Filed: 09/28/2022   Page: 132 of 205

108

1   the suspect allegedly drove into the front yard and kidnapped

2   ██████████.

3   Q.    And then what did you do?

4   A.    And then -- then we observed a Hispanic male come from the

5   rear of the house.  I alerted the other TFO's, Ronnie Cooper and

6   Royal, and said that there was a Hispanic male right there.  We

7   shined our flashlights.  It appeared to be Mr. Javier, and from

8   recent booking photos from Wayne County Sheriff's Office that

9   was provided to us at that meeting with Sergeant Stallings, TFO

10  Royal yelled out "Mendoza," and he was on his cell phone and

11  lighting a cigarette.  He looked right at us and made a pretty

12  immediate U-turn to return back to -- towards his truck at that

13  time.

14  Q.    And at that time, you had already identified that the

15  prior domestic issue was between ██████████ and Mr. Javier

16  Sanchez; is that correct?  Or do you know?

17  A.    That was from TFO Royal.  That's what he told us.

18  Q.    Y'all had the collective intel at that point?

19  A.    Yes, sir.

20  Q.    And were y'all originally going to use SWAT to try to go

21  in?

22  A.    They were -- they were trying to -- yeah, they were

23  getting SWAT en route, but with such a fast pace that we were

24  going, you know, they couldn't get there in time.

25  Q.    Sure.

1  A.   But they were -- they were getting around, getting ready.

2  Q.   So when Mr. Javier Mendoza started doing an about-face and

3  head toward the truck, what did you and your team do?

4  A.   Yeah, we went ahead and we observed -- yeah, on our way,

5  we went ahead and approached him and then we confirmed as we got

6  closer that it was him from the booking photo, and there was an

7  earpiece in his right ear, so we told him or demanded for him to

8  get on the ground, which he did, and we placed him under arrest

9  at that time.

10 Q.   And he's detained and then obviously the next plan is

11 identifying the victim; right?

12 A.   Absolutely.

13 Q.   Tell The Court about what happened, what you observed

14 and --

15 A.   TFO Cooper and I heard running, people running inside the

16 mobile home.  They were running -- the footsteps were leading

17 towards the -- the -- like the other end of the trailer, like

18 we're at the back end.  They were at the other end of the mobile

19 home, and we started hearing the footsteps running towards the

20 rear door, which that's where the vehicle, the truck, the F150,

21 was parked at.

22      TFO Cooper ran towards the rear door and I ran towards the

23 front, the front door, and they opened up the door.  They

24 observed Cooper and they slammed, slammed the door shut and

25 started running toward my location.  They opened up the door.  I

110

1   didn't give them a second chance to shut the door.  I went ahead

2   and grabbed the first lady that came out.

3   Q.   You say "they."  Were there two females?

4   A.   There were two females.

5   Q.   Was one older?

6   A.   Yes.  Yes, sir.

7   Q.   Do you remember how that -- you know, was there any

8   contact between the older female and ████████?

9   A.   There was.  There was a -- yeah, she had -- so the older

10  female was later identified as Anna or Anna Mendoza and the

11  female behind her was ██████████████.  That was our victim

12  from that night, and the strangeness of it was that she -- she

13  didn't -- they weren't hand in hand, but Anna or Anna had

14  ████████ by the wrist, by her left wrist, in fact -- it would

15  be her left wrist -- in tow.

16  Q.   So almost, be it fair to say almost -- is it fair to say

17  almost in a controlling, grabbing manner?

18  A.   Absolutely, sir.

19  Q.   And did you come to learn that this Anna individual is

20  this defendant's mom?

21  A.   Yeah.  So I quickly separated them two to figure out, you

22  know, who is who, and as soon as, like I had to pry Anna or Ms.

23  Anna away from ████████, like forcibly pry her away from each

24  other, and as soon as ████████, as soon as she got free, she

25  ran right towards Wayne -- Wayne County marked units, and then

111

1    I -- and Ms. Anna stayed with me.

2    Q.    What was ███████████ demeanor like at that point?

3    A.    Oh, she was crying, makeup just all over, all over her

4    face.  I did see some redness on the -- it would have been the

5    left side of her face to her cheek and her eye and she was

6    scared, very scared.

7    Q.    If I could, if I could procure Exhibit 3 and Exhibit 7 to

8    show the witness.  May I approach, Your Honor?

9            THE COURT:  You may.

10           THE WITNESS:  Okay.

11   Q.    (By Mr. Gilluly)  All right, let's start with Exhibit 3

12   that is before you.  It's already been marked into evidence.  Is

13   that a photograph of the truck -- did they just fall on the

14   ground?

15   A.    They fell on the floor.

16   Q.    Sorry about that.  Is that a photograph of the defendant's

17   truck that was at that location?

18   A.    Yeah.  See, that would be the rear side of the mobile

19   home.

20   Q.    And then Exhibit 4, there's a bandanna.  Is that something

21   you found in that truck?

22   A.    Yeah.  Upon executing a Georgia state search warrant with

23   a Detective Lowrey with Glynn County PD, we discovered that and

24   seized it.

25   Q.    Exhibit 7, is that a photograph of the house where the

112

1    victim was found?

2    A.    Yes, sir.  That's the front of the house.  That's where I

3    made contact with Anna and ███████████.

4    Q.    Did you go in the house?

5    A.    We did.

6    Q.    Tell The Court about your experience in that regard.

7    A.    Yeah.  So Cooper came -- yeah, TFO Cooper came back, and I

8    told him that we're going to have to clear the rest of the house

9    due to preservation of evidence and also to see, conduct a

10   security check of the residence, ensuring nobody else was

11   inside.  Whether they be victims or suspects, we didn't know.

12   We weren't even expecting the older lady and there she was when

13   she first opened the door, Ms. Anna.

14        So we entered, entered the front door, and -- which led

15   into the living room.  There's a bedroom immediately off to the

16   right.  Nothing unusual there.  Nobody was inside there.

17        We went back into the living room, and then there was a

18   little wall you had to go around to the right and that room was

19   the only room -- that room was the only room in that whole

20   trailer or that mobile home that was off, and that gave us a

21   little bit of concern due to how dark it was.  We also saw the

22   flickering of lights, going -- emitting from within that room.

23        So we went ahead and entered that room and -- we entered

24   that room.  We saw a statue that was later identified as Santa

25   Muerte statue known in my training and knowledge and experience

113

```
 1   to be some type of like a drug cartel statute that they -- or a

 2   god, representation of their god that they worship or whatever.

 3          And we -- so there was candles lit all around the statue.

 4   There was candles throughout the whole bedroom that was lit that

 5   was very dark.  We saw -- we saw blood, fresh blood, on the

 6   scythe of the statue and we saw pieces of hair in front of the

 7   statue.  We saw a photograph, which we didn't touch at that

 8   time, and there was other items on the table I can't recall.

 9          All I could recall was that statue.  It's creepy.

10   Q.   Have you ever encountered something --

11   A.   I saw it in prior law enforcement training, Power Points

12   and videos.  You know, this is what you may encounter and never

13   in real life, though.  I've never seen anything like that in

14   real life.

15   Q.   And after, you know, getting some background from the

16   victim, was it difficult to communicate with this individual who

17   spoke Spanish?

18   A.   Which individual?

19   Q.   I'm sorry, ███████.

20   A.   Yes.

21   Q.   I was going to say did investigators on the scene even use

22   Google translate in order to translate Spanish to English to try

23   to understand what's going on?

24   A.   Yes.  I stayed at the front door, so we cleared the rest

25   of the residence.  No other people was found inside, and we
```

114

1    exited the residence.  I stayed with Ms. Anna, and she was

2    saying that -- she identified herself as the mother of Javier

3    and she identified ████████ as his wife, but she kept telling

4    me that, even though she's married to Javier, she keeps in her

5    broken English -- she kept saying she keeps sleeping with other

6    men, I mean, like she's constantly, "She's sleeping with other

7    men, she's sleeping with other men," and then that's when TFO

8    Cooper came back and told me or place -- we placed her under

9    arrest at that time because he had a conversation with ████████

10   ████████.  ████████████ said that she was in on the

11   kidnapping.  She was in on all this events that occurred that

12   night, and so we arrested her for kidnapping.

13   Q.    And with regard -- if I may approach, Judge?

14         THE COURT:  You may.

15   Q.    (By Mr. Gilluly)  Thank you.  I just handed you what's

16   been marked as Government Exhibit 19.  Is that a screen shot of

17   the Google translate translating what ████████████ stated to

18   one of the law enforcement officers on the scene?

19   A.    Yes, sir.

20   Q.    And, in fact, during this investigation was the

21   defendant's demeanor when he was arrested, I mean, describe his

22   demeanor?  How was he acting?

23   A.    Oh, he was -- he was loud.  He was screaming.  He was

24   shouting.  I could hear him -- actually in this Exhibit Number

25   7, as I was standing at the front door, he was in the back seat

115

1   of the patrol car, windows rolled up.  I could still hear him

2   yelling and shouting in what I believed to be his language.

3        I didn't know what he was saying, but TFO Cooper came back

4   and he showed me this phone with the Google translate.  That's

5   what he was telling ████████████ at the time.

6   Q.   So he was literally yelling out something to ████████████

7   on the scene?

8   A.   Yes.

9   Q.   And then ultimately ████████████ told the officers what

10  was said and then Google translate was used and that's a screen

11  shot of the Google translate?

12  A.   Yes, sir.

13       MR. GILLULY:  Your Honor, I'd like to move this as the

14  next exhibit?

15       THE COURT:  Any objection?

16       MR. BLACKERBY:  Your Honor, I would object because it

17  appears to be an officer's recitation of what ██████ said that

18  Mr. Mendoza said.

19       It's then been run through an online translator, so

20  there are just multiple layers of hearsay, and I'm not sure how

21  reliable the Google translate even is, so I would object.

22       THE COURT:  I understand the deficiencies that you point

23  out, but I will overrule your objection and use it for what it's

24  worth.

25       MR. GILLULY:  Thank you, Your Honor.

116

1   Q.   (By Mr. Gilluly)   That will be Exhibit 19 for the record.

2   Will you read the translation of what purportedly this defendant

3   was saying to ██████████?

4   A.   Yes, sir.   "He is threatening me to kill my family in

5   Mexico and he wants to have me with him by force.   I do -- I

6   don't want him to hurt me."

7   Q.   You mentioned, you said the room was creepy.   I mean, on

8   scenes like -- have you ever encountered a scene of this nature?

9   A.   No, not at all, sir.

10  Q.   In addition to the candles, the blood, the hair, the photo

11  upside down, the older woman exercising control over ██████████,

12  you know, this whole instant, I would submit, rescue, did you

13  see other things in the room that made you believe that death

14  was eminent?

15  A.   I did.   I did.   Yeah, so we turned -- we quickly -- after

16  seeing the items on the table, seeing the candles and hair and

17  blood and those sort of effects, we quickly turned on the

18  bedroom light and we observed shovels in the same bedroom as

19  that statue was.   They were used.   They were older and they had

20  dry dirt on them.

21  Q.   Additionally, did you execute a search of the truck -- or

22  law enforcement -- and find a knife?

23  A.   We did.   We did.

24       MR. GILLULY:   Your Honor, may I approach?

25       THE COURT:   You may.

117

1        MR. GILLULY:  I was just showing counsel the exhibit.

2  It's premarked as Exhibit 22, Your Honor.

3        THE COURT:  All right.

4  Q.   (By Mr. Gilluly)  And I just handed you a box.  It's got a

5  tag, Exhibit 22, marked by the Government.  Did you, in fact,

6  check that out of the property room and bring it here?

7  A.   I did, sir.

8  Q.   Is that a knife that was seized on that occasion from this

9  defendant's truck, the evening of the kidnapping?

10 A.   Yes, sir.

11 Q.   And what's in the box?

12 A.   A silver knife, stainless china steak knife that I would

13 use.

14 Q.   Okay, and it was found in his vehicle?

15 A.   Yes, sir.

16       MR. GILLULY:  If I may have a second.

17       THE COURT:  Just to be clear, there was nothing else

18 found in the vehicle that would go along with that knife in the

19 way, no forks, spoons, plates, anything like that?

20       THE WITNESS:  We did not, ma'am.

21 Q.   (By Mr. Gilluly)  In fact, were there items related to

22 Santa Muerte in the truck that you can remember?

23 A.   I cannot recall off the top of my head.

24 Q.   We have a bandanna?

25 A.   There is a bandanna.

118

```
 1    Q.    And knife?

 2    A.    Yes, sir.

 3          MR. GILLULY:  That's all the questions I have, Your

 4    Honor.  Thank you.

 5          THE COURT:  Cross-examination, Mr. Blackerby.

 6          MR. BLACKERBY:  If I could have one moment.

 7          MR. GILLULY:  And if I didn't move the knife into

 8    evidence.

 9          THE COURT:  Any objection?

10          MR. BLACKERBY:  No objection, Your Honor.

11          THE COURT:  Admitted without objection.

12          MR. BLACKERBY:  No questions, Your Honor.

13          THE COURT:  Any objection to this witness being excused?

14          MR. GILLULY:  No, Your Honor.

15          THE COURT:  You may step down.  Thank you.

16          THE WITNESS:  Thank you, Judge.

17          MR. GILLULY:  I would like to call Rosalino Hernandez

18    Diaz.

19          THE COURT:  Mr. Gilluly, is this a witness that also

20    will need the services of your interpreter?

21          MR. GILLULY:  Yes, Your Honor.

22          THE CLERK:  Ma'am, you were previously sworn, do you

23    still uphold that oath?

24          INTERPRETER RAMCHERAN:  Yes, I do.

25          THE CLERK:  And, sir, you were previously sworn.  Do you
```

119

1  uphold that oath?

2          THE WITNESS:  Yes.

3                      ROSALINO HERNANDEZ DIAZ,

4  having been first duly sworn, was examined and testified as

5  follows:

6          THE CLERK:  If you will please state your full name.

7          THE WITNESS:  Rosalino Hernandez Diaz.

8                      DIRECT EXAMINATION

9  BY MR. GILLULY:

10  Q.    And, sir, how old are you?

11  A.    38.

12  Q.    And without giving us your actual address, what country

13  are you from?

14  A.    Mexico, Chiapas, Mexico.

15  Q.    And are you married, have any kids?

16  A.    Yes, I have children.

17  Q.    How many kids?

18  A.    Six.

19  Q.    And I want to ask you, you're here in the United States

20  and I want to ask you, what brought you here to the United

21  States?

22  A.    I was invited here to the United States for a visa to work

23  here in the United States.

24  Q.    And, in fact, you had come to the United States before on

25  an H-2A visa to work on the farms for Javier Guerero; is that

120

1    correct?

2           INTERPRETER RAMCHERAN:  Last name?

3           MR. GILLULY:  Guerero.

4           THE WITNESS:  Yes.

5    Q.   (By Mr. Gilluly)  And in that experience what kind of work

6    did you do?

7    A.   Picking blueberries and grapes.

8    Q.   And with that experience, did you make money, enough

9    money, to even send it back to your family in Mexico to help

10   them?

11   A.   Yes, the little that I could send, yes, I did send.

12   Q.   And then you went back to Mexico; is that right?

13   A.   Yes.  That is correct.

14   Q.   And then you came back under Javier Mendoza; is that

15   right?

16   A.   Correct.

17   Q.   In fact, the way you even came in contact with him in

18   December of 2019, a friend of yours named Jorge Luis told you

19   about Mr. Mendoza and him bringing people to the US under this

20   program?

21          INTERPRETER RAMCHERAN:  December 2019; correct?

22          THE WITNESS:  Yes, my friend Jorge Luis.

23   Q.   (By Mr. Gilluly)  And did you decide to come here and work

24   for Mr. Mendoza?

25   A.   Yes, that's correct.

121

1   Q.    And you ultimately, to get here, you at some point had to

2   go to Monterey, Mexico to meet with an attorney named Jasmine or

3   Jasmine; is that correct?

4   A.    Yes, that's correct.

5   Q.    And there were like 40 people with you at that time -- is

6   that right -- trying to go through the same program through Mr.

7   Mendoza?

8   A.    Correct.

9   Q.    And how far is Monterey from your home?

10  A.    It's 24 hours.

11  Q.    How did you get there?

12  A.    On a bus.

13  Q.    And was it you and a number of other people going to

14  Monterey to come to the US to make money to send back to Mexico?

15  A.    Yes.

16  Q.    Did you have, did you know whether or not you were going

17  to have to pay in order to come over through Mr. Mendoza?

18  A.    They told me when I was already in Monterey.

19  Q.    Okay.  What did you learn, how much you would have to pay?

20  A.    When I arrived to turn over my papers, my documents.

21  Q.    And how much were you supposed to pay to come?

22  A.    I paid $1,000.00 to be able to pass and come over here.

23  Q.    And did you have a thousand dollars just in your bank

24  account in Mexico?

25  A.    No.

122

1   Q.    How did you get the money in order to come here?

2   A.    It was a loan.

3   Q.    Was it a loan from family members?

4   A.    Yes, family loan.

5   Q.    In January of 2020, you traveled this 24-hour journey.

6   You make it to Monterey, Mexico, and did you get your visa at

7   that time?

8   A.    No.

9   Q.    So what happened?

10  A.    According to the official at the consulate that it would

11  be a process.

12  Q.    How long did that process take?

13  A.    About a month, one month.

14  Q.    And what did you do for that month?  Did you stay in

15  Monterey or did you make your journey back to your house?

16  A.    I had to return.

17  Q.    And were there other people who had traveled with you on

18  the bus who faced the same situation where they had to return or

19  they didn't get their visa at that time?

20  A.    No, they -- they stayed there.  They waited.

21  Q.    Were there women, children and men that waited?

22  A.    Men and women only.

23  Q.    And in late February, did you finally get a call from

24  Jasmine telling you that the visas are ready and that you could

25  finally come back to Monterey to then ultimately make it to the

123

1    United States?

2    A.    Yes, that is.

3    Q.    So you had to make that journey again; is that right?

4    A.    Yes.

5    Q.    And in March of 2020, did you and about 38 other people

6    travel from Monterey to Brunswick here in Georgia?

7    A.    Yes, we arrived here and at Waycross.

8    Q.    You know, how long did it take to get from Monterey to

9    Waycross?

10   A.    One night and one day.

11   Q.    And where would you sleep?

12   A.    When we were all headed here on the bus, we arrived, we

13   arrived at Tallahassee and Javier arrived there for me and three

14   other gentlemen.

15   Q.    And let me ask you:  Like on the journey, you know, the

16   journey from Monterey into the United States before you get to

17   Tallahassee, did you observe anyone, you know, bringing Santa

18   Muerte statues on the bus to deliver to Javier Sanchez Mendoza?

19         INTERPRETER RAMCHERAN:  I'm sorry, can you repeat the

20   Point A to Point B?

21   Q.    (By Mr. Gilluly)  Yeah, during the trip to the United

22   States, did you observe anyone on the bus bringing with them

23   Santa Muerte statues?

24   A.    Yes.

25   Q.    And were those to be delivered to Javier Sanchez Mendoza?

124

1    A.    That is correct.

2    Q.    And you believed that you would be working for a farmer or

3    contractor named Neal McGauley; is that right?

4          INTERPRETER RAMCHERAN:  Neal?

5    Q.    (By Mr. Gilluly)  Neal is fine?

6    A.    Yes.

7    Q.    What did you think you would be doing at the farm?

8    A.    Well, supposedly we were told that we would first start

9    cleaning up the land and then that we would move on to picking

10   blueberries.

11   Q.    And during this trip, did Jorge Luis ask you if you could

12   drive because Mr. Mendoza was looking for a driver?

13   A.    That is correct.

14   Q.    And you mentioned going to Tallahassee.  Was it explained

15   that four people would be separated from the others?

16   A.    Yes.

17   Q.    And the bus stopped in Tallahassee and Mendoza arrived and

18   called out four people to go with him?

19   A.    Yes.

20   Q.    Was that Lisbeth?

21   A.    Yes.

22   Q.    Olga?

23   A.    Yes.

24   Q.    Jorge Luis?

25   A.    Yes.

125

1    Q.    And you?

2    A.    Yes, that's correct.

3    Q.    And did you grab your luggage and the four of you get in

4    Mr. Mendoza's truck?

5    A.    Yes.

6    Q.    And where did the other -- how many other people were on

7    that bus?  What happened to them?

8    A.    About 37 of us were onboard.  Or 36, somewhere around

9    there.

10   Q.    And they stayed -- most of the people stay on the bus and

11   go to one location and then the four of you get in the truck?

12   A.    They stayed behind to eat at a restaurant.

13   Q.    Did y'all eat?

14   A.    No.

15   Q.    Had you eaten on this journey at all?

16   A.    We had stopped to eat before somewhere maybe around ten

17   o'clock that morning.

18   Q.    And once you talked to Mr. Mendoza, did he say he would

19   pay you $400.00 a week to drive people to farms?

20   A.    That is correct.

21   Q.    And $300.00 a week to keep an eye on the people who were

22   working in the fields?

23   A.    That is correct.

24   Q.    And did you learn that he wanted Olga to be with him?

25   A.    No.  I did not find out until afterwards.

126

1   Q.    Okay.  And did the bus and the truck ultimately go to a

2   Wal-Mart near Waycross where Mendoza bought I guess four cases

3   of beer?

4   A.    That is correct.

5   Q.    And did Mendoza talk to all of the people on the bus and

6   have them get in a circle?

7   A.    That is correct.

8   Q.    What did he say to all these people who he made or told to

9   get in a circle?

10  A.    So he began telling the group that Jorge Luis would be in

11  charge of the women and that Olga would be his personal

12  secretary.  And Lisbeth would be the one in charge of all the

13  women in the group.  And I was the one who would be the driver.

14  Q.    And who was going to be the boss?

15  A.    Him, Javier, he started -- we all had a piece of paper

16  where Jonathan's name was on it.  He began telling us that

17  Jonathan didn't know anything about this.  He knew nothing about

18  this, that he was the boss.

19  Q.    And did he say what would happen if people crossed him, as

20  in Mendoza?

21  A.    Yes.  He introduced another gentleman, another man who I

22  did not know, that happened to be his cousin.  We were told that

23  they knew and ruled that area and that they pretty much knew

24  everything that happened in that area.

25  Q.    And did he even say that he controlled things in that

127

1    town?

2    A.    Yes.

3    Q.    That morning at around 2:00 in the morning, did Mr.

4    Mendoza take the four of you to a hotel in Alma?

5    A.    That is correct.

6    Q.    Did y'all stay in the hotel?

7    A.    Yes.

8    Q.    And at some point, did he take the four of you to his

9    mother's house in Jesup, Georgia?

10   A.    Yes.

11   Q.    Do you know why?

12   A.    No.

13         THE COURT:  Counsel, to pull back, we're addressing the

14   objections that have been made.

15         MR. GILLULY:  I was going to get into the force, the

16   violence, some of the -- the violence, Judge, and I will

17   fast-forward.

18         THE COURT:  Which objection are we on?

19         MR. GILLULY:  Regarding the escape, where people were in

20   the bathroom, the four --

21         THE COURT:  Okay.

22         MR. GILLULY:  I will get closer.

23         THE COURT:  Continue.

24   Q.    (By Mr. Gilluly)  Did he instruct you to do anything with

25   women who were separated from the group?

128

1   A.   Yes.  We began transferring people from Alma to Jesup from

2   the barracks to trailers.

3   Q.   And did he tell you to leave the five Michoacanis women at

4   the barracks and that he would personally deal with them?

5   A.   Yes.

6   Q.   What did that mean to you?

7   A.   There was a moment where Olga called me and told me that I

8   needed to get these women out because she overheard him tell

9   someone that they needed to come over to kill these women.

10  Q.   Did he say that there would be a price on your head if you

11  did not keep the women at the barracks?

12  A.   He told me personally to tell these women that they were

13  staying behind, that he would come by for them between 4:00 --

14  no, no, between 4:00 and 5:00 that afternoon.

15  Q.   Ultimately did you help the women escape?

16  A.   Well, yes, when I found out, what I did was I called one

17  of them.  I let them know that something bad was up and that I

18  was coming to pick them up.

19  Q.   And did you free them and help them escape?

20  A.   Yes, that's correct.

21  Q.   Is there another incident that you saw where Mr. Mendoza

22  pulled a knife on somebody and threatened to kill him?

23  A.   Yes, that's correct.

24  Q.   And did you try to help this young man?

25  A.   Yes.  Javier, Olga, myself tried to help.  Jorge Luis,

129

1   sorry.

2   Q.    Was this young man a teenager?

3   A.    This was a young man who came in the same trip with us and

4   supposedly he was Jonathan's son.

5   Q.    And during that encounter, did he drag Olga by the hair

6   across the floor?

7   A.    Yes.  He dragged her inside the house.

8   Q.    You went back ultimately and you talked to Mendoza, and

9   how was he acting after you freed the women from the barracks?

10  How was Mr. Mendoza acting?

11  A.    Well, I did not know if he knew that I had helped these

12  women escape or not.  I arrived with three other men that were

13  with me.  Since everyone else had escaped, they were scared with

14  everything that had happened.

15  Q.    Did Mr. Mendoza have armed guards?

16  A.    Supposedly the one, those who were at the barracks, there

17  was one night where people couldn't sleep because they were so

18  scared because some armed men wanted to enter the barracks.

19  They were surrounding the barracks and wanted to come in.  And

20  that was the same night that he wanted to stab that young man.

21  Q.    Did Mr. Mendoza take you, Gregoria, Olga and a man named

22  Christian on a long drive to North Carolina against your will?

23         INTERPRETER RAMCHERAN:  Can you repeat the names?

24  Sorry.

25         MR. GILLULY:  Gregoria, Olga and Christian.

130

1          THE WITNESS:  Yes, that is correct.

2   Q.   (By Mr. Gilluly)  Were you afraid?

3   A.   Yes.

4   Q.   Did you learn he was going to keep Olga for him?

5   A.   Yes.

6   Q.   Did Mendoza take you or did you meet a sicario with

7   Mendoza?

8   A.   Supposedly when we were in the car, we were headed towards

9   New York but he only reached North Carolina.

10  Q.   Did he pick up a sicario?

11  A.   From North Carolina, we -- we returned to Charleston

12  supposedly to pass by for a sicario, pick up a sicario.

13  Q.   Did you see the sicario?

14  A.   Yes.  I saw the man that was there with him.

15  Q.   Did he have a long gun?

16  A.   All he said was that he had automatic rifles and -- in his

17  house and that he had a gun.

18  Q.   Did the sicario and Mendoza get drugs and get drunk?

19  A.   Yes.

20  Q.   Did you drive down a long dirt road?

21  A.   Yes.

22  Q.   What did you think was going to happen to you and the

23  other three people?

24  A.   At that moment when we saw that we were entering down this

25  desert road, we started thinking about our families back in

131

1   Mexico, and we started thinking about how all -- everything that

2   was happening was just not normal, everything that was happening

3   in general.

4   Q.   And did you and the other three escape from the truck?

5   A.   We stopped at a parking lot in a business and he let out

6   Gregoria, Christian and myself included, got us off the truck.

7   Q.   Olga had to stay in the truck?

8   A.   Olga was not allowed to get off of the truck.

9   Q.   What did y'all do?

10  A.   I decided to stand behind the truck and I told Javier that

11  if he wanted to leave with Olga and take her that he would have

12  to go over our bodies to do so.

13  Q.   And what happened?

14  A.   So he just kept saying that he didn't want us, that all he

15  wanted was Olga and he was going to take her.

16  Q.   Did he leave and give you an opportunity to rescue Olga?

17  A.   They were parked there and Olga managed to unlock the car

18  and get out, and -- but at the same time there was a patrol car

19  passing down by the road nearby.  We were able to get Olga off

20  of the truck and we ran into a Mexican restaurant.

21  Q.   And did you hide in that restaurant?

22  A.   That is correct.

23  Q.   And ultimately get away?

24  A.   Yes.  We asked the restaurant owner if he could help us

25  find a ride or ...

132

1        He told us that he didn't have any known numbers but he

2   did call a taxi and they took us to a hotel.

3   Q.   I'm going to hand you three documents -- may I approach,

4   Judge, and I'm concluding my direct examination.

5        THE COURT:  You may.

6   Q.   (By Mr. Gilluly)  Exhibit 7 is a photograph of a white

7   house.  Does that look familiar?

8   A.   Yes, it looks like the one where we arrived at.

9   Q.   Exhibit 20 and 21, is that a van?

10  A.   Yes.

11  Q.   That was used to transport people?

12  A.   Yes, that is correct.

13       MR. GILLULY:  I would like to move formally Exhibits 20

14  and 21 into evidence.

15       THE COURT:  Any objection?

16       MR. BLACKERBY:  No objection, Your Honor.

17       THE COURT:  Admitted without objection.

18  Q.   (By Mr. Gilluly)  Did you ever do any farm work for Mr.

19  Mendoza?

20  A.   Not even one day.

21  Q.   And have you been in the United States ever since?

22       INTERPRETER RAMCHERAN:  I'm sorry?

23  Q.   (By Mr. Gilluly)  Have you been in the United States the

24  entire time since you escaped?

25  A.   How ...

133

1          INTERPRETER RAMCHERAN:  He's asking, I guess he doesn't

2     understand the question.

3     Q.   (By Mr. Gilluly)  Have you been able to see your family

4     since you escaped?

5     A.   Yes.

6          MR. GILLULY:  That's all the questions I have, Your

7     Honor.

8          THE COURT:  Cross-examination, Mr. Blackerby.

9                         CROSS-EXAMINATION

10    BY MR. BLACKERBY:

11    Q.   Good afternoon, Mr. Diaz.  Just a few questions for you.

12         You met Mr. Mendoza through Javier Guerero; is that

13    correct?

14    A.   No.

15    Q.   How did you, tell me again then how did you meet Mr.

16    Mendoza?

17    A.   I did not know him personally.  I was invited to come here

18    to work, to come work here.

19    Q.   By Mr. Mendoza?

20    A.   That is correct.

21    Q.   Have you ever, you yourself, have you ever worked for the

22    attorney in Mexico named Jasmine?

23    A.   No.

24    Q.   Have you ever been paid by anyone to recruit workers in

25    Mexico?

134

1    A.    No.

2    Q.    You testified a moment ago about the meeting with the

3    sicario.   Is it your testimony that you thought at first you

4    were going to New York; is that correct?

5    A.    No, because when we were in North Carolina, when we

6    returned, turned back towards Charleston is when he said he was

7    going to go for a -- to pick up a sicario or the sicario.

8    Q.    And the sicario was in Charleston?

9    A.    In Charleston, yes, that's where he was.

10   Q.    So did Mr. Mendoza actually meet with anyone in North

11   Carolina?

12   A.    No.

13   Q.    Do you know why he drove to North Carolina and then turned

14   back to Charleston?

15   A.    Because he was receiving threats from someone in

16   Michoacan.

17   Q.    Do you know who he was receiving threats from?

18   A.    One of the boyfriends of the women that were there.

19   Q.    Was sending him threats through text messages?

20   A.    That is correct, that even Olga received threats.

21   Q.    Do you know if that's why he was trying to find a sicario

22   for protection from this individual making the threats?

23   A.    The threat that Olga received was because we were with

24   him.

25   Q.    With Mr. Mendoza?

135

1   A.    That is correct.

2           MR. BLACKERBY:  Nothing further.  Thank you.

3           THE COURT:  Any redirect?

4           MR. GILLULY:  No, Your Honor.

5           THE COURT:  You may step down.

6           Call your next witness.

7           MR. GILLULY:  We have no more witnesses.

8           THE COURT:  Before we turn to Mr. Blackerby -- and you

9   may be excused -- go through with me the exhibit numbers and

10  let's make we've got straight on what has been admitted.

11          MS. GROOVER:  Yes, Your Honor.  I believe Exhibit 1

12  would be Charles King's affidavit and I believe that was

13  admitted in the first witness' testimony, Special Agent J. C.

14  Lopez.  Exhibits 2 through 17 are photographs that I believe

15  were admitted through the witness ███████████ and they are

16  photographs concerning the defendant's truck, his home, the

17  shrine and then her injuries.

18          Exhibit 18 is a medical report I believe was admitted

19  through the first witness, Special Agent Lopez.  Exhibit 19 is a

20  photograph of the Google translate that I believe was admitted

21  through Officer Stagner and then Exhibits 20 through 21,

22  photographs of the defendant's van that were admitted through

23  the last witness, Mr. Rosalino, and then finally Number 22 is

24  the knife that was seized and admitted through Officer Stagner.

25          THE COURT:  Ms. Sharp, does that comport with your

136

1  records?

2      THE CLERK:  Yes, Your Honor, it does.

3      THE COURT:  Let me turn to you, Mr. Blackerby.  In

4  support of your objections, are there any witnesses you'd like

5  to call or evidence you'd like to bring forth or arguments you

6  would like to make?

7      MR. BLACKERBY:  Just argument, Your Honor.

8      THE COURT:  If you will come to the podium and proceed,

9  and Mr. Mendoza, you may remain at counsel table at this point.

10     MR. BLACKERBY:  Thank you, and I will try to go through

11  these just in the exact order that they are set forth in the

12  presentence report.

13     THE COURT:  All right.

14     MR. BLACKERBY:  So these objections are set forth

15  verbatim as I presented them to the probation officer starting

16  on Page 17 of the report.  I will note that these first, the

17  first category of objections that are grouped together as

18  Objections Number 1, these are really I think more the nature of

19  clarifications than true objections because frankly they don't

20  have any impact on the guideline calculation because they are

21  factual disputes, and some of this was addressed by the

22  testimony.

23     I'm just going to go through each of these now one by

24  one.  The Paragraph 11 objection was really just a matter of my

25  client's recollection and whether it comported with the numbers

1    of visa beneficiaries.  I think the Section 11 stated that 224

2    visas were issued or approved for Mr. King and that 91 of them

3    worked.  My client thought those numbers were off.  Again it's

4    not material to the guideline calculation so I'm not going to

5    belabor that point.  I don't think there's been any evidence

6    presented on that issue either way.

7          Section or Paragraph 16, again mostly a dispute or an

8    issue about the specific dates and the numbers and whether that

9    comported with my client's recollection.  It specifically deals

10   with when Jane Doe, who we now today have been referring to as

11   ████████████, how many individuals came over with her and I

12   think precisely when she came over.  Again just a matter of the

13   recollection of my client versus what the Government said those

14   numbers and dates were.

15         The only other issue I think that came up in Paragraph

16   16 concerned whether they were married, and I think as I stated

17   in the objection, my client's position is simply that they went

18   to the courthouse to get married.  The Judge was not there that

19   day and so they left.  They signed the paperwork and they left.

20         I don't think that's actually been seriously disputed.

21   I think that actually comports with what Ms. ████ testified was

22   it was her understanding that they were getting married.  They

23   went to the courthouse but, in fact, they never actually had a

24   ceremony or had the -- by the way, they have produced a marriage

25   certificate application which was signed by them, but I don't

138

1   think the marriage certificate itself was ever issued.  Again

2   it's just a point of clarification.  I don't know that it has

3   material impact on this.

4           In Paragraph 19, again, just an issue about the numbers

5   and my client's belief was that none of the individuals who were

6   approved for visa to work on Mr. McGauley's farm actually worked

7   there, whereas the presentence report stated that 36 of 69 of

8   those beneficiaries did work there.

9           Again, it's not relevant to the guideline calculation

10  but my client wanted to be as accurate as possible.

11          In the Section 22 through 25, this deals with the

12  incident with the sicario, and to be clear, my client has not

13  denied -- and the objection was not a denial that they took this

14  trip to North Carolina.  They turned around and went to South

15  Carolina.  They were meeting with this individual that they are

16  calling a sicario.  That's not in dispute.  I guess the only

17  thing that's in dispute is how it's been characterized at times.

18          As I stated in the objection, it's our position that my

19  client was under a threat from an individual in Mexico named

20  Esau Gonzalez and he was looking for protection, and that's

21  actually I think supported now by the last testimony we heard,

22  which is that my client and one of the other individuals were

23  getting these threatening text messages from someone in Mexico,

24  and so again it's really a matter of how this was characterized.

25          My client wanted to be clear that he was not taking

1    these individuals there to be killed on the spot by a hit man.

2    He had gone out and looked for this individual because he felt

3    like he needed protection for himself.

4         I would also point out that the way that story has been

5    presented through various witnesses, it raises some red flags.

6    The testimony is that they went to North Carolina.  They

7    abruptly turned around and went to Charleston.

8         Then they escape at a restaurant.  No one ever called

9    the police.  There's testimony that two of these individuals

10   after this, quote/unquote, escape went to New Jersey.  They were

11   contacted by phone in New Jersey and then decided to come back

12   to South Georgia after having been supposedly in fear for their

13   lives.

14        The whole story is rather strange, but, again, my client

15   just wanted to be clear that he was not taking these people to

16   be killed on the spot by a sicario.  That's not what was

17   happening, but again we are not disputing that this trip

18   occurred.  These people were with my client.  They did go meet

19   with this individual in South Carolina, and again that's another

20   one that I really don't think has any bearing on the guideline

21   calculation anyway.

22        Turning to the issues that do bear upon the guideline

23   calculation, that would be Objection Number 2, which concerns

24   the cross-reference to Section 2A3.1 of the guidelines, and this

25   is really I think the heart of the matter here.

140

1          This information that my client pleaded guilty to

2    charges him with basically a conspiracy to commit involuntary

3    servitude.  That's what he's pleaded guilty to.

4          The guideline section that primarily deals with that

5    offense is 2H4.1, but the presentence report notes that if, in

6    the course of committing that offense, another offense is

7    committed and that other offense would carry a higher guideline

8    offense level, then we would look to the other guideline, and so

9    the presentence report states that, in the course of this, there

10   was sexual abuse that occurred, and therefore 2A3.1 ought to

11   apply and imposes a far more severe offense level.

12         THE COURT:  And that's contemplated in 2H4.1 itself as a

13   possibility?

14         MR. BLACKERBY:  It is.  Absolutely.  I don't dispute

15   that.  What 2H.41 says specifically in Subsection B4 --

16         THE COURT:  4B.

17         MR. BLACKERBY:  -- is it says.  If any other felony

18   offense was committed during the commission of or in connection

19   with the peonage or involuntary servitude offense, then you can

20   look at the guideline for that other felony offense.

21         THE COURT:  But just not higher than 43.

22         MR. BLACKERBY:  Right.  But the objection that we're

23   making is essentially this:  That what we've heard about is the

24   this event with the kidnapping, the assault.  There was the

25   assault that we've heard a lot of testimony about.  My client

141

1   got briefly arrested and detained.  He bonded out, and then

2   approximately two months later is the incident where he finds

3   her in Brunswick with his mother.  They put her in a van.  They

4   take her to Jesup, and all that happens, and not here to try to

5   minimize any of that.

6        I'm not trying to dispute any of that.  Not trying to

7   say that there is not an appropriate time and place for

8   punishment to be imposed for that, but the argument that I just

9   want to present is a very simple one and that is that that

10  conduct that we've heard so much about really occurred far

11  outside the realm of the involuntary servitude offense.

12       By the time that that event, those events occurred,

13  particularly where my client finds her here in Brunswick.  They

14  take her back to Jesup.  They've been separated for months.

15  He's already been arrested and incarcerated.  She's left him.

16  She's moved to a different city.

17       The objection is that that is just simply totally

18  separate and distinct from this involuntary servitude offense

19  that again he's pleaded guilty to, not denying that, but just

20  there are two separate things and that they are so separate that

21  it's not appropriate in this case to look to the cross-reference

22  to 2A3.1.

23       Again, the language in 2H4.1 says that the other felony

24  offense has to be committed during the commission of or in

25  connection with the involuntary servitude offense, and my

 1    position is that it's not during the commission of or in

 2    connection with.  It's separate.  It arises out of a personal

 3    relationship between these two.

 4         The -- there's not a case law on this.  The case that I

 5    did cite in the objection is the *United States versus Dann* case

 6    out of the Ninth Circuit where The Court there said in the

 7    forced labor context a felony is committed in connection with

 8    forced labor if it facilitates and has the potential to

 9    facilitate the forced labor.  And I don't see the connection

10    there, how these events that happened in November 2020 -- I may

11    be wrong on the date; 2020, I think -- how that was facilitating

12    these earlier schemes concerning the visas and how that was

13    facilitating the transport of the visa recipients from Mexico to

14    the United States and the housing and whether they were working

15    on the farms or not.  It was temporally distant.  It was months

16    later and fell outside of it.

17         THE COURT:  Is it your understanding that the only basis

18    for the cross-reference is that one day, November 4th, and that

19    the cross-reference would not be supported by the continued

20    rapes?

21         MR. BLACKERBY:  I believe most of the evidence we've

22    heard today dealt with that later incident, the November

23    incident, the kidnapping.

24         THE COURT:  I'm not going to make the decision by

25    weighing, counting how many words were said about this versus

1    that because the words that were said -- and although it was

2    hours ago -- it wasn't a focus at the time of the repeated rapes

3    that happened not at a temporal distance but began the moment

4    she was put into the servitude, so how is that not related?

5         MR. BLACKERBY:  As we stated in our objections, it's our

6    position that frankly that he disputes that; it's not true,

7    that -- we don't dispute the kidnapping.  We don't dispute the

8    assault that occurred in connection with the kidnapping.

9         But I think there are credibility issues with the

10   testimony about what happened earlier in their relationship.  On

11   cross-examination, she admitted -- and this had not come up

12   before and apparently she hadn't told the investigating

13   officer -- she went back to Mexico at one point after she came

14   here and after this had allegedly begun with my client,

15   allegedly after the non-consensual relationship was already

16   playing itself out, she went back to Mexico and stayed for a

17   week and then came back.

18        We know, too, from her testimony that she was fairly

19   involved in this in a way that I think she's tried to minimize

20   the scheme.

21        THE COURT:  How do you know that, that she was fairly

22   involved?

23        MR. BLACKERBY:  She testified that she was going to pick

24   up money for him, payments.  The money would come in and she

25   would be the money person who would go pick up the money and

Case 2:21-cr-00034-LGW-BWC   Document 46   Filed 05/18/22   Page 144 of 179
USCA11 Case: 22-11273   Document: 17   Date Filed: 09/28/2022   Page: 168 of 205

144

1   bring it back to him.  She was on these phone calls, she said

2   that she would listen to all the phone calls he was having back

3   and forth to Mexico so she was aware of what was happening.

4         There was the testimony that came into the US with a

5   considerable amount of money to bring to him, which is a red

6   flag that seems very unusual and out of line with what we heard

7   the scheme was.  I think she said she brought in $8,000.00 to

8   give to them.

9         THE COURT:  All of them had money, all of the 37.  Some

10   had 9,000.00.  Some had 10,000.00.  She herself had 8,000.00.

11         MR. BLACKERBY:  Her situation is also unique in that she

12   had this preexisting texting back and forth with him that we

13   heard about.  She has communications with him beforehand.  She

14   brings a large sum of cash for him.  She's picking up money for

15   him.  Again, it's my client's position that it was -- it was a

16   consensual relationship at least at that stage and then things

17   certainly went bad, and we have the kidnapping and we have all

18   that.  We don't deny all that.

19         But it's just our position that prior to that it was --

20   it was a consensual relationship.

21         THE COURT:  So it's your argument that because she

22   brought $8,000.00 here, she agreed to have sex with him?

23         MR. BLACKERBY:  Not at all; not at all.

24         THE COURT:  How do I know she agreed to have sex with

25   him?  What are you saying?

145

1          MR. BLACKERBY:  I'm saying that I just think she has

2     some credibility issues.

3          THE COURT:  So I know she had sex with him because she

4     wanted to because you believe her credibility was bad here?

5          MR. BLACKERBY:  I don't want to -- my client has very

6     adamantly stated to me that he -- it was a consensual

7     relationship, and he's asked me to state the objection.

8          Again, we're not denying that the kidnapping, the

9     assault, all that happened, not trying to minimize that at all

10     but that's his position.

11          THE COURT:  I understand.

12          MR. BLACKERBY:  The only other issue I think we raised

13     was the two points for vulnerable victim.  The guideline I think

14     is a little vague as to what that means.  It says someone who is

15     unusually vulnerable due to age, physical or mental condition or

16     otherwise particularly susceptible, and I will just stand on

17     what we wrote in the objection on that issue.

18          THE COURT:  Thank you, Mr. Blackerby.  Let me turn

19     finally to the Government.  Any argument to the contrary with

20     regard to those objections?

21          MS. GROOVER:  Yes, Your Honor.  Would you like me to

22     approach the podium?

23          THE COURT:  Yes.

24          MS. GROOVER:  Thank you.

25          Your Honor, with respect to the objections, 1, with

1   respect to the facts of the offense conduct, Paragraph 11 we

2   agree that it doesn't change the guideline calculations so we

3   have no objection to adding defendant's beliefs and will also

4   submit that Exhibit 1 is a sworn statement by Charles King that

5   indicates that King did, in fact, pay the defendant for wages of

6   the workers and that the workers were missing, and so that has

7   been offered in evidence, but again, we have no objection to

8   adding defendant's belief statement with respect to Paragraph

9   11.

10          With respect to Paragraph 16, no objection to adding his

11   belief that over 100 other individuals entered with Jane Doe

12   because, quite frankly, she may not have known how many people

13   would have entered and there was testimony by Special Agent

14   Lopez that the state department has determined there were five

15   separate petitions filed in connection with this defendant and

16   over 500 people actually entered the United States in connection

17   with the defendant and that belief statement would not change

18   the guideline calculations, but the Government does submit that

19   Jane Doe, ████████ testimony supports the rests of the facts

20   in Paragraph 16.

21          She testified that she did, in fact, communicate with

22   him before she entered the United States through a cell phone

23   and she explained that he was interested in her but she not

24   interested in him and she explained that she never expressed an

25   interest in marrying him or in him in any way but that he forced

147

1   himself upon her and he tricked her into marrying him.

2       Back with respect to the vulnerable victim adjustment,

3   she is someone that doesn't speak English, doesn't know the

4   laws, doesn't understand how marriage works with the laws, with

5   the marriage in the United States with respect to getting a

6   license and going before a judge and yet was put paperwork in

7   front of her in English, told to sign and then was explained

8   that now she's married to him, and she just accepted it because

9   she had nowhere to go and nothing else to do, and so we believe

10   she was, in fact, credible with respect to that issue as to

11   whether or not they were married with Paragraph 16.

12       With respect to Paragraph 19, again no objection to

13   adding his belief statement.  It does not change the guideline

14   calculations.

15       However, with respect to Paragraphs 22 and 23,

16   describing the event, that the trip took place, it's my

17   understanding that Defendant does not object that it took place

18   and that there was an individual that he even recognizes as a

19   sicario.  Just disagrees as to what -- who the sicario was

20   coming after.

21       You heard from Rosalino exactly what he believed would

22   happen to him and his fears and his beliefs.  You also heard

23   from Special Agent Lopez who personally interviewed the other

24   three individuals who were with Rosalino at the time of that

25   event and they all explained similar situations.  They gave a

1   similar statement to Special Agent Lopez about what happened at

2   that situation, so we do believe the witness Rosalino was

3   credible with his statement about what had happened that night

4   as well as Special Agent Lopez's summary of the other witnesses

5   who were there that night.

6       With respect to Paragraph 24, Rosalino did testify that

7   Javier Sanchez Mendoza made the threats as well Special Agent

8   Lopez testified that the other witnesses that he had personally

9   interviewed gave consistent statements, too, that they were

10  threatened.

11      Moving on to the second objection with respect to the

12  cross-reference, the Government absolutely agrees that the

13  guidelines for forced labor allow for a cross-reference for

14  sexual assault and quite frankly believe they are absolutely

15  appropriate in this case, agree there is not much case law on

16  this issue with a cross-reference of sexual assault with the

17  forced labor.

18      The case law as cited by defense counsel does not touch

19  on the issue of sexual assault in the nature, just if an another

20  felony occurred.

21      I am aware of a case from the Northern District of Texas

22  and that is a case that went on appeal to the Fifth Circuit

23  under an Anders brief and the Fifth Circuit did affirm the case

24  on appeal with the Anders brief that was filed and that case is

25  *United States versus Nnanji*, N-n-a-n-j-i, and in that particular

149

1    case -- and I do have the Fifth Circuit cite to that.  One

2    moment, I apologize, Your Honor.

3         It's an unrecorded decision 445 Fed. App'x 558.  That is

4    a 2011 decision from the Fifth Circuit, and in that particular

5    case, a husband and wife, there was evidence that the defendants

6    together they brought an individual over to live and work in

7    their home, and they -- together they took control of the victim

8    and they forced her to perform labor work in her home, taking

9    advantage of the victim's vulnerability stat -- vulnerable

10   status, inability to speak English and the lack of her friends

11   or family in America, they exercised complete control over her,

12   and the husband repeatedly raped her without her -- against her

13   will, and they kept her -- they kept her travel documents.  They

14   took steps to isolate her from her family and her community.

15   They denied her medical treatment and they were subjecting her

16   to verbal abuse as well.

17        In that particular case I have not personally seen the

18   PSI and it's not addressed in any of the public documents, but

19   from speaking with prosecutors on the particular case, The Court

20   did impose the cross-reference for the sexual abuse for the

21   husband but not the wife, and again, although it's not address

22   in the documents on WestLaw, Anders briefs were filed and the

23   decision was affirmed by the District Court, and so I do believe

24   there is some evidence that, you know, that the Fifth Circuit

25   has approved the use of the cross-reference for sexual abuse in

1    the labor-trafficking context.

2          And then with respect to whether or not the sexual abuse

3    in this facilitated the labor-trafficking conspiracy, it's the

4    Government's position that it absolutely does.  ███████████

5    testified that from Day One of her interaction with Javier that

6    he was interested in her, and the only reason why she was coming

7    over to America was on an H-2A visa to work, to work for Javier,

8    and he immediately separated her.  He did not let her go to the

9    barracks where the other workers were and he did not put her in

10   the other states where the other workers were going.  He kept

11   her under his control in his home and under his complete

12   isolation.  He raped her and beat her almost repeatedly.  She

13   didn't give us exact number but whenever he wanted for over a

14   year and he would beat her when she was in the pine straw

15   packing, while she was performing the labor that she was here.

16   He beat her.  He also beat her when she tried to -- when she

17   took his car and tried to take children to a gas station to get

18   them water because of the conditions, and so the beatings were

19   part of this climate of fear that she was under, under his

20   complete control, and he just threw on the rapes to keep her

21   there and do whatever he wanted.

22          He absolutely isolated from her -- isolated her from

23   everyone, took advantage or her vulnerabilities, of her

24   inability to speak English and to understand the laws and her

25   fear of calling law enforcement and her fear of being deported

151

1   and he committed the sexual abuse in furtherance of and in

2   connection with the labor trafficking.  So we absolutely do

3   believe that Probation did accurately calculate it and that

4   there is some guidance on this in the Fifth Circuit, that it can

5   be appropriate in this particular case.

6        And finally with respect to the vulnerability objection,

7   I think the testimony here supports that all of the workers in

8   this particular case are vulnerable victims.  Again they are not

9   from -- they are not United States citizens.  They came over on

10  a program that they didn't understand the rules so much where

11  they were paying money to get a visa from Day One, which is in

12  violation of the rules.

13       And they do not speak English, do not understand the

14  laws, had a fear of being deported and a fear of law enforcement

15  and so they are absolutely vulnerable, and we would ask that the

16  objections be overruled.

17       THE COURT:  Thank you, Ms. Groover.

18       Mr. Blackerby and Mr. Mendoza, reapproach.  As to the

19  paragraphs that were not objected to, I'll adopt those as my

20  findings of fact and my conclusions with regard to the

21  applicable advisory guidelines.

22       Objections in the nature of factual objections to the

23  offense conduct did arise with regard to Paragraphs 11, 16, 19,

24  22, 23, 24 and 25.

25       As has been noted out by both sides, many of those

152

1   really don't affect the guideline calculations, but just to

2   cross all of our T's and dot all of our I's, I'm going to go

3   through each paragraph and make a ruling with regard to each.

4           First with regard to Paragraph 11, the information

5   contained therein, I find by a preponderance of the credible

6   evidence -- and let me just say that all of my factual findings

7   are based on just that, a conclusion that I find this way based

8   on a preponderance of the credible evidence as brought forth

9   today by the witnesses and by the documentary evidence received.

10          With regard to Paragraph 11, I find by a preponderance

11  of the credible evidence that it is supported that Mr. King and

12  the defendant met in May of 2018 as reflected in the presentence

13  report.  I think there is adequate preponderance of the credible

14  evidence that King approved for the visa beneficiaries and 91

15  ultimately ended up working for King.  I will let the record

16  reflect that the defendant believes it was a different number.

17  He believes it was 142 laborers and none actually ended up

18  working for him.  Instead he believes they worked on a sweet

19  potato farm, so let that be known that Mr. Mendoza contends as

20  such, but I do find there's adequate evidence on the record for

21  what's stated in Paragraph 11 and so I overrule the objection to

22  Paragraph 11.

23          With regard to the objection to Paragraph 16, which

24  reflects that Jane Doe entered the US with 37 others and the

25  defendant contrary believes that it was more in the way of 100

1    others, I do find based on a preponderance of the credible

2    evidence that the two witnesses that testified about the numbers

3    and put it at about 37, 38, 39, that that is credible, and as a

4    result I decline to overrule the numbers set forth in the

5    presentence report by the probation officer, and let the record

6    reflect that Mr. Mendoza has a different recollection and he

7    recalls that it was actually more in the neighborhood of 100,

8    but the objection is due to be overruled in that regard.

9         Paragraph 19 reflects a report that Mr. Neal McGauley

10   had -- says that 36 of the 69 H-2A visa beneficiaries worked at

11   Hilltop.  The defendant believes that they didn't.  It doesn't

12   have any impact whatsoever on the sentencing guidelines or on

13   the sentence that Mr. Mendoza is ultimately due.  I really

14   didn't hear any testimony about the number of people working at

15   Hilltop Packing so we will count that one as sustained and I

16   will sustain the objection to whether those 36 or 69 people

17   worked at Hilltop.  I'm just not sure and so I will sustain that

18   objection.

19        As to Paragraphs 22 and 23, that brings us into

20   territory of a more consequential nature, and with regard to

21   Paragraphs 22 and 23, I listened closely to the testimony in

22   that regard, and I find that the preponderance of the credible

23   evidence supports the facts set forth in Paragraphs 22 and 23

24   and I will overrule the objections in that regard.

25        As to Paragraph 24, that's the paragraph that says that

154

 1   Mr. Mendoza has threatened to kill or harm workers' families and

 2   it is Mr. Mendoza's contention, I believe he contends that it

 3   was McGauley and not him that was threatening the workers and

 4   the families, and I've listened carefully to the testimony in

 5   that regard and I find that a preponderance of the credible

 6   evidence supports the verbiage that's set forth in Paragraph 24,

 7   and as a result, I overrule that objection.

 8        Likewise, with regard to the objection set forth in

 9   Paragraph 25, it, too, relates threats that were made and Mr.

10   Mendoza denies those threats but the credible evidence shows by

11   a preponderance that those threats were made by the defendant

12   and so I overrule that objection as well.

13        Moving on to the offense level computation objections,

14   the one set forth is Objection 2 to Paragraph 34 and the very

15   consequential usage of the cross-reference for this offense,

16   specifically I find that pursuant to guideline provision

17   2H4.1(4)(b) that there were felony offenses that were committed

18   during the commission of and in connection with the involuntary

19   servitude offense.

20        There are different felonies to choose from

21   unfortunately for the victims.  The kidnapping, where she was

22   snatched out of the yard while she was taking care of the

23   children and held at knifepoint in the car and then dragged in

24   with the Santa Muerte shrine in that trailer and held, I find

25   that would support the cross-reference.

155

1            I also find that the rape after rape after rape after

2     rape that occurred much closer in time to when she was

3     originally put in the servitude, that would also count.  I find

4     that the kidnapping itself would count.

5            All of those felonies I find merit the cross-reference

6     and the increase as set forth in 2A3.1(b)(1).  It is

7     appropriate.  He used force against her in raping her.

8            I find that it had the potential of facilitating the

9     forced labor and actually that the forced labor had the

10    potential of facilitating the rape and the kidnapping.  It

11    actually runs both ways in this case.

12           To the extent -- and I believe it is hotly contested by

13    the defendant that he ever raped her.  It is his contention that

14    she did all that voluntarily, and I watched her very closely,

15    and having seen her testify and watched her, listened to her

16    tone, her delivery, the content, her body language, I would find

17    by any standard of proof that she's telling the truth.

18           As a result I find that the rapes did occur.  The

19    kidnapping did occur.  The aggravated assault did occur and that

20    it does certainly support the cross-reference, and as a result I

21    overrule the objection to Paragraph 34, which brings us to the

22    final objection, and that is enumerated as Number 3, the victim-

23    related adjustment set forth in Paragraph 35 of the presentence

24    report.

25           In that paragraph, the probation officer proposes that a

156

1   two-level increase be given because she contends it is a

2   vulnerable victim involved.  Here I do find that Ms. ███ and

3   others but Ms. ███ as the focal point is unusually vulnerable

4   due to being particularly susceptible to the criminal conduct

5   involved.

6           In some ways, these victims are the most vulnerable of

7   all.  They are unfamiliar with the language, the culture, the

8   nature of law enforcement.  They were afraid their visas would

9   be confiscated.  They were legitimately afraid of some sort of

10  action that would happen to them and to their family back in

11  Mexico.  I find based on watching them testify that they were

12  being truthful when they testified that they felt threatened.

13          As a result, I overrule the objection to Paragraph 35

14  and find that the two-level increase pursuant to 3A1.1(a) -- I'm

15  sorry, 1(b)(1) is justified and appropriate.

16          There is the one last bit noted in the addendum and that

17  is the defendant wishes to state that, in way of clarification

18  to Paragraphs 2 through 15 which describe the incident on

19  November 4th, 2019, Mr. Mendoza wants to put forth that that was

20  preceded by a domestic dispute between the defendant and Ms.

21  ███ and his dispute, he puts in the addendum that money was

22  stolen and a phone and documents.

23          I will just say I have heard no evidence about that and

24  those will remain words on the page but I simply have not heard

25  any evidence that would back up that contention.

157

1          We've been here since about 2:30, and I've not heard

2    anything, so while he has caused those words to be typewritten

3    on the addendum, they are in no way supported by any evidence in

4    the case.

5          Let me ask, have I dealt with all of the objections that

6    have been raised?  Have I left any out, Mr. Blackerby?

7          MR. BLACKERBY:  No, I think that addresses everything,

8    Your Honor.

9          THE COURT:  And are you aware of any omissions, Ms.

10   Groover?

11         MS. GROOVER:  No, Your Honor.

12         THE COURT:  Then having overruled all of the objections

13   except for the one about whether somebody did work at Hilltop,

14   which does not factor into any sentencing decision or to the

15   guideline calculations, I find that the advisory guidelines for

16   Mr. Mendoza are a total offense level of 42, a criminal history

17   category of 1.  The advisory guideline is 360 months to life in

18   prison, two to five years of supervised release, 50,000- to

19   250,000-dollar fine.

20         Ms. Groover, as far as the restitution amount, is this

21   like all the previous defendants, one that needs to be reserved?

22         MS. GROOVER:  Yes, Your Honor.  Last week we did submit

23   a proposed restitution for the known victims that we have

24   calculations for to Probation and defense counsel, and that

25   total is $75,486.64, and those are for three identified victims

 1   that we have calculated for, and we would respectfully request

 2   that the restitution be open for a period of 60 days.

 3        THE COURT:  And what is your contention regarding good

 4   cause under 18 USC Section 64(d)(5)?

 5        MS. GROOVER:  As the last two cases, Your Honor, in this

 6   particular case as Your Honor has found involves vulnerable

 7   victims who do not understand the law and the culture, and they

 8   are afraid of law enforcement and so it takes time for us to

 9   identify those victims who have actually been harmed by Mr.

10   Mendoza.

11        While the United States does know the identity of every

12   single individual who entered the United States on a H-2A visa

13   in connection with these five petitions, the nature of this

14   scheme is that they were being taken to locations all over the

15   United States and not to the locations that are documented on

16   the paperwork where they should be, and when law enforcement

17   would conduct site visits or execute search warrants at the

18   locations where the individuals should have been located at,

19   they were not always found there, and so it takes time for us to

20   locate the individuals, and then once we locate them, it also

21   takes time for us to speak with them and work through the

22   barriers of language and the culture and the mistrust of law

23   enforcement, Your Honor.

24        THE COURT:  Mr. Blackerby, just to back up about what

25   has happened with two other defendants earlier today, the

159

1    Government has moved and the probation officer has recommended

2    that the issue of the exact amount of any restitution be

3    reserved for a day which is approximately 55 days in the future,

4    that is May 24th.

5         In the previous two cases I did find good cause for

6    reserving that issue for another day.  It is contemplated by the

7    code.  Any objection to proceeding that way in this case?

8         MR. BLACKERBY:  Your Honor, I understand the basis for

9    the extension.  I feel like I have to state that we would prefer

10   to have an immediate ruling based on what they have been able to

11   present thus far on that but I do understand the basis for their

12   request.

13        THE COURT:  I understand and I do find good cause for

14   setting that restitution aside and reserving it and proceeding

15   with the remainder of sentencing and so we will reconvene on May

16   24th at 1:00 p.m. to take up the issue of restitution and then

17   proceed with the remainder of sentencing now so restitution is

18   set aside for now.

19        There is a $100.00 special assessment, which is due

20   immediately.

21        As for the statutory penalty for Count 1, there is no

22   minimum required and there's a maximum of life in prison.

23        Ms. Groover, are there any victims that wish to be heard

24   as a part of this proceeding?

25        MS. GROOVER:  Your Honor, there are no victims that

1    would like to speak at this portion of the proceeding.  There

2    are three victim impact statements that were submitted, and I do

3    have copies for counsel, Probation and The Court if you need

4    those copies.  And I will state that they are identified by

5    alias numbers in the victim impact statement but Jane Doe Number

6    10 was Rosalino who testified before Your Honor.  Jane Doe

7    Number 8 is Olga, who is pregnant and under doctor's orders to

8    prohibit her travel, and Jane Doe Number 12 is ██████ and I

9    will note that the reason that Jane Doe numbers changed is

10   because of the connecting case that was charged later, and I

11   would also just like to point out for the record, I made a

12   mistake earlier.  I said I believe we have restitution for three

13   victims.  I apologize.  I was mistaking that for the victim

14   impact statements.  The restitution figure that I cited as

15   $75,000.00, that includes seven individuals, Your Honor.

16           THE COURT:  And as far as the victim impact statements,

17   Mr. Blackerby, have you and Mr. Mendoza been privy to those?

18           MR. BLACKERBY:  Yes, Your Honor.

19           THE COURT:  Have you received those?

20           Well, let me turn back to you then, Mr. Blackerby.  Are

21   there any witnesses you'd like to call, exhibits you would like

22   to introduce or argument you would like to make in mitigation.

23           MR. BLACKERBY:  Just argument, Your Honor, and then my

24   client would like to make a brief statement.

25           THE COURT:  Proceed.

161

1          MR. BLACKERBY:  Thank you, Your Honor.

2          The first point, my client did plead guilty to the

3     offense, the involuntary servitude offense.  He has accepted

4     responsibility by doing so.  But he's, on top of that, he's also

5     cooperated, and that came up today during the first agent's

6     testimony.

7          While incarcerated, my client sat down with three

8     federal agents investigating this visa scheme.  Ms. Groover was

9     there also.  We met for a fairly considerable length of time

10    that day and he did provide I believe substantial information

11    about the visa scheme.

12         I think the agent said that it corroborated what they

13    had already found during their investigation, and since then, I

14    have conveyed again that he remained willing to sit down again

15    and talk further, so not only pleaded guilty and accepted

16    responsibility in that way but also did cooperate with

17    officials.

18         You know, the guideline range, as Your Honor has found

19    it to be, is extremely harsh, and to impose a sentence in that

20    range, you know, really gives almost no benefit for the

21    acceptance and the cooperation, you know.

22         It sends I think maybe a bad message to impose that sort

23    of sentence on someone who has pleaded guilty and cooperated.  I

24    think it's got to be worth something that he did that.

25         The next point I want to make as you said a moment ago,

Case 2:21-cr-00034-LGW-BWC   Document 46   Filed 05/18/22   Page 162 of 179
USCA11 Case: 22-11273   Document: 17   Date Filed: 09/28/2022   Page: 186 of 205

162

1   he is in the lowest criminal history category.  He has zero

2   criminal history points.  It's, I'm sure, quite rare that

3   anybody would be facing this guideline range with no real

4   criminal history whatsoever.  The only previous conviction was

5   driving with an invalid license.

6         On top of that, he's, as he stands before you today,

7   only 24 years old.  He's a young man.  He's been in custody

8   since November two years ago, so he was taken into custody at

9   the age of 23.  You know, his entire life is ahead of him.

10         A sentence at the high end of this guideline range it's

11   incredibly significant, more so than it would be if we had an

12   individual in front of you who was 50 or 60 years old who had

13   had a productive working life.

14         Mr. Mendoza's entire productive adult life is in front

15   of him and I think that has to be taken into account.  To impose

16   this sort of guideline sentence on someone of his age, I mean,

17   to me it almost says that we don't think he's redeemable, that

18   we're going to put him away forever, somebody in their early

19   twenties who did this.

20         Certainly his age doesn't excuse what he did, and I'm

21   not trying to say that at all or minimize it, but he's got a lot

22   of life ahead of him.  He's got a lot of time to mature, to

23   grow, to move past this, and I hate to see anybody in their

24   early twenties have that much life essentially taken away by

25   having them incarcerated for that length of time.

163

1          I also want to point out that he has a number of health
2    issues, some of which are mentioned in the presentence report.
3    He's got a cleft palate.  He needs surgery for that.  He's
4    already had some surgeries for it.  He needs more.  As you will
5    hear in a minute, he has great difficulty speaking.  He is
6    missing his uvula.  He was born without a uvula, which is that
7    piece of flesh that hangs down in the back of your throat.  He's
8    missing teeth which was something he was born with.

9          He needs surgery for all these issues.  It gives him
10   very -- it makes it very difficult for him to interact with
11   other people.  It makes him have a lot of difficulty with his
12   day-to-day activities.

13         He's got high blood pressure.  He's deaf in one ear,
14   which is why he has had the ear pieces in help him here.
15   Physically he's just got a lot of challenges in life, and for
16   the most part, these are things he was born with, but again.  I
17   want to point out these things, many of which could be corrected
18   and improved with surgery.

19         And my concern is he's not going to get the medical care
20   in prison to address these issues as well as he may be able to
21   get it outside of prison.

22         The last thing I want to point out is one of the factors
23   to be considered in impose these sentences, you want to avoid
24   sentencing disparities between Mr. Mendoza and other individuals
25   with similar criminal history or similar crimes.

164

1       This is a fairly unique case in terms of what he's been

2   charged with and the facts of it, but I did take a look at the

3   sentencing commission's data that's available online just to get

4   some sense of what individuals with similar charges have been

5   receiving in their sentences, and I searched for, first of all,

6   nationwide every judicial circuit, every court for a six-year

7   period, 2015, 2020, cases where the primary guideline is 2H4.1,

8   which is that involuntary servitude guideline, and with

9   individuals across the spectrum of criminal history categories,

10  so from lowest, which he is, to the highest.  Individuals where

11  that was the primary guideline, the average sentence nationwide

12  was 87 months.

13      Now obviously you may say that's 2H4.1.  In this case

14  we've got the cross-reference to 2A3.1 that applies.

15      THE COURT:  I may say that.

16      MR. BLACKERBY:  I'm sure you will.  That's why I looked

17  at that also, and so if you look at 2A3.1 cases and you look

18  again nationwide all years 2015 through 2020 and you again look

19  at every criminal history category from the lowest to the

20  highest, it said the average sentence was 177 months.

21      That's a significant sentence.  That's far more than I

22  would imagine most of the defendants who come before you

23  receive, but it's also significantly less than the guideline

24  range in this case.

25      So even if you combined the average sentence that's

1   imposed in a 2H4.1 case with the average sentenced imposed in a

2   2A3.1 case, it would still be lower than what the guideline

3   range is in this case, and so I do think based on the statistics

4   nationwide, a guideline range sentence in this case would lead

5   to some disparity.

6           THE COURT:  All right, thank you, Mr. Blackerby.  You

7   two may have a seat.

8           Mr. Gilluly, on behalf of the United States.

9           MR. GILLULY:  Judge, one thing I will point out from the

10  start is the comment from the special agent who testified that

11  out of this Blooming Onion, this entire case, all of the

12  defendants, this defendant was the one who engaged in the most

13  brutal conduct, and when you consider disparity, he is in a

14  league of his own.

15          This defendant was part of a criminal organization that

16  at its core shatters lives and dreams, that exploits people in

17  the most horrendous ways, akin to modern-day slavery, and it was

18  for greed and it was for power and it was for control.

19          And what this defendant did was horrendous.  It can't be

20  minimized.  It can't be justified, and he definitely needs to be

21  held accountable, and when you look at his conduct, he preyed on

22  the vulnerable people who were searching for an American dream,

23  trying to get ahead in life, and they were lied to.  They were

24  misled and they were betrayed, and this defendant and members of

25  his conspiracy promised a better life, lawful employment, US

1    wages, housing, food, transportation, the opportunity to make

2    money to send back, and people bit on that because they had

3    hope.  They had hope if they come to the United States they

4    could make money and send it back to their family, and they all

5    went on their journeys, 565 people on visas through this

6    defendant, 300 who are waiting to come into this country based

7    on petitions involving this defendant stuck in Mexico.

8          They traveled great distances, leaving behind their

9    families and everything they knew for a better life, and you

10   heard that from Rosalino who talked about the journey just

11   getting from his hometown to Monterey and then from Monterey to

12   the US and how difficult it was, but once they got into the

13   United States, these victims, their passports were collected and

14   they were held to ensure that people didn't flee.

15         They were placed in substandard housing, which is

16   illegal.  They were forced to pay for transportation, which is

17   illegal.  If they worked, they worked much less than the law

18   required.  They were threatened and they were exploited.

19         This defendant himself treated people worse than

20   animals, like property, zero compassion.  We have information in

21   the presentence report where he sold workers to other

22   individuals.  And this defendant did it for money, for power and

23   control and he made lots of money.

24         People delivered thousands of dollars when they arrived

25   in the US for the opportunity to work and you heard the

1   testimony about 8,000.00 here, 9,000.00 there, 10,000.00.

2       According to his own reports in the presentence report,

3   he was making $27,000.00 a month exploiting people.  And you

4   heard how he treated ████████ a young woman who left her child

5   and family behind to make money.  He decided he wanted her, that

6   he would own her, that he would control her, that he would make

7   her his, and you heard how he threatened her and he beat her and

8   he raped her and he climbed onto her body and forced himself on

9   her, not just once, but whenever he wanted to.

10      The reality of this man climbing on to a woman who has

11  come into the United States to make money for her child who she

12  left behind and she gets stuck in a situation where this guy

13  decides "I own you, and when I want to climb on you, I'm going

14  to climb on you; when I want to beat on you, I'm going to beat

15  on you."

16      The reality of the rape after rape after rape, instead

17  of working in the fields, she was being raped.  She was being

18  threatened by this defendant.  She was being chased down the

19  street by this defendant with a knife, and when he was finally

20  locked up for that chasing her down the street with a knife, she

21  escaped.

22      She went to Brunswick.  She had some sense of peace,

23  some sense of security away from him, where she is in the front

24  yard of a house in a neighborhood miles from this courtroom

25  playing with kids, and during the day, before the darkness came

168

 1  upon her, this defendant and his mother hunted her down and they

 2  drove the truck and, armed with a knife, this defendant got out

 3  of the truck, and in daylight, got out, with his mask on or his

 4  bandanna.  He exited the truck with his knife and he abducted

 5  her in front of the children.

 6       He has zero regard for human life or zero regard for law

 7  enforcement or for the consequences.  He and his mother drove

 8  away with her against her will.  He then stopped -- he didn't

 9  just stop at a random place, but he stopped at a very symbolic

10  place.  He stopped at graveyard, and at that graveyard he got in

11  the back seat and he punched her repeatedly in the face and the

12  stomach over and over again, and he threatened to kill her and

13  her son in Mexico.

14       He then took her back to his mom's house where he lived

15  where there was this Santa Muerte shrine and he talked on the

16  phone with Salvador on speaker phone, another conspirator, and

17  because she knew too much, the decision was made he was going to

18  murder her.  He had a Santa Muerte shrine, the patron saint of

19  death.  You heard about the quasi-saint worship by human

20  traffickers and drug traffickers, used to protect traffickers,

21  terrorize victims, and you saw the sacrifices that he made to

22  the shrine, food, fruit, cigarettes, alcohol, things of value.

23       This defendant values the Santa Muerte so much he has it

24  tattooed on his chest and on his stomach, and he had another

25  offering coming, and that was ████████, as evidenced by her

169

1    photo face down with her date of birth on the back, him cutting

2    her hair, him putting her blood on the sickle of the statue.  I

3    would submit he was about to make another offering.

4            And but for the children who called 911 about the

5    abduction, ███████, I believe that the evidence shows she

6    would not be here today.  But for the Coastal Gang Task Force,

7    the Waycross Police Department and the Brunswick Police

8    Department, ███████ may not be here today because they acted

9    swiftly.  They procured an emergency order to track his phone.

10   They found the location, and while this defendant was pacing

11   outside, smoking, talking on his cell phone, and while ███████

12   was inside being held captive by this defendant's mother while

13   she was bleeding from her nose, in pain, not knowing whether she

14   was going to live or die, fortunately, the police arrive and

15   arrest this defendant.

16           She's transported to the hospital, and you saw the

17   bruises, the swollen face, the evidence of a concussion, but her

18   injuries are so much deeper than what we see in photos.  They

19   will live with her forever.

20           What she thought was going to a season of prosperity

21   became years of being in a foreign country, away from her

22   family, dealing with this case and what she has to live with.

23           And she wasn't even the only victim.  You heard about

24   how he treated others, how he attempted and had a knife pulled

25   on a teenager and how he dragged Olga by her hair across the

1  floor and how he attempted to discard the women from

2  Michoacanis, his attempt to kidnap Olga to keep her.  His new

3  ███████ would have been Olga.  But for Mr. Rosalino and others

4  helping her escape, she may not be here either or available here

5  in the presence sense of being alive.

6        He picked up the sicario.  You heard about what he did,

7  how he impacted the people who had been rescued, and it was all

8  about power and control and greed, and he did plead to an

9  offense that carries up to a life in prison.  While he admitted

10  the elements, he did deny relevant conduct.  He was not

11  completely forthcoming in his proffer because he denied one of

12  the very material acts where he tortured a woman.

13        If he earns a Rule 35 somehow, we will come before The

14  Court at a later date but he's not in that position.  His range

15  is 360 to life, yet it doesn't even take into consideration the

16  multiple rapes, the multiple victims, and I would submit his

17  criminal activity is underrepresented.

18        In a case like this with labor trafficking, with

19  involuntary servitude, with rapes, with beatings, with the

20  exploitation of vulnerable victims with scars that last forever,

21  I would submit that there is only one sentence that is

22  sufficient but not greater than necessary and that is life in

23  prison.  Thank you.

24        THE COURT:  Thank you, Mr. Gilluly.

25        Mr. Blackerby and Mr. Mendoza, reapproach.

171

1          Mr. Mendoza, it is your opportunity to address me last.

2     Is there anything you would like to say before I decide your

3     punishment?

4          MR. BLACKERBY:  Your Honor, if I may, he, as I

5     mentioned, has got speech problem.  He wrote out a statement.  I

6     have typed it up.  He's going to read it, but if you would like

7     a copy so you can understand it in case there is any problems

8     with the communication.

9          THE COURT:  If you would like me to do that, I will be

10    happy to.

11         MR. BLACKERBY:  He will read it as well.

12         THE COURT:  Yes.  Mr. Mendoza, proceed.

13         THE DEFENDANT:  Good morning, Your Honor.  Thank you for

14    the opportunity to speak.  First, I would like to say that I'm

15    sorry for everything I have done.  Since I was arrested I have

16    repented for all the things I have done.  Please, Your Honor,

17    understand that I'm sorry for everything.

18         I repent and surrender before God, before you, Your

19    Honor, and before the whole United States of America for

20    breaking the law.  With all my heart, Your Honor, I'm sorry.

21         When I finally have the opportunity to be released, I

22    first want to go to church and give thanks to God for the

23    opportunities and the blessings that He has given me.  Also,

24    Your Honor, I want to return to college and start a career.  I

25    want to get a job so I can pay for college and also so that I

172

1    can take care of my family.

2         I have my mother and my father who are old -- who both

3    are older and they depend on me for support.  My mother is in a

4    bad condition with her health.  She has diabetes and is also

5    half-blind.  I take care of her, and she needs me to care for

6    her.  I also care a lot about my father and I really only have

7    my mother and father in my life.

8         Today, Your Honor, I stand in front of this Court, I

9    stand in front of the United States of America, and I stand in

10   front of God.  I put my right hand up to the sky, and I will say

11   this, "Forgive me for everything I have done."  I ask for

12   forgiveness for breaking the law and everything I have done.  I

13   promise to God, to the United States of America and to you, Your

14   Honor, that I learned from this.  I will turn away from the past

15   and I will not break the law again.

16        Please, Your Honor, I'm sorry and please forgive me.  I

17   am the only child that my parents can depend on, also their only

18   child here in Georgia where my mother lives.

19        I have problem with alcoholism.  I need help.  I think

20   it would be good for me to be in a program or rehab for my

21   alcoholism.

22        In the name of God Jehovah, with all my heart, I'm sorry

23   to the United States of America and to you, Your Honor, for what

24   I have done.

25        Please forgive me and thank you for listening to me and

1  forgive me -- and giving me the chance to speak to you.  God

2  bless you, Your Honor.  Thank you.  Javier Sanchez Mendoza.

3       THE COURT:  All right, Mr. Mendoza, well, it is -- it's

4  just a horrible situation all the way around.  I have studied

5  the presentence report and its addendum and have thought about

6  your case maybe more than you might imagine, thought about all

7  of the 3553(a) factors as they apply in your case, listened to

8  what both attorneys have said, listened to what you have said in

9  your statement.

10       I've made my rulings as far as the guidelines are

11  concerned.  I do want to make sure that it's understood there

12  were some provisional rulings I made about the admissibility of

13  evidence and reserved final decision about having a sufficient

14  indicia of reliability until I heard further witnesses, and I do

15  find that the exhibits that were admitted are done so properly

16  and did have a basis for sufficient reliability.

17       So Mr. Mendoza, Mr. Blackerby has done what he can for

18  you and represented you as best can be here, but the obstacle

19  that you and he have is there's just a mound of very damaging

20  evidence against you.  It's just the truth.

21       My duty at this juncture is to look at the good and the

22  bad in your background, the nature of the offense, the nature of

23  you and make a sentencing decision based on the good and the

24  bad, all the relevant factors and come up with punishment that's

25  neither too harsh nor too lenient given who you are and what

1   you've done, and it may be that the heartland of sentencings

2   under the cross-reference are in the way of 175 months or the

3   heartland of sentencing for involuntary servitude/forced labor

4   is in the way of 70 to 80 months, but this is far from a

5   heartland fact pattern, far from that.

6           And to be clear, you've done some good things.  You've

7   admitted responsibility for some of your conduct and you've

8   entered a plea of guilty.  You have no discernible criminal

9   conduct before the incidents that form some of the underlying

10   relevant conduct in this case and the crime itself, and those

11   are in your favor, but what you're up against is the nature of

12   the crime itself and the details, and people think that there's

13   no slavery anymore.  There is, and you were doing it right here

14   in our state.  There's no other way to properly call it, but you

15   were treating free humans as slaves and in a brutal and -- I've

16   never had to say this to a defendant before -- but really

17   monstrous fashion.  You hit a woman with a piece of wood for not

18   packing pine straw fast enough.  You beat a woman for attempting

19   to buy food for children.  You tried to choke a woman.  You

20   threatened to hurt her family.  You chased people down the

21   street with a knife.  You took a woman's blood and smeared it on

22   a Santa Muerte idol.  You cut her hair and hung it up on that.

23   You threatened her.  You scared her.  You flat-out kidnapped her

24   and you raped her, not once or ten times but you raped a person

25   who was as vulnerable as somebody can be.

175

1          After considering all of those things, it is the

2     judgment of The Court that the defendant, Mr. Javier Sanchez

3     Mendoza, Jr., is hereby committed to the custody of the Bureau

4     of Prisons to be prison for a term of 360 months.  That will be

5     served concurrently with any sentence that may be imposed on the

6     pending related state cases.

7          That is the very bottom of the guidelines.  I could have

8     sentenced you to life in prison if I found that it was

9     warranted, but having considered all of the 3553 factors, it is

10    my considered assessment that a sentence of 30 years in federal

11    prison is sufficient but not greater than necessary to account

12    for the horrific nature of your crime, to send an adequate

13    deterrence, to promote respect for the law.

14         I will say that, regardless of how the guideline would

15    have been resolved, a sentence of 360 months is what's deserved,

16    setting the guidelines aside.  The terror that you enacted on

17    these people justifies a 30-year sentence.

18         Now, you are a young man and this is not a life

19    sentence.  You will some day be released.  And you need to

20    remember what you've said here at the podium.

21         Upon release from confinement, you will be delivered to

22    a duly authorized immigration and customs enforcement officer

23    for deportation proceedings.  I find no reason to vary or

24    depart.

25         That sentencing span of 360 months to life does fall

176

1    within the category of where there is a greater than 24-month

2    span, so it is incumbent upon me to make sure I set forth

3    exactly why I picked that point that I did.

4         And as I said, I base it on the history and

5    characteristics of the defendant.  He was a manager, a

6    supervisor of this scheme and held vulnerable victims in a

7    condition of modern-day slavery/involuntary servitude for an

8    extended period of time.

9         He made threats.  He sexually abused people.  He

10   kidnapped people, all the things that I've detailed, and in

11   consideration of all the factors, I've determined that a 30-year

12   sentence is adequate.

13        You don't have the ability to pay a fine so I'm not

14   going to order that one be imposed.  There is the $100.00

15   special assessment, which is due immediately.  Your indigent

16   status prohibits you from making the special assessment that

17   would ordinarily be due under the Justice for Victims of

18   Trafficking Act of 2015.  So I am going to waive that.

19        You will be on supervised release for five years if you

20   are not deported and comply with all the mandatory and standard

21   conditions of supervised release adopted by The Court and

22   required by law.  That will include prohibition against the

23   possession of any firearm or dangerous weapon.

24        Recall that as a convicted felon you're never to possess

25   a firearm, but during that period of supervised release, you're

1    not to possess any form of dangerous weapon.

2         You will cooperate in the collection of a DNA sample as

3    directed by Probation.  I've also determined that if you are not

4    deported and remain here, certain special conditions are

5    important.  You must not communicate either indirectly or

6    directly, in print, electronically, on the phone, in any

7    fashion, with any of the victims that are identified in your

8    case.

9         You must remain outside the United States if you are

10   deported unless you are legally authorized to reenter by the

11   appropriate officials, that is, the Attorney General of the

12   United States of America or the Secretary of the Department of

13   Homeland Security.

14        If you do reenter the United States in any way, you must

15   report to the nearest probation officer within 72 hours of your

16   entry.

17        As another special condition if you are not deported,

18   you will be subject to certain searches as directed by Probation

19   but only conducted at a reasonable time and reasonable manner

20   based on a reasonable suspicion of a violation of one of these

21   terms.

22        I did accept the plea agreement and pursuant to that

23   plea agreement, I now order that the underlying indictment that

24   is Case 2:20-49 be dismissed as it relates to this defendant.

25        Further pursuant to that plea agreement, absent the

178

1    three limited exceptions that are set forth within it, he's

2    waived his right to direct appeal, and again those three

3    exceptions are if I sentenced you above the statutory maximum,

4    if I sentenced you above the advisory guideline range as found

5    by me or if the Government were to file a direct appeal.  Those

6    are three exceptions that are carved out for you to make a

7    direct appeal under the plea agreement.  You waive all other

8    direct appeal rights.

9         Also pursuant to that plea agreement you've waived any

10   right to collaterally attack your sentence absent the one

11   exception.  That one exception is that you've retained the right

12   to collaterally attack based on a claim of ineffective

13   assistance of counsel.  Otherwise, the plea agreement waives all

14   other collateral attack rights.

15        Mr. Blackerby, do you have a request as to where he be

16   placed?

17        MR. BLACKERBY:  Jesup facility if possible, Your Honor.

18        THE COURT:  And I will make that recommendation to the

19   extent that space and security can accommodate that request that

20   he be placed there.  I'll also recommend that he be evaluated

21   for participation in any drug or alcohol treatment program that

22   they have to include RDAP.  And I recommend that they evaluate

23   him for his healthcare needs.

24        Sentence has now been pronounced.  Other than the

25   objections that were made and ruled upon, do you now have any

179

1   objections to my findings of fact, my conclusions of law, or to

2   the manner in which sentence was pronounced, Mr. Blackerby?

3          MR. BLACKERBY:  No, Your Honor.

4          THE COURT:  And Ms. Groover?

5          MS. GROOVER:  No, Your Honor.

6          THE COURT:  Then, Mr. Mendoza, I will remand you back to

7   the custody of the US Marshal, and counsel, we will be in

8   recess.

9          (Proceeding concluded at 7:43 p.m.)

10                       CERTIFICATION

11

12          I certify that the foregoing is a true and correct

13   transcript of the stenographic record of the above-mentioned

14   matter.

15

16

18   _____   05/16/2022

19   Debra Gilbert, Court Reporter        Date

20

21

22

23

24

25

# SEALED

**PSI and Addendum
(paper copy only)**

## CERTIFICATE OF SERVICE

The undersigned certifies that he served a copy of the foregoing Appendix on counsel on this date in accordance with the directives from the Court Notice of Electronic Filing ("NEF") that was generated as a result of electronic filing. As required by 11th Cir. R. 30-1, counsel also certifies that he served a paper copy of the Appendix on the United States Attorney's Office for the Southern District of Georgia via United States mail.

The undersigned certifies that he served a paper copy of the foregoing Appendix (with the sealed portion omitted) on the appellant, Javier Sanchez Mendoza, Jr., via hand delivery.

Respectfully submitted this 28th day of September, 2022.

/s/ Scott G. Reddock
Scott G. Reddock Attorney at Law, LLC
Georgia Bar No. 476162
111 West Court St. Suite B
Hinesville, GA 31313
Tel: 912.332.7077
Fax: 912.332.7179
reddgeg@aol.com
Attorney for Appellant